**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NEW JERSEY CARPENTERS HEALTH FUND, NEW JERSEY CARPENTERS VACATION FUND and BOILERMAKER BLACKSMITH NATIONAL PENSION TRUST, *on Behalf of Themselves and All Others Similarly Situated,*<br><br>                    Plaintiffs,<br><br>              *v.*<br><br>RESIDENTIAL CAPITAL, LLC, RESIDENTIAL FUNDING, LLC, RESIDENTIAL ACCREDITED LOANS, INC., BRUCE J. PARADIS, KENNETH M. DUNCAN, DAVEE L. OLSON, RALPH T. FLEES, LISA R. LUNDSTEN, JAMES G. JONES, DAVID M. BRICKER, JAMES N. YOUNG, RESIDENTIAL FUNDING SECURITIES CORPORATION d/b/a GMAC RFC SECURITIES, GOLDMAN, SACHS & CO., RBS SECURITIES, INC. f/k/a GREENWICH CAPITAL MARKETS, INC. d/b/a RBS GREENWICH CAPITAL, DEUTSCHE BANK SECURITIES, INC., CITIGROUP GLOBAL MARKETS, INC., CREDIT SUISSE SECURITIES (USA) LLC, BANK OF AMERICA CORPORATION *as successor-in-interest to* MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., UBS SECURITIES, LLC, JPMORGAN CHASE, INC. *as successor-in-interest to* BEAR, STEARNS & CO., INC. and MORGAN STANLEY & CO., INC.,<br><br>                    Defendants. | Case No.: 08-CV-8781 (HB)<br><br><br><br>**ECF CASE** |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO**
**THE UNDERWRITER DEFENDANTS' MOTION TO DISMISS**

**COHEN MILSTEIN SELLERS & TOLL PLLC**

Joel P. Laitman (JL-8177)
Christopher Lometti (CL-9124)
Daniel B. Rehns (DR-5506)
Kenneth M. Rehns (KR-9822)
150 East 52nd Street, Thirtieth Floor
New York, New York 10022
(212) 828-7797
(212) 828-7745 (Facsimile)

Steven J. Toll (admitted pro hac vice)
S. Douglas Bunch (SB-3028)
1100 New York Avenue NW, Suite 500 West
Washington, D.C. 20005
(202) 408-4600
(202) 408-4699 (Facsimile)

*Attorneys for Plaintiff and the Class*

# TABLE OF CONTENTS

**PRELIMINARY STATEMENT** ...................................................................................................1

**SUMMARY OF FACTS**........................................................................................................2

**ARGUMENT**...........................................................................................................................2

I.      PLAINTIFFS ADEQUATELY ALLEGE
        STANDING TO ASSERT THEIR CLAIMS .....................................................................2

        A.      Whether a Purchaser Is Required on Each of the 59 Offerings
                Pursuant to the Common Registration Statements Should Be
                Decided at the Certification Stage ...............................................................................2

        B.      There Is No Requirement That There Be a Purchaser
                on Each of the 59 Offerings Where the Registration
                Statements and Prospectus Supplements Share
                Identical Alleged Misstatements and Omissions........................................................4

        C.      Plaintiffs Have Standing to Assert Their Section
                12(a)(2) Claims against the Seller Underwriters. .......................................................5

        D.      Plaintiffs Adequately Allege a Legally Cognizable Injury........................................6

II.     PLAINTIFFS' CLAIMS ARE NOT TIME BARRED........................................................8

        A.      The Standard for Inquiry Notice .................................................................................8

        B.      The Underwriters Do Not Establish Inquiry Notice ...................................................9

                1.      None of the News Articles or Reports Reference
                        the Certificates, the Effect on the Certificates or RALI MBS .......................9

                2.      News Articles Relating to the Ratings Agencies'
                        Outdated Models Do Not Satisfy Inquiry Notice ..........................................9

                3.      News Articles Relating to the Ratings Agencies'
                        Conflicts of Interest and Ratings Shopping Do Not
                        Satisfy Inquiry Notice ..................................................................................10

                4.      News Articles Relating to the Ratings Agencies'
                        Role in Structuring Do Not Satisfy Inquiry Notice .....................................11

                5.      General News Articles on Subprime Originators Do
                        Not Demonstrate a Probable Claim on the Certificates.................................12

III.    THE COMPLAINT SATISFIES THE PLEADING STANDARDS OF
        RULES 8(a) AND 12 OF THE FEDERAL RULES OF CIVIL PROCEDURE.................13

IV.     PLAINTIFFS STATE A CLAIM UNDER SECTION 15 OF THE 1993 ACT ..............14

**CONCLUSION** .................................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*APA Excelsior III L.P. v. Premiere Techs.*,
    476 F.3d 1261 (11th Cir. 2007) ...............................................................................6

*Foman v. Davis*,
    371 U.S. 178 (1962) ................................................................................................15

*Guenther v. Cooper life Sciences, Inc.*
    759 F. Supp. 1437 (N.D. Cal. 1990) .......................................................................6

*Herman & MacLean v. Huddleston*,
    459 U.S. 375 (1983) ................................................................................................2

*Hevesi v. Citigroup Inc.*,
    366 F.3d 70 (2d Cir. 2004) ....................................................................................3

*In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*,
    No. 03-md-1529, 2007 U.S. Dist. LEXIS 66911 (S.D.N.Y. Sept. 7, 2007) ...........7

*In re AMF Bowling Sec. Litig.*,
    Civ. No. 99-3023 (DC), 2003 U.S. Dist. LEXIS 7389 (S.D.N.Y. May 2, 2003) ......15

*In re AOL Time Warner, Inc. Sec. & ERISA Litig.*,
    381 F. Supp. 2d 192 (S.D.N.Y. 2004) ....................................................................7

*In re Cosi, Inc. Sec. Litig.*,
    379 F. Supp. 2d 580 (S.D.N.Y. 2005) ....................................................................6

*In re Countrywide Fin. Corp. Sec. Litig.*,
    588 F. Supp. 2d 1132 (C.D. Cal. 2008) .............................................................2, 4, 5, 7

*In re Dreyfus Aggressive Growth Mut. Fund Litig.*,
    98 Civ. 4318 (HB), 2000 U.S. Dist. LEXIS 13469 ...............................................4, 5

*In re Global Crossing, Ltd. Sec. Litig.*,
    313 F. Supp. 2d 189 (S.D.N.Y. 2003) ....................................................................3

*In re Initial Pub. Offering Sec. Litig.*,
    214 F.R.D. 117 (S.D.N.Y. 2002) ............................................................................3

*In re Initial Pub. Offering Sec. Litig.*,
    341 F. Supp. 2d 328 (S.D.N.Y. 2004) ....................................................................8

*In re Moody's Corp. Sec. Litig.*,
  599 F. Supp. 2d 493 (S.D.N.Y. 2009) .................................................................8, 9

*In re Prestige Brands Holding, Inc.*,
  05-cv-06924 (CLB), 2006 U.S. Dist. LEXIS 46667 (S.D.N.Y. July 10, 2006) ..........6

*In re Salomon Smith Barney Mut. Fund Fees Litig.*,
  441 F. Supp. 2d 579 (S.D.N.Y. 2006) ........................................................................5

*In re Ultrafem, Inc. Sec. Litig.*,
  91 F. Supp. 2d 678 (S.D.N.Y. 2000) ..........................................................................6

*In re Wash. Mut., Inc. Sec. Litig.*,
  No. 2:08-md-1919 (MJP), 2009 U.S. Dist. LEXIS 41575 (W.D. Wash. May 15, 2009).............5

*In re Worldspace Sec. Litig.*,
  No. 07-cv-2252, 2008 U.S. Dist. LEXIS 56244 (S.D.N.Y. Jul. 21, 2008) .............15

*J&R Marketing, SEP v. GMC*,
  519 F.3d 552 (6th Cir 2008) ......................................................................................5

*Kramer v. Time Warner, Inc.*,
  937 F.2d 767 (2d Cir. 1991).....................................................................................14

*La. Mun. Police Employees Ret. Sys. .v. Merrill Lynch & Co.*,
  No. 08-9063 (JSR) (S.D.N.Y. Feb. 19, 2009) ..........................................................5

*Lapin v. Goldman Sachs Group, Inc.*,
  506 F. Supp. 2d 221 (S.D.N.Y. 2006) ........................................................................8

*McMahan & Co. v. Wherehouse Entertainment*,
  65 F.3d 1044 (2d Cir. 1995).......................................................................................7

*Newman v. Warnaco Group, Inc.*,
  335 F.3d 187 (2d Cir. 2003) ......................................................................................8

*Ong v. Sears, Roebuck & Co.*,
  388 F. Supp. 2d 871 (N.D. Ill. 2004).........................................................................5

*Shah v. Meeker*,
  435 F.3d 244 (2d Cir. 2006) ......................................................................................8

*Staehr v. The Hartford Fin. Servs. Group, Inc.*,
  547 F.3d 406 (2d Cir. 2008) ......................................................................................8

*Tooley v. Napolitano*,
  556 F.3d 836 (D.C. Cir. 2009).................................................................................14

*W.R. Huff Asset Management Co. v. Deloitte & Touche LLP,*
    549 F.3d 100 (2d. Cir. 2008)..................................................................4

**STATUTES**

15 U.S.C. § 77, et seq..................................................................*passim*

15 U.S.C. § 77m..........................................................................8

15 U.S.C. § 77o..........................................................................14

15 U.S.C. § 77z..........................................................................3

**OTHER AUTHORITIES**

U.S. Const. Art. III, § 2................................................................4

**RULES**

Rule 9(b)...............................................................................13

Rule 15(a)..............................................................................15

Rule 8(a)..............................................................................13, 14

Rule 12(b)(6)..........................................................................1, 13

**PRELIMINARY STATEMENT**

Plaintiffs submit this memorandum of law in opposition to the motion made by defendants Goldman, Sachs & Co ("Goldman Sachs"), RBS Securities, Inc. ("RBS"), Deutsche Bank Securities, Inc. ("Deutsche Bank"), Citigroup Global Markets, Inc. ("Citigroup"), Credit Suisse Securities (USA) LLC ("Credit Suisse"), Bank of America Corporation ("BofA") as successor-in-interest to Merrill Lynch, Pierce Fenner & Smith, Inc. ("Merrill Lynch"), UBS Securities, LLC ("UBS"), JP Morgan Chase, Inc. ("JP Morgan"), as successor-in-interest to Bear, Stearns & Co., Inc. ("Bear Stearns"), and Morgan Stanley & Co. Inc. ("Morgan Stanley") (together, the "Underwriters") pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss Plaintiffs' Amended Securities Class Action Complaint (the "Complaint").

This is an action brought pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "1933 Act"), 15 U.S.C. §§ 77k, 77l(a)(2) and 77o by Court-appointed Lead Plaintiff New Jersey Carpenters Health Fund, Plaintiff New Jersey Carpenters Vacation Fund and Plaintiff Boilermaker Blacksmith National Pension Trust (together, "Plaintiffs"), on their own behalf and as a class action on behalf of all persons and entities who purchased or otherwise acquired interests in the Issuing Trusts pursuant and traceable to two Registration Statements and accompanying Prospectuses filed with the Securities and Exchange Commission ("SEC") by Residential Accredited Loans, Inc. ("RALI"), on March 3, 2006 and April 3, 2007.

Defendants registered the securities at issue with the SEC, received the benefits of an SEC-registered offering and also were obliged to comply with the strict liability provisions of the federal securities laws, including the private rights of action provided for in the 1933 Act.

Plaintiffs assert claims against the Underwriters pursuant to Sections 11, 12(a)(2) and 15 of the 1933 Act.[1] These 1933 Act claims impose "a harsh, nearly strict-liability rule designed to make sure those involved in securities offerings meticulously prepare the registration statement."

---

[1]    Plaintiffs do not oppose dismissal without prejudice of the Section 12(a)(2) claims against Underwriter Defendants RBS, Deutsche Bank, Credit Suisse, BofA, JP Morgan and Morgan Stanley.  Plaintiffs oppose dismissal of the Section 12(a)(2) claims against Underwriter Defendants RFSC, Goldman Sachs, Citigroup and UBS, who were the co-lead Underwriters in each of the four Offerings pursuant to which Plaintiffs purchased Certificates.("Seller Underwriters")

*In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1170 n.47 (C.D. Cal. 2008).  As the Supreme Court noted, liability under the 1933 Act is "virtually absolute, even for innocent misstatements."  *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983) (citing 15 U.S.C. §77k(b)).  Neither intent nor reliance need be pled in asserting 1933 Act claims – instead the pleading must identify material misstatements and omissions in the Registration Statement. Here, the Complaint alleges that the Underwriters sold billions of dollars of mortgage-backed Certificates based on identical misstatements and omissions in the two common Registration Statements and in the Prospectus Supplements incorporated therein.  These allegations are sufficient and preclude dismissal.

## SUMMARY OF FACTS

The relevant facts, as alleged in the Complaint, are set forth in the accompanying Plaintiffs' Memorandum of Law in Opposition to the RALI Defendants Motion to Dismiss the Amended Securities Class Action Complaint, at 2-5, which is incorporated herein by reference.

## ARGUMENT

**I.    PLAINTIFFS ADEQUATELY ALLEGE STANDING TO ASSERT THEIR CLAIMS.**

    **A.    Whether a Purchaser Is Required on Each of the 59 Offerings Pursuant to the Common Registration Statements Should Be Decided at the Certification Stage.**

The Underwriters assert that a plaintiff is required for each of the Offerings regardless of the common registration statements at issue and thus plaintiffs have standing for only four of the 59 challenged offerings.[2]  UDM at 3-5.  However, it is undisputed that the Plaintiffs purchased Certificates pursuant and traceable to the two common Registration Statements from which all of the 59 challenged Certificate Offerings were issued and incorporated.  ¶¶19-20.  Given that Section 11 requires that the plaintiff have purchased pursuant to a Registration Statement containing

---

[2]    The Underwriters assert at length that, with a shelf registration statement, each post-effective amendment, *e.g.*, prospectus supplement, is deemed a new registration statement.  However, as the District Court in *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d at 1166 held the regulatory definition of a registration statement does not preclude standing to assert a Section 11 claim arising from different offerings issued pursuant to a common registration statement as long as the claims arise from common alleged misstatements: "So long as (1) the securities are traceable to the same initial shelf registration and (2) the registration statements share common 'parts' the (3) were false and misleading at each effective date, there is § 11 standing."

alleged material misstatements and omissions, these facts are sufficient to satisfy the standing requirement at the pleading stage, leaving the issue of whether a purchaser is required for each offering to the class certification stage. The PSLRA envisioned that the Lead Plaintiff would not necessarily have standing to assert each claim.[3] It has been noted that "nothing in the PSLRA indicates that district courts must choose a lead plaintiff with standing to sue on every available cause of action." *Hevesi v. Citigroup Inc.*, 366 F.3d 70, 82 (2d Cir. 2004). "Because the PSLRA mandates that courts must choose a party who has, among other things, the largest financial stake in the outcome of the case, it is inevitable that, in some cases, the lead plaintiff will not have standing to sue on every claim." *Id.* The district court in *In re Global Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 204-05 (S.D.N.Y. 2003),[4] held:

> [N]othing in the PSLRA requires that the lead plaintiffs have standing to assert all of the claims that may be made on behalf of all of the potential classes and subclasses of holders of different categories of security at issue in the case. Indeed, the imposition of any such requirement would be at odds with the purposes of the statute, since in the case of large alleged frauds involving issuers of many classes of securities, the consequence would be either the appointment of a large number of lead plaintiffs (undermining the goal of a cohesive leadership and management group) or the premature breakdown of the action into an unmanageable number of separate cases brought by different lead plaintiffs on behalf of each potential subclass of securities holders.

It is therefore not uncommon for additional named plaintiffs to intervene prior to class certification in order to resolve standing issues. *See, e.g., Hevesi*, 366 F.3d at 82-83 (affirming lead plaintiff's ability to add named plaintiffs to aid in representing the class where lead plaintiff did not have standing to bring every available claim); *In re Initial Pub. Offering Sec. Litig.*, 214 F.R.D. 117, 122-23 (S.D.N.Y. 2002) (granting leave to add new named plaintiffs for purpose of conferring standing prior to class certification). As a result, the Underwriters' assertions regarding Lead

---

[3]    Lead Plaintiff moved the District Court, pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 77z, for an order appointing it Lead Plaintiff of this putative securities class action on behalf of all persons who acquired the Certificates pursuant and/or traceable to the Registration Statement at issue. None of the Defendants opposed that motion, and the Court issued its Order appointing New Jersey Carpenters Lead Plaintiff on June 30, 2009. *See* Order Appointing Lead Plaintiff, Dkt. No. 34, June 30, 2009.

[4]    *Accord Hevesi*, 366 F.3d at 82 n.13 ("any requirement that a different lead plaintiff be appointed to bring every single available claim would contravene the main purpose of having a lead plaintiff – namely, to empower one or several investors with a major stake in the litigation to exercise control over the litigation as a whole"); *In re Initial Pub. Offering Sec. Litig.*, 214 F.R.D. 117, 123 (S.D.N.Y. 2002) ("The only other possibility – that the court should cobble together a lead plaintiff group that has standing to sue on all possible causes of action – has been rejected repeatedly by courts in this Circuit and undermines the purpose of the PSLRA.").

Plaintiff's ability to represent a class of Certificate purchasers are premature and more appropriately addressed at the class certification stage. *See, e.g., Countrywide*, 588 F. Supp. 2d at 1167 ("The well-developed class certification framework will better guide this inquiry and lead to more efficient resolution of class claims than standing's sometimes-arbitrary distinctions.").[5]

> **B.    There Is No Requirement That There Be a Purchaser on Each of the 59 Offerings Where the Registration Statements and Prospectus Supplements Share Identical Alleged Misstatements and Omissions.**

Contrary to the Underwriters' arguments, there is no requirement to have a purchaser on each offering where, as here, the claims arise from alleged misstatements and omissions in the Registration Statements and are thus necessarily common to all the offerings. *Countrywide*, 588 F. Supp. 2d at 1166. See also *In re Dreyfus Aggressive Growth Mut. Fund Litig.*, 98 Civ. 4318 (HB), 2000 U.S. Dist. LEXIS 13469, at *14-15 (permitting purchasers on one offering to represent purchasers on a different offering for purposes of asserting Section 11 claims where there are common misstatements and omissions).[6] The *Countrywid*e ruling has particular applicability here where additionally, the alleged misstatements and omissions in the Prospectus Supplements identified in the Complaint appear identically in each of the 59 Prospectus Supplements. *See*

---

[5]    Plaintiffs have adequately alleged Article III standing.  As discussed in Point III, *infra*, the Complaint alleges that Plaintiffs have standing to assert claims under Sections 11 and 12(a)(2) of the 1933 Act against the Underwriters.  Standing under Sections 11 and 12(a)(2) clearly also gives Plaintiffs standing under Section 15 of the 1933 Act.  As a result, the Complaint also adequately alleges Plaintiffs' standing under Article III, which expressly refers to federal statutes as one basis for conferring subject matter jurisdiction on federal courts. *See* U.S. Const. Art. III, § 2 ("The judicial power shall extend to all cases, in Law and Equity, arising under this Constitution, the Laws of the United States and Treaties"). *See also W.R. Huff Asset Management Co. v. Deloitte & Touche LLP*, 549 F.3d 100, 106-07 (2d. Cir. 2008) (while an investment manager that has not alleged it suffered an injury does not have Article III standing, a plaintiff that alleges an injury in fact, causation and redressability does.  Here, Plaintiffs have alleged all three elements: an injury (loss in Certificate value) caused by common misrepresentations and omissions in the Registration Statements and Prospectus Supplements that can be remedied by an award of monetary damages.)

[6]    In *Dreyfus*, 2000 U.S. Dist. LEXIS 13469, this Court held:

> In light of these authorities, I conclude that the class representatives may represent both an AG Fund Class and a Premier Fund Class.  Here, the claims of the named plaintiffs and prospective class members derive from the same course of events.  The plaintiffs have alleged that both Funds made similar misrepresentations and omissions in the Registration Statements [and] Prospectuses … and thus, the named plaintiffs who purchased the AG Fund may represent a Premier Fund Class.

*Id*. at *14-15.

Laitman Decl.[7]  As set forth in *Countrywide*, standing is sufficiently pled where the claim is based on alleged misstatements and omissions in the Registration Statements because all of the Offerings incorporate those misstatements and omissions.  *Id*. at 1164-66.  Here, the Complaint alleges identical misstatements and omissions both in the common Registration Statements, ¶¶205-18, and in the Prospectus Supplements.

Significantly, the cases upon which the Underwriters purport to rely are not supportive because there was no analysis of whether the claim arose from common misstatements and omissions in the common registration statements, much less in the Offering Supplements.[8]

Further and significantly, the single appellate decision addressing in part this precise standing issue is not supportive of the Underwriters' position.  In *J&R Marketing, SEP v. GMC*, 519 F.3d 552, 557 (6th Cir 2008), the Sixth Circuit, in its review of the district court's decision upon which the Underwriters purport to rely, stated that it had "grave concerns" about the dismissal of the Sections 11 and 12 claims on standing grounds.[9]

### C.    Plaintiffs Have Standing to Assert Their Section 12(a)(2) Claims against the Seller Underwriters.

The Underwriters also assert that Plaintiff's allegations are insufficient to establish statutory standing for a Section 12(a)(2) claim because Plaintiff does not allege that it purchased its Certificates in a public offering directly from or at the solicitation of the Underwriter.  UDM at 5.

---

[7]    As discussed below and as set forth in the Declaration of Joel P. Laitman (the "Laitman Decl."), dated September 18, 2009, even though the Complaint does not cite to each of the 59 Prospectus Supplements when identifying the alleged misstatements and omissions in the Prospectus Supplements, ¶¶221, 223, 225, 227, 229, 231, 234, 241, 244, these same statements appear identically in all 59 Prospectus Supplements.

[8]    *See, e.g., In re Salomon Smith Barney Mut. Fund Fees Litig.*, 441 F. Supp. 2d 579, 608 (S.D.N.Y. 2006); *In re Wash. Mut., Inc. Sec. Litig.*, No. 2:08-md-1919 (MJP), 2009 U.S. Dist. LEXIS 41575, at *60-61 (W.D. Wash. May 15, 2009) *Ong v. Sears, Roebuck & Co.*, 388 F. Supp. 2d 871, 892 (N.D. Ill. 2004); *La. Mun. Police Employees Ret. Sys. .v. Merrill Lynch & Co.*, No. 08-9063 (JSR) (S.D.N.Y. Feb. 19, 2009).

[9]    While dismissing the case on other grounds, the Sixth Circuit stated:

Because both causes of action [i.e., Sections 11 and 12] are tied to an offering document or oral communication only those who acquired securities in the offering to which the document or oral communication pertains have standing to sue.  Based on this rationale the district court found that the named plaintiffs in this case lacked statutory standing to sue regarding ten of the named offerings, because the named plaintiffs have purchased bonds on only the Second SmartNotes offering.  ***While we have grave concerns about such an analysis***, we need not reach the question regarding the named plaintiffs' standing to represents the alleged class.

*J&R Marketing,* 519 F.3d at 557 (emphasis added).

As noted, Plaintiffs only oppose dismissal of the Section 12(a)(2) claims against the Seller Underwriters who were co-lead Underwriters in the Offerings in which Plaintiffs made their Certificate purchases.

Regardless, Plaintiffs have standing with respect to the Seller Underwriters because the Complaint specifically alleges that "[a]s reflected in the Certification of Securities Class Action filed herein," Lead and Named Plaintiffs "purchased the … Certificates pursuant *and* traceable to the Registration Statement and Prospectus Supplements…." ¶¶19-20 (emphasis added). Where a plaintiff alleges that it "purchased shares 'pursuant to the Offering,' *i.e.,* in the Offering, [its] allegations may stand under Section 12(a)(2)." *In re Ultrafem, Inc. Sec. Litig.*, 91 F. Supp. 2d 678, 693-94 (S.D.N.Y. 2000); *accord In re Cosi, Inc. Sec. Litig.*, 379 F. Supp. 2d 580, 588-89 (S.D.N.Y. 2005) (citing *Ultrafem*, 91 F. Supp. 2d at 693-94).[10, 11]

### D.    Plaintiffs Adequately Allege a Legally Cognizable Injury.

The Complaint alleges specifically the market loss suffered by each Plaintiff from their Certificate investments with Plaintiffs' Certificates having lost, on average, 42% of their value. ¶9.

---

[10]    *In re Prestige Brands Holding, Inc.*, 05-cv-06924 (CLB), 2006 U.S. Dist. LEXIS 46667 (S.D.N.Y. July 10, 2006), a case upon which the Underwriters rely, is in accord. In that case, the district court held that "to the extent that shareholders allege, as here, merely that they bought shares 'traceable to' or 'in connection with' an IPO, they lack standing…. Named Plaintiffs who purchased their stock pursuant to the IPO have claims which survive the motions." Id. at *27.

[11]    The Underwriters also challenge standing based on the timing of Plaintiffs' purchases. It is argued that, given the timing of Plaintiffs' purchases, it is not plausible that Plaintiffs purchased pursuant to the Offerings because (1) Boilermakers purchased its Certificates six months after the Offering, and (2) Lead Plaintiff and Vacation Fund purchased their Certificates "before they were offered to the public via the relevant Prospectus Supplements." UDM at 6 n.5. The Underwriters' assertions are baseless. A purchase after the Offering is in no way fatal to a Section 11 claim where it is alleged, as it is here, that the purchase is "traceable" to the Offering. And, there is no reason why Boilermakers could not have purchased in the Offering six months after the registration date. Boilermakers alleges that it purchased its Certificates "pursuant and traceable to the Offering. ¶20. That is sufficient at this stage of the litigation. As for the Vacation Fund purchase, those had to have occurred pursuant to the Registration Statements even if there was an indication of interest prior to the Registration Statement. Where, as here, securities are required to be registered with the SEC, no one is able to purchase prior to the registration date. The dates to which the Underwriters refer are the commitment dates on which Plaintiffs committed to purchase the Certificates. The actual purchases occurred on or immediately after the Offering dates, as alleged. Lead Plaintiff and Vacation Fund allege that they purchased their Certificates "pursuant and traceable to" the Offerings. Nothing more is required at this stage of the litigation. Further, the cases upon which the Underwriters rely are inapposite. *See APA Excelsior III L.P. v. Premiere Techs.*, 476 F.3d 1261 (11th Cir. 2007) (ruling, on summary judgment, that Plaintiffs purchased outstanding shares and alleged only that a later filed registration statement omitted the necessary disclosure). *Guenther v. Cooper life Sciences, Inc.* 759 F. Supp. 1437 (N.D. Cal. 1990) (ruling on summary judgment that plaintiffs failed to trace their purchases back to a defective registration statement, but only alleged that a later filed amendment was misstated). Plaintiffs herein made the commitment to purchase the Certificates before any Certificates were in the marketplace, whereas Excelsior and Guenther both involve alleged misstatements contained in a later filed amended or additional prospectus.

The Underwriters nonetheless assert that Plaintiffs "lack standing because they have not alleged any actual loss or that they failed to receive outstanding principal or interest payments on the Certificates." UDM at 5 n.4. Defendants are wrong.

Section 11 states that a plaintiff who purchases a security may "recover such damages as shall represent the difference between the amount paid for the security … and … the value thereof as of the time such suit was brought." 15 U.S.C. § 77k(e). The type of injury that the statute contemplates is "a decline in investment value due to materially false or misleading information in the registration statement. *Countrywide*, 588 F. Supp. 2d at 1168. A plaintiff pleading a Section 11 claim is required to allege (1) the purchase of relevant securities and (2) facts creating the reasonable inference that the value of the securities at the presumptive damages date is *less* than the purchase price. *Id*. at 1169-70. Section 12(a)(2) requires an allegation of "[s]ome cognizable loss." *Id*. at 1183. So long as the complaint's allegations, and matters of judicial notice, do not conclusively demonstrate that plaintiff cannot prove a loss, the complaint survives a motion to dismiss. *Id*. at 1169-70.

The Complaint alleges that Plaintiffs and the Class have suffered damages as a result of the Underwriters' Section 11 and 12(a) violations, ¶¶274, 284, and that the value of the Certificates purchased by Plaintiffs and the Class has dramatically plummeted since the Offerings, ¶¶9, 19-20. At this stage of the litigation, nothing more is required. *Countrywide*, 588 F. Supp. 2d at 1169.[12]

Further, *In re AOL Time Warner, Inc. Sec. & ERISA Litig*., 381 F. Supp. 2d 192, 246 (S.D.N.Y. 2004), cited by the Underwriters, is not on point. There, the district court held:

> Rather than alleging any losses on [the] bonds, the allegations of the Amended Complaint reveal that [the] bonds purchased by Lead Plaintiff have actually increased in value. Indeed, each of the bonds at issue was trading at a minimum of $4.169 more per unit than when it was purchased. Absent any factual allegation of

---

[12]    *See McMahan & Co. v. Wherehouse Entertainment*, 65 F.3d 1044, 1048 (2d Cir. 1995) ("any decline in value is presumed to be caused by the misrepresentation" and defendants have burden of proving "that any portion or all of such damages represents other than the depreciation in value of such security resulting from [the] part of the registration statement"); *In re Adelphia Commc'ns Corp. Sec. & Derivative Litig*., No. 03-md-1529, 2007 U.S. Dist. LEXIS 66911, at *24 (S.D.N.Y. Sept. 7, 2007) (Section 11(e) establishes an affirmative defense, with the burden of proof squarely on the defendant …. Whether Plaintiffs' losses owed to their investment strategy or to the misstatements and omissions they cite is a question of fact, and no motion to dismiss can thus be granted on these grounds.").

'injury in fact' plaintiffs lack Article III standing to assert claims against the Underwriter Defendants and Citibank.

Plaintiffs here allege a legally cognizable injury and thus standing to assert their claims.

## II.    PLAINTIFFS' CLAIMS ARE NOT TIME BARRED

### A.    The Standard for Inquiry Notice

The Underwriters assert that Plaintiffs' claims are time barred because Plaintiffs had been on inquiry notice of their claims since before either September 22, 2007 – more than one year prior to the filing of the original complaint – for Goldman, RBS, Deutsche, Credit Suisse and UBS, or May 18, 2008 – more than one year prior to the filing of the amended complaint – for Citigroup, BofA, JP Morgan and Morgan Stanley.[13]    UDM at 6-12.    To demonstrate inquiry notice, defendants are required to present evidence of so-called "storm warnings."  *Staehr v. The Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406, 427 (2d Cir. 2008).  These storm warnings must be ***directly*** related to the legal claims such that they would apprise a person of reasonable intelligence of ***probable*** wrongdoing and legal claims.  *Shah v. Meeker*, 435 F.3d 244, 249 (2d Cir. 2006) (storm warnings exist only when wrongdoing is "probable, not merely possible").

In order for courts to demonstrate inquiry notice as a matter of law at the motion to dismiss stage, defendants must present *uncontroverted* evidence that the plaintiff should have discovered the wrongdoing and legal claims.  *See In re Initial Pub. Offering Sec. Litig.*, 341 F. Supp. 2d 328, 347 (S.D.N.Y. 2004).  *Accord Newman v. Warnaco Group, Inc.*, 335 F.3d 187, 193-95 (2d Cir. 2003).  Where defendants offer reasonable words of comfort, the storm warnings become "controverted" and inquiry notice is defeated.  *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 506 (S.D.N.Y. 2009) (Plaintiffs are not put on inquiry notice when they "reasonably rely" on "reliable words of comfort from management"); *Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221, 234 (S.D.N.Y. 2006) ("A plaintiff may not be considered to have been placed on inquiry notice, 'despite the presence of some ominous indicators,' when 'the warning signs are

---

[13]    Section 13 of the 1933 Act (timeliness of claims brought pursuant to Section 11 and 12(a)(2)) provides that "[n]o cause of action shall be maintained … under [Sections 11 or 12(a)(2)] unless brought within one year after the discovery of the untrue statement or omission, or after such discovery should have been made by the exercise of reasonable diligence …"  15 U.S.C. § 77m.

accompanied by reliable words of comfort from management.'"").  Indeed, the issue of whether media coverage apprised investors of claims arising from alleged conflicts of interest between analysts and their financial institutions and from the alleged non-independence of Moody's have been determined to be factual issues that could not be resolved on motion to dismiss.  *See, e.g., Moody's Corp.*, 599 F. Supp. 2d at 506-07.

**B.      The Underwriters Do Not Establish Inquiry Notice.**

**1.      None of the News Articles or Reports Reference the Certificates, the Effect on the Certificates or RALI MBS.**

Despite the Underwriters' effort to gather together disparate news articles and reports, none, either individually or collectively, can fill the void arising from the fact that no possible, much less "probable" 1933 Act claims on behalf of Certificate purchasers can be demonstrated to have been reasonably known prior to either September 22, 2007, because 99% of the Certificates at issue in this action were downgraded after that date, or May 18, 2008, because 85% of the Certificates were downgraded after that date.  Further, it is fatal to the Underwriters' inquiry notice showing that none of the articles or reports mention or refer to the Certificates or RALI MBS.

**2.      News Articles Relating to the Ratings Agencies' Outdated Models Do Not Satisfy Inquiry Notice.**

The Underwriters assert that allegations that the Offering Materials failed to disclose the insufficiency of the Ratings Agencies' models are time-barred because, as alleged in the Complaint, Moody's & S&P publicly acknowledged in April and July 2007 that their models were several years old and required revision, ¶¶89, 91, 96, and "those admissions were simultaneously echoed in the press" on June 2, 2007 and July 11, 2007.  UDM at 8.  The Underwriters are mistaken.  First, Paragraph 96 of the Complaint, to which the Underwriters refer, quotes a passage from an April 8, **2008** *New York Times* article reporting that **one year earlier**:

> [i]n April 2007, Moody's announced it was revising the model it used to evaluate subprime mortgages.  It noted that the model was first introduced in 2002.  Since then, the mortgage market has evolved considerably."  This was a rather stunning admission; its model had been based on a world that no longer existed.

*The New York Times*' April 2008 hindsight observation clearly was not a storm warning. Moreover, Moody's April 2007 announcement, as well as Moody's and S&P's July 2007 announcements of methodology revisions and unspecified anticipated future downgrades, ¶¶89, 91, would not have been a storm warning to a reasonable investor because neither Moody's nor S&P announced that the use of these models would have an impact on the initial ratings given to the Certificates at issue here and there was no indication that these Certificates would eventually have to be significantly downgraded. Similarly, neither the June 2, 2007 article in *The Economist* nor the July 11, 2007 *Wall Street Journal* article raised any such storm warnings.

### 3. News Articles Relating to the Ratings Agencies' Conflicts of Interest and Ratings Shopping Do Not Satisfy Inquiry Notice.

The Underwriters assert that alleged conflicts of interest and ratings shopping practices had been a focus of governmental inquiry since at least 2002 and had been widely publicized for years. UDM at 8. However, the January 2003 SEC "Report on the Role and Function of Credit Rating Agencies in the Operation of the Securities Markets," does not warn of the specific risks, as alleged in the Complaint, that the Ratings Agencies were critically involved in creating and structuring the Certificates, that investors were given the false impression that the Ratings Agencies were independent and were brought in only after the Certificates had been structured, and that the Ratings Agencies largely determined the amount and kind of credit enhancement rather than merely evaluating it after the fact. ¶¶117-21.

Indeed, the two "potential" conflicts of interest in the January 2003 SEC Report were that (1) issuers paid for ratings "which could induce [the ratings agencies] to rate issuers more liberally" and (2) the large ratings agencies had developed ancillary businesses and "credit rating decisions might be impacted by whether or not an issuer purchases additional services offered by the credit rating agency." Lari Decl., Ex. 13. And, the Report also contains numerous reassuring statements from the Ratings Agencies as to why neither of these potential conflicts of interest is likely to occur. *Id.*

Further, the January 2003 SEC Report does not mention or refer to ratings shopping, one of the core undisclosed conflict of interest practices engaged in by the Ratings Agencies. The only news article to make an oblique reference to what became known as ratings shopping is the August 15, 2007 *Wall Street Journal* article, Lari Decl., Ex. 14, which briefly quoted a former Moody's managing director who stated that "[i]t was always about shopping around." This article does not satisfy inquiry notice because (1) it does not refer or relate to either the Certificates or any Defendant in this action; (2) no Certificate downgrades had occurred by August 15, 2007, the date of the article, so an investor would not have had any reason to believe that anything in this article applied to the Certificates; and (3) the first disclosure of the ratings shopping practice came in June 2008, when the NYAG's Office announced that, after an investigation, it had reach an agreement with the Ratings Agencies to put an end to what had been termed ratings shopping, ¶114, and the subsequent disclosures in the October 2008 House Oversight Hearing, ¶115-16.

### 4. News Articles Relating to the Ratings Agencies' Role in Structuring Do Not Satisfy Inquiry Notice.

The Underwriters also assert that Plaintiffs were on inquiry notice of the true roles of the Ratings Agencies in structuring offerings they rated as of June 1, 2007, based on a June 1, 2007 *International Herald Tribune* article, referred to in the Complaint, ¶118, an August 15, 2007 *Wall Street Journal* article, and a September 2007 article appearing in *Conde Nast's Portfolio.com*, also referred to in the Complaint, ¶120. UDM at 9. However, these articles do not warn of the specific risks that the Ratings Agencies were critically involved in creating and structuring the Certificates; that investors were given the mistaken impression that the Ratings Agencies were independent and were brought in only after the Certificates had been structured and that the Ratings Agencies largely determined the amount and kind of credit enhancement rather than merely evaluating it after the fact. Nor do they refer or relate to either the Certificates or any Defendant in this action. Indeed, the June 1, 2007 *International Herald Tribune* article relates to CDOs, not MBS.

Further, the Underwriters' selective quotes omit reassuring statements. For example, the August 15 *Wall Street Journal* article also provided:

> Executives at both ratings firms and underwriters say the back-and-forth stopped short of bargaining over how to construct securities or over the criteria used to rate them. "We don't negotiate the criteria. We do have discussions," says Thomas Warrack, a managing director at S&P, which is a unit of McGraw-Hill Cos. He says the communication "contributes to the transparency" preferred by the market and the regulators.

These words of comfort controvert and defeat any alleged storm warnings in these news articles.[14]

### 5. General News Articles on Subprime Originators Do Not Demonstrate a Probable Claim on the Certificates.

The Underwriters assert that Plaintiffs were on inquiry notice regarding a loosening of underwriting standards and the adequacy of the due diligence because the high delinquency rates were disclosed in Form 10-D SEC filings provided directly to Certificate holders prior to September 22, 2007. UDM at 9. However, these 10-Ds contain no discussion of the significance of these increased delinquencies. As a result, an investor could not discern whether, for example, the delinquencies were caused by temporary or systemic problems. Storm warnings require more than mere statistical information.

The Underwriters also assert that Plaintiffs were on inquiry notice that "purportedly lax loan underwriting standards had contributed to the subprime mortgage crisis." UDM at 10. None of the news articles cited by the Underwriters mention or refer to the Certificates at issue in this action or to any Defendant in this action, or to HFN, the Originator of the Certificates, which is not a Defendant in this action.[15] Further, even the most explicit news articles about lax subprime originator lending practices generally cannot give rise to a probable 1933 Act claim on behalf of Certificate purchasers absent some clear evidence that those practices impacted the Certificates prior to September 22, 2007 (for certain of the Underwriters) or May 18, 2008 (for the remaining Underwriters). This, the Underwriters cannot and do not demonstrate because the critical impact

---

[14] There are other examples of contemporaneous "reliable words of comfort," including, for example, the September 17, 2007 *Wall Street Journal* publication of a self-serving letter submitted by S&P called "How S&P Protects Integrity of Credit Ratings," in which S&P, countering claims of conflicts of interest, S&P categorically stated that they "do not structure transactions, nor do [they] determine which deals can proceed and which cannot." They further heralded their provision of objective, impartial opinions on the quality of bonds, and their institutional safeguards in place to ensure the independence and integrity of those opinions.

[15] Indeed, the May 7, 2007 *Washington Post* article is specifically about New Century Financial – a mortgage company that was not an originator for any of the Offerings at issue here. Again, this article does not trigger inquiry notice of a claim with respect to the Certificates at issue here.

on the Certificates in terms of downgrades occurred after May 18, 2008.  In short, Plaintiffs were not on inquiry notice of probable 1933 Act claims against the Underwriters until after May 18, 2008.[16, 17]

## III.    THE COMPLAINT SATISFIES THE PLEADING STANDARDS OF RULES 8(a) AND 12 OF THE FEDERAL RULES OF CIVIL PROCEDURE.

As set forth in Point II of the accompanying Plaintiffs' Memorandum of Law in Opposition to the RALI Defendants Motion to Dismiss, which is incorporated herein by reference, the Complaint satisfies the pleading standards of Fed. R. Civ. P. Rules 8(a) and 12. And, as set forth in Point III of the accompanying Plaintiffs' Memorandum of Law in Opposition to the RALI Defendants Motion to Dismiss, which is incorporated herein by reference, Plaintiffs' Section 11 and 12(a)(2) claims do not sound in fraud and are not subject to the heightened pleading requirements of Fed. R. Civ. P. 9(b).

Further, Fed. R. Civ. P. 8(a) requires that a complaint clearly indicate the defendants against whom relief is sought and the basis for which relief is sought against them.  Plaintiffs have more than adequately satisfied this standard.  Defendants argue that Plaintiffs use a "one-size-fits all" approach which fails to satisfy Rule 8(a) because it fails to set forth a sufficient basis separately against each Underwriter.  UDM at 13.  An independent evaluation of each Offering reveals that regardless of when or in which Offering each Underwriter participated, each of the 59 Prospectus Supplements contained not just similar, but *identical*, misstatements, to those quoted and alleged to be actionable in the Complaint, *i.e.,* that RFC's underwriting guidelines were supposedly adhered to by HFN, ¶221; that HFN verified borrower income and creditworthiness, ¶223; that HFN's use of reduced documentation programs led to an increase in

---

[16]    The Underwriters also assert that concerns about Bohan and Clayton's due diligence surfaced in June 2007 when the NYAG's Office subpoenaed them about "whether investment banks held back information they should have provided in the disclosure documents related to the sale of" MBS.  UDM at 10.  Bohan and Clayton are not defendants in this action.  And, once again, inquiry notice is not triggered by this disclosure because no investor would have reason to believe that it impacted the Certificates at issue in this action.

[17]    In general, the arguments made in Points II.B.1-5, *supra*, also apply to the news articles referred to in Point II.B of the Underwriters' Memorandum of Law.  UDM at 10-12.

shakier loans being securitized, ¶225; that RFC and the Underwriters conducted meticulous appraisals of the mortgage collateral, ¶227; that RFC carefully reviewed the mortgage loan files before assigning them to a depositor, ¶229; that exceptions where granted in the mortgage loan process only where compensating factors existed, ¶231; that, as of the cut-off date none of the mortgage loans were more than 30 days delinquent, ¶234; and that mortgage loan collateral fell within a disclosed range of loan-to-value ratios, ¶244.[18]

Furthermore, although the Complaint quoted only two Prospectus Supplements, the inclusion of those misstatements together with the fact that they were identical in each and every Prospectus Supplement and the Complaint's numerous other allegations, ¶¶2, 4, 6, 8-15, 40-52, 80-103, 113-16, 128-204, 263-70, 278-81, 283-84, is sufficient at this stage to satisfy Rule 8(a). *See Tooley v. Napolitano*, 556 F.3d 836, 839 (D.C. Cir. 2009) ("*Twombly* leaves the longstanding fundamentals of notice pleading intact.").[19]

## IV. PLAINTIFFS STATE A CLAIM UNDER SECTION 15 OF THE 1933 ACT

Section 15 of the 1933 Act, extends liability created under Sections 11 and 12 to "[e]very person who, by or thought stock ownership, agency, or otherwise … controls any person liable under Sections 11 and 12. 15 U.S.C. § 77o. As set forth in Point III, *supra*, the Complaint adequately alleges primary violations of Sections 11 and 12 against the Underwriters, and Plaintiffs therefore states claims against them under Section 15 of the 1933 Act.

Plaintiffs allege that each Underwriter (1) had control over the primary violators, ¶289; (2) helped draft and disseminate the Offering Documents, ¶¶43-51; (3) participated with the

---

[18] Citations to the relevant Prospectus Supplements, of which the Court may take judicial notice, *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991), are set forth in the accompanying Declaration of Joel P. Laitman, dated September 18, 2009.

[19] The Underwriters also assert that the disclosures regarding credit enhancement varied from one Offering to the next. UDM at 13. Of course, the specific types of credit enhancements applicable to each Offering varied. As alleged in the Complaint, ¶¶14-15, 93-103, 121, 124, 236-43, credit enhancements were employed by the Underwriters and the Ratings Agencies in structuring the MBS to enable the underlying collateral to receive AAA ratings by satisfying the Ratings Agencies' requirements. Because the inadequacies of the underlying loans, by their very nature, varied between Offerings, so too did the credit enhancements assigned to each Offering. Because none of the credit enhancements were adequate to protect against losses in any Offering, ¶14-15, 236-243, although not identical in language, these misstatements were identical in substance.

remaining Defendants in the wrongful acts and course of conduct or otherwise caused the damages and injuries claimed in the Complaint and is responsible in some manner for the acts, occurrences and events alleged in the Complaint, ¶¶43-51; (4) had the power to influence, and exercised that power and influence, to cause the remaining defendants and the Issuing Trusts to engage in violations of the 1933 Act described in the Complaint, ¶289; (5) had the control, position and influence which made them privy to, and provided them with actual knowledge of, the material facts and omissions concealed from Plaintiffs and the other Class members, ¶290; (6) was responsible for overseeing the formation and operation of the Issuing Trusts, including routing payments from borrowers to investors, ¶291; and (7) prepared, reviewed and/or caused the Registration Statements and Prospectus Supplements to be filed and disseminated, ¶¶43-51.

These facts establish claims against these Defendants under Section 15 of the 1933 Act. *See In re Worldspace Sec. Litig.*, No. 07-cv-2252, 2008 U.S. Dist. LEXIS 56244, at *20-21 (S.D.N.Y. Jul. 21, 2008). Defendants' assertions to the contrary are without merit.

## CONCLUSION

For all of the foregoing reasons, Defendants' Motion to Dismiss the Amended Complaint should be denied in its entirety.[20]

---

[20] Should the Court dismiss all or part of Plaintiff's allegations, Plaintiff requests leave to replead. Fed. R. Civ. P. 15(a) (leave to amend shall be granted freely); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962); *In re AMF Bowling Sec. Litig.*, Civ. No. 99-3023 (DC), 2003 U.S. Dist. LEXIS 7389 (S.D.N.Y. May 2, 2003) ("the only possible reasons to reject amendment would be prejudice to the defendant or misconduct by plaintiffs…").

Dated:  New York, New York
        September 18, 2009

**COHEN MILSTEIN SELLERS & TOLL PLLC**

By: /s/  Joel P. Laitman
    Joel P. Laitman (JL-8177)
    Christopher Lometti (CL-9124)
    Daniel B. Rehns (DR-5506)
    Kenneth M. Rehns (KR-9822)
150 East 52nd Street, Thirtieth Floor
New York, New York 10022
(212) 828-7797
(212) 828-7745 (Facsimile)
*jlaitman@cohenmilstein.com*
*clometti@cohenmilstein.com*
*drehns@cohenmilstein.com*
*krehns@cohenmilstein.com*

    Steven J. Toll (admitted *pro hac vice*)
    S. Douglas Bunch (SB-3028)
1100 New York Avenue NW, Suite 500 West
Washington, D.C. 20005
(202) 408-4600
(202) 408-4699 (Facsimile)
*stoll@cohenmilstein.com*
*dbunch@cohenmilstein.com*

*Attorneys for Plaintiff and the Class*

## <u>CERTIFICATE OF SERVICE</u>

I, Kenneth M. Rehns, hereby certify that, on September 18, 2009, I caused the foregoing document to be filed electronically with the United States District Court for the Southern District of New York through the Court's mandated ECF service.  Counsel of record are required by the Court to be registered e-filers, and as such are automatically e-served with a copy of the documents upon confirmation of e-filing.

/s/  Kenneth M. Rehns

Kenneth M. Rehns
