**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**



JAN - 3 2011
U.S.D.C. S.D. N.Y.
COMPLETED

---

|  |  |
|---|---|
| NEW JERSEY CARPENTERS HEATLH FUND, NEW JERSEY CARPENTERS VACATION FUND and BOILERMAKER BLACKSMITH NATIONAL PENSION TRUST, *on Behalf of Themselves and All Others Similarly Situated,*<br><br>Plaintiffs,<br><br>v.<br><br>RESIDENTIAL CAPITAL, LLC, RESIDENTIAL FUNDING, LLC, RESIDENTIAL ACCREDITED LOANS, INC., BRUCE J. PARADIS, KENNETH M. DUNCAN, DAVEE L. OLSON, RALPH T. FLEES, LISA R. LUNDSTEN, JAMES G. JONES, DAVID M. BRICKER, JAMES N. YOUNG, RESIDENTIAL FUNDING SECURITIES CORPORATION d/b/a GMAC RFC SECURITIES, GOLDMAN, SACHS & CO., RBS SECURITIES, INC. f/k/a GREENWICH CAPITAL MARKETS, INC. d/b/a RBS GREENWICH CAPITAL, DEUTSCHE BANK SECURITIES, INC., CITIGROUP GLOBAL MARKETS, INC., CREDIT SUISSE SECURITIES (USA) LLC, BANK OF AMERICA CORPORATION *as successor-in-interest to* MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., UBS SECURITIES, LLC, JPMORGAN CHASE, INC. *as successor-in-interest to* BEAR, STEARNS & CO., INC. and MORGAN STANLEY & CO., INC.,<br><br>Defendants. | Case No.: 08-CV-8781 (HB)<br><br>**CONSOLIDATED SECOND AMENDED SECURITIES CLASS ACTION COMPLAINT**<br><br>**ECF CASE** |

## TABLE OF CONTENTS

I.   SUMMARY OF THE ACTION .......................................................................1

II.  JURISDICTION AND VENUE .................................................................10

III. PARTIES AND RELEVANT NON-PARTIES ........................................10

IV.  BACKGROUND .........................................................................................24

     A.   Residential Capital Emerges As a Major Issuer
          and Underwriter of Mortgage-Backed Securities ................................24

     B.   Residential Capital's Securitization and Underwriting Operations ......26

V.   DEFENDANTS' OMISSIONS OF MATERIAL FACT FROM
     THE OFFERING DOCUMENTS UNDER THE SECURITIES ACT ......28

     A.   Exponential Increases in Borrower Delinquencies Shortly After Each
          Certificate Offering Reflects Defective Collateral and Faulty Origination ..........28

     B.   The Collapse of the Certificates' Ratings Shortly After Each
          Offering Reflects Defective Loan Collateral and Faulty Origination ..................30

     C.   Investigations and Disclosures Subsequent to
          Offerings Evidence That HFN Disregarded
          Stated Mortgage Loan Underwriting Guidelines ..................................31

     D.   The Offering Documents Failed to Disclose the Underwriter
          Defendants' Inadequate Due Diligence with Respect to
          Compliance with Stated Mortgage Loan Underwriting Guidelines ......36

     E.   Governmental Agency Investigations Subsequent to Offerings
          Evidence Faulty Loan Origination and Securitization Practices ..........39

     F.   The Offering Documents Failed to Disclose that Residential Capital and
          the Underwriter Defendants Relied on S&P and Moody's Outdated
          Models to Determine Levels of Credit Enhancement and Ratings ......40

     G.   The Ratings Agencies Relaxed the Ratings Criteria Which
          Led to Artificially High Ratings Awarded to the Certificates ..............45

     H.   The Prospectus Supplements Did Not
          Reflect the True Risk of the Certificates ..............................................47

i

I.      The Offering Documents Failed to Disclose
Residential Capital's Ratings Shopping Practices ................................49

J.      The Offering Documents Failed to Disclose the True
Roles of Ratings Agencies in Forming and Structuring
the Certificates for Sale as Primarily AAA Securities...........................50

K.     The Offering Documents Failed to Disclose Material Financial Conflicts
of Interest Between Residential Capital and the Ratings Agencies......................53

L.     Subsequent Disclosures Evidence Underwriter Defendants'
Write-Downs and Near Collapse Due to Their Role in
Securitizing And Underwriting Mortgage-Backed Securities ..............................57

          1.     Defendant RFSC ...............................................................57

          2.     Defendant Goldman Sachs........................................................59

          4.     Defendant Deutsche Bank.....................................................62

          5.     Defendant Citigroup...........................................................64

          6.     Defendant UBS ...............................................................66

VI.    MATERIAL MISSTATEMENTS AND
OMISSIONS IN THE OFFERING DOCUMENTS.......................................68

     A.     Defendants' Material Misstatements and Omitted Information
Regarding Stated Mortgage Loan Underwriting Guidelines ................................68

          1.     The Registration Statements ....................................................68

          2.     The Prospectus Supplements ....................................................75

     B.     The Offering Documents Omitted Information
Regarding Delinquencies as of the Cut-Off Dates.................................80

     C.     The Offering Documents Included Material Misstatements
and Omitted Information Regarding Credit Support ............................81

     D.     The Prospectus Supplements Misstated the True Loan-to-
Value Ratios Associated with the Underlying Mortgages....................86

     E.     The Prospectus Supplements Misstated
the Certificates' True Investment Rating...................................89

923071.1 1

**VII.  CLASS ACTION ALLEGATIONS** ............................................................................92

**VIII.  CAUSES OF ACTION** ..............................................................................................94

    FIRST CAUSE OF ACTION ..........................................................................94

    SECOND CAUSE OF ACTION .....................................................................96

    THIRD CAUSE OF ACTION ........................................................................98

**IX.  PRAYER FOR RELIEF** ............................................................................................100

Plaintiffs undertake this amendment to comply with this Court's Opinion and Order dated December 21, 2010 ("December 21 Order") granting the motions to intervene brought by (i) Court-Appointed Lead Plaintiff New Jersey Carpenters Health Fund ("Carpenters Health Fund" or "Lead Plaintiff"); (ii) Plaintiff New Jersey Carpenters Vacation Fund ("Carpenters Vacation Fund," with Carpenters Health Fund, the "Carpenters Funds"); (iii) Plaintiff Boilermaker Blacksmith National Pension Trust ("Boilermaker Pension Trust"); and Plaintiffs-in-Intervention (iv) Iowa Public Employees' Retirement System ("IPERS"); (v) Midwest Operating Engineers Pension Trust Fund ("Midwest OE"); (vi) Orange County Employees Retirement System ("OCERS"); and (vi) Police and Fire Retirement System of the City of Detroit ("Detroit PFRS") (collectively, "Plaintiffs").   In so doing, Plaintiffs do not waive and hereby preserve all previously asserted claims regarding all securities included in the Consolidated First Amended Securities Class Action Complaint ("First Amended Complaint" or "FAC") filed May 18, 2009 in this action including any previously dismissed claims or parties, as if fully set forth herein. Plaintiffs believe that substantial additional evidentiary support for the allegations set forth below will be developed after a reasonable opportunity for discovery.

## I.

## SUMMARY OF THE ACTION

1.     This Consolidated Second Amended Securities Class Action Complaint (the "Complaint" or "SAC") is alleged upon personal knowledge with respect to Plaintiffs, and upon information and belief with respect to all other matters.  This action is brought pursuant to Section 11, 12 and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77l(a)(2) and 77o, by Plaintiffs on their own behalf and as a class action on behalf of all persons and entities who purchased or otherwise acquired interests in the Issuing Trusts (as set forth in ¶¶ 19-24, *infra*) (the "Issuing Trusts") pursuant or traceable to two (2) separate Registration Statements and accompanying Prospectuses filed with the Securities and Exchange Commission

1

("SEC") by Residential Accredited Loans, Inc. ("RALI"), a subsidiary of Residential Capital, LLC f/k/a Residential Capital Corporation ("RCC"),[1] on March 3, 2006 (No. 333-131213) (the "2006 Registration Statement") and on April 3, 2007 (No. 333-140610) (the "2007 Registration Statement," with the 2006 Registration Statement, collectively referred to herein as the "Registration Statements") (the "Class").

2.      Pursuant to the Registration Statements and Prospectus Supplements incorporated therein (collectively, the "Offering Documents"), $9.44 billion of RALI mortgage backed securities ("MBS") designated Mortgage Pass Through Certificates (the "Certificates") were sold to Plaintiffs and the Class in ten (10) Offerings within eleven months between June 28, 2006 and May 30, 2007 (collectively, the "Offerings").   Since RALI had limited investment bank capabilities, Residential Funding Securities Corporation d/b/a GMAC RFC Securities (another subsidiary of GMAC) underwrote two (2) Offerings either on its own or in conjunction with a second Underwriter.  A total of eight (8) Offerings were underwritten by Defendants Goldman, Sachs & Co., Inc. ("GSC"), Deutsche Bank Securities, Inc. ("DBS"), Citigroup Global Markets, Inc. ("CITI") and/or UBS Securities, LLC ("UBS") (collectively, the "Underwriters" or the "Underwriter Defendants").[2]  Each of the Underwriter Defendants was itself a major player in the rapid and massive securitization of sub-prime and Alt-A residential mortgage loans.

3.      As set forth below, the Offering Documents contained material misstatements and omitted material information in violation of Sections 11, 12 and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o.  Defendants are strictly or negligently liable for the material

---

[1]      Defendant RCC is a wholly-owned subsidiary of General Motors Acceptance Corporation ("GMAC"). Although GMAC was a wholly owned subsidiary of General Motors Corporation ("GM"), it is now a GM subsidiary that is majority owned by a consortium of investors led by Cerebus Capital LLC (¶¶ 27, 132).  For the purposes of the within Complaint, GMAC and GM are collectively referred to as "General Motors."

[2]      Lehman Brothers, Inc. ("LB") served as the Underwriter on one of the RALI Certificate Offerings. However, as set forth in ¶¶ 32 and 50 below, LB is not named as a Defendant herein.

923071.1 1

misstatements and omissions under the Securities Act.  The Complaint asserts no allegations or claims sounding in fraud.

4.      Plaintiffs seek redress against Defendant RALI, the Issuer of the Registration Statements and Depositor of the underlying collateral; the individual signatories to the Registration Statements, Defendants Bruce J. Paradis ("Paradis"), Kenneth M. Duncan ("Duncan"), Davee L. Olson ("Olson"), Ralph T. Flees ("Flees"), Lisa R. Lundsten ("Lundsten"), James G. Jones ("Jones"), David M. Bricker ("Bricker") and James N. Young ("Young"); the Sponsor and Seller for each of the Offerings, Defendant Residential Funding Company, LLC ("RFC");[3] Defendant RCC, the parent Company of RALI and RFC; and the Underwriters of the RALI Offerings, Defendants RFSC, GSC, DBS, CITI and UBS.  RCC, RALI, RFC and RFSC, along with their affiliates and subsidiaries are referred to collectively as "Residential Capital."

5.      This action arises from the conversion by Residential Capital of largely sub-prime and Alt-A mortgage loans into $9.44 billion of purportedly "investment grade" residential MBS. The value of the Certificates was directly tied to repayment of the underlying mortgage loans since the principal and interest payments due to investors were secured and derived from cash flows from those loans.[4]

---

[3]      Residential Funding Corporation, a Delaware Corporation formed in 1982, became Residential Funding Company, LLC, a limited liability company, in October 3, 2006.  All references to Defendant RFC are inclusive of the current as well as the former entity.

[4]      As the original borrowers on each of the underlying mortgage loans paid their mortgages, distributions were made to investors through the Issuing Trusts in accordance with the terms of the Offering Documents governing the issuance of the Certificates.  If borrowers failed to pay back their mortgages, defaulted, or were forced into foreclosure, the resulting losses flowed to the Certificate investors.  As set forth in the Prospectus Supplements, the Certificates were divided into a structure of classes, or "tranches," reflecting different priorities of seniority, payment, exposure to risk and default, and interest payments.

6.      By the end of 2005, GMAC and its subsidiary, Residential Capital, had become one of the largest issuers of MBS, not just in the United States, but in the world.  According to *Inside Mortgage Finance*, in 2005 alone, Residential Capital issued over $56.93 billion of MBS, making it the fifth largest issuer of such securities.  Residential Capital was capable of securitizing such massive quantities of mortgage collateral because it created and operated what was essentially a high-speed assembly line for the securitization of mortgage loans.  Residential Capital had sufficient "product" in the form of mortgage loans because it owned and operated Homecomings Financial LLC f/k/a Homecomings Financial Network, Inc. ("HFN") – a subsidiary principally engaged in the business of residential mortgage loan origination.  HFN solely acquired and originated non-conforming (sub-prime and Alt-A) loans.  The HFN-originated loans were immediately purchased by RFC, who acted as Sponsor and Seller of the Certificates, and securitized by RALI, the Depositor of the Certificates.[5]  Because Residential Capital's investment banking operations were more limited, it underwrote only two of the 10 Certificate Offerings.  The remaining four Underwriter Defendants were engaged on the balance of the Offerings.

7.      The Certificates could not be sold at all – much less profitably – unless they had been assigned the highest investment grade rating from one or more Nationally Recognized Statistical Ratings Organizations ("NRSRO"), specifically, Moody's Investors Service, Inc. ("Moody's") and Standard & Poor's Ratings Services, a Division of the McGraw-Hill Companies ("S&P," with Moody's collectively referred to herein as the "Ratings Agencies"). The reason was simple.  Without such ratings, they could not be purchased by the Underwriter

---

[5]      RALI served as "Depositor" for the Offerings (¶¶ 29-33) acquiring the loans from RFC and "depositing" them to the Issuing Trusts where RALI securitized the cash-flows from the mortgage loans and formed the Certificates.

923071.1 1

Defendants' principal potential clientele – institutional investors, namely pension funds and insurance companies.

8.     Residential Capital and the Underwriter Defendants did not leave the assignment of these highest AAA ratings to chance.  These Defendants ensured the award of such ratings by engaging Moody's and S&P not only to "rate" the Certificates prior to issue, but, more importantly, to directly participate in the securitization and structuring of the Offerings.  (¶¶ 61-64).   Also, using their economic weight as a source of substantial rating engagements as leverage, the Defendants had the Ratings Agencies submit their proposed ratings as part of their competitive bid for the ratings engagement. (¶ 64).   Regardless of the creditworthiness of the borrower or the terms of the underlying mortgages,[6] the Certificates were substantially assigned the highest investment grade ratings by the Ratings Agencies.  Moody's and S&P rated $9.14 billion and $9.26 billion, respectively, of the $9.44 billion Certificates issued pursuant to the Offerings complained of herein.  (¶ 71).   At the time the Certificates were issued, Moody's assigned its highest investment grade rating of "Aaa" to 95.11%, or $8.70 billion, of the Moody's rated Certificates, and S&P assigned its highest investment grade rating of "AAA" to 95%, or $8.80 billion, of the S&P rated Certificates.[7] (*Id.*). These ratings reflected the risk or probability of default by the borrower according to the Offering Documents. (¶ 71, 208).   None of the Certificates were initially rated below "investment grade," ("Ba1" and below for Moody's and "BB+" and below for S&P). (*Id.*).

9.     Soon after issuance of the Certificates, the value of the Certificates collapsed. Further, the likelihood of these securities ever recovering its value is severely diminished by the

---

[6]     The Certificate collateral included adjustable rate loans which posed a high degree of risk of "payment shock" since they required small fixed payments for an initial or limited period of time which would reset to much higher adjustable rate interest payments.

[7]     "AAA" and "Aaa" are collectively referred to herein as "AAA."

fact that approximately *41%* of the mortgage loans underlying the Certificates – the source of financial return for Certificate investors – as of the filing of the FAC, were in delinquency, default, foreclosure or repossession.   (¶¶ 65-69).   Moreover, approximately 100% of the Certificates had, by May 2009, been downgraded by Moody's to speculative and junk bond status.  (¶ 71).

10.    Since Certificate Investors were dependent on the quality of the underlying mortgage loan collateral for receipt of a return on their investment, the descriptions of the loan origination guidelines in the Offering Documents were highly material disclosures to Certificate purchasers.  The descriptions of the underwriting guidelines included in the Offering Documents described the policies employed by RFC, by way of its wholly-owned subsidiary HFN, in examining borrower creditworthiness and verifying borrower information (¶¶ 168-195) and in conducting appraisals of the mortgaged properties. *Id*. These portions of the Offering Documents also contained misstatements and omissions since, as has emerged only well after issuance of the Certificates, HFN and its correspondent lenders systematically disregarded the stated underwriting guidelines set forth in the Offering Documents.  *Id.*  These misstatements and omissions as well as the defective nature of the Certificate collateral were further reflected in the fact that the Ratings Agencies themselves, in downgrading the Certificates from the highest investment grade to junk status, specifically attributed the downgrades to "aggressive underwriting" in the origination of the mortgage loans (¶ 90) the utter collapse of the AAA ratings originally assigned the Certificates (¶ 71); and the uniform pattern of exponential increases in delinquency, default and foreclosure rates almost immediately after the consummation of the various Offerings (regardless of when the Offering occurred) (¶¶ 65-68).

6

11.     While compliance with those loan underwriting guidelines was highly material to Certificate investors, who were dependent on the creditworthiness of the borrowers for interest and principal payments, Residential Capital had no such similar financial interest.  Residential Capital and the Underwriting Defendants conducted inadequate due diligence with respect to whether the loans were originated in conformity with the underwriting guidelines set forth in the Offering Documents.  "Due diligence" principally occurred not during the underwriting phase of the Offering by the Underwriter Defendants, but while Residential Capital acquired the collateral from its subsidiary HFN.  (¶ 63).  At that stage, there was a disincentive for Residential Capital to reject loans as non-compliant with stated guidelines because the loans were the property of RCC regardless, since the loans were originated by its subsidiary.  Residential Capital's and the Underwriter Defendants' "due diligence" was limited, inadequate and defective. (¶¶ 69, 80-86, 109, 135, 146, 152, 158, 167).  Residential Capital and the Underwriter Defendants were forced to review loans on an expedited basis and therefore did not commit to a full review of the mortgage loans underlying the securitizations.

12.     Residential Capital and the Underwriters contracted out the inspection of loans for compliance with the Originator's underwriting guidelines to outside firms – Clayton Holdings, Inc. ("Clayton") and The Bohan Group ("Bohan") – and then conducted limited oversight of these subcontractors' activities.  As disclosed as part of an ongoing investigation of investment banking misconduct in underwriting MBS being conducted by the New York Attorney General (the "NYAG"), Clayton and Bohan routinely provided investment banks with detailed reports of loans non-compliant with underwriting guidelines, but the investment banks routinely overrode exclusion of those loans from purchase and securitization.  (¶ 84).  Further, Bohan's President

stated that, by the time the Offerings of the Certificates took place, investment banks were requiring a review of only 5% to 7% of the entire loan pools. (¶ 86).[8]

13.    The Offering Documents failed to disclose that, given Residential Capital and HFN's systematic disregard for the underwriting guidelines, the amount of credit enhancement supporting the Certificates was insufficient to substantiate the assigned AAA and other investment grade ratings; and that the Ratings Agencies caused this understatement by failing to timely and adequately update the models employed to make those assessments. As was only disclosed well after the issuance of the Certificates, S&P's models had not been materially updated since 1999; and Moody's models had not been materially updated since 2002. Because these models employed statistical assumptions based on the performance of mortgage loans issued in or before 2002, they failed to accurately reflect the performance of the Certificate collateral which included substantial portions of the type of loans which only began to be originated en masse after 2002 – *i.e.,* sub-prime and Alt-A loans, non-traditional or hybrid adjustable rate mortgages; interest-only and negative amortization loans,[9] as well as loans issued with limited borrower documentation or employment verification. (¶¶ 168-195).

14.    The Offering Documents also failed to disclose material financial conflicts of interest between the Ratings Agencies and Residential Capital, including Residential Capital's engagement of the Ratings Agencies through "ratings shopping." (¶¶ 64, 112-15). These conflicts of interest were detailed in a report released by the SEC in July 2008 (the "SEC Report"), after a year-long investigation into the Ratings Agencies' activities relating to the

---

[8]    As former head of MBS at Moody's, Brian Clarkson stated in an October 17, 2008 article in the *Financial Times*, in structured finance, including mortgage backed securities "[y]ou start with a rating and build a deal around a rating." (¶ 118).

[9]    As discussed below, originations of non-traditional adjustable mortgages, interest only and negative amortization loans increased dramatically between 2004 and 2006. (¶ 60). These types of loans presented the greatest potential for **"payment shock"** to the borrower since they both provide small initial fixed rates for a limited period of time which then reset thereafter to much higher monthly payment amounts.

923071.1 1

issuance of RMBS in the period spanning 2005 through 2007.  The SEC Report disclosed that the Ratings Agencies typically were engaged by way of "ratings shopping" whereby the Ratings Agency that was ultimately engaged was the one which provided the most profitable rating to the investment bank in "bidding" for the engagement.  The SEC Report also explained that the Ratings Agencies were incentivized, due to the highly profitable nature of these MBS engagements and the concentration of business in the hands of a relatively small group of investment banks, to not update their models lest they become unable to provide to the investment bank the most profitable credit enhancement and rating structure for the MBS transaction.  (¶¶ 92-102).

15.     As set forth herein, the Offering Documents contained material misstatements and omissions of material facts in violation of Sections 11 and 12 of the Securities Act, including the failure to disclose that: (i) the Certificate mortgage loan collateral was not originated in accordance with the loan underwriting guidelines set forth in the Registration Statements or the Prospectus Supplements, since Residential Capital and HFN failed to conduct meaningful assessment of the borrower's creditworthiness, employment verification and/or standard appraisals of the mortgaged properties sufficient to assess their fair value (¶¶ 168-195); (ii) Residential Capital and the Underwriter Defendants failed to conduct adequate due diligence with respect to HFN's compliance with the loan underwriting guidelines stated in the Offering Documents (¶¶ 79-86); (iii) the stated credit enhancement did not support the investment grade ratings assigned to the Certificates in light of the true undisclosed and impaired quality of the mortgage collateral. (¶¶ 92-115); (iv) there were material undisclosed conflicts of interest between Residential Capital and the Underwriter Defendants, and the Ratings Agencies, including as reflected in the undisclosed ratings shopping practices, which incentivized the

9

Ratings Agencies to understate the appropriate Certificate credit enhancement and inflate the Certificate ratings (¶¶ 121-26); and (v) the amount of credit enhancement provided to the Certificates was inadequate to support the AAA and investment grade ratings because those amounts were determined primarily by Ratings Agencies' models which had not been updated in a timely manner. (¶¶ 92-102).

16.     As a result of these material misstatements and omissions of material fact Plaintiffs and the Class have suffered damages for which Defendants are liable pursuant to Sections 11, 12 and 15 of the Securities Act.

**II.**

**<u>JURISDICTION AND VENUE</u>**

17.     The claims alleged herein arise under Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o. Jurisdiction is conferred by Section 22 of the Securities Act and venue is proper pursuant to Section 22 of the Securities Act.

18.     The violations of law complained of herein occurred in this County, including the dissemination of materially false and misleading statements complained of herein into this County. RCC, RFC, RALI, RFSC, the Underwriter Defendants their affiliates, subsidiaries and/or successors-in-interest conduct or conducted business in this County.

**III.**

**<u>PARTIES AND RELEVANT NON-PARTIES</u>**

19.     Court-Appointed Lead Plaintiff Carpenters Health Fund and Plaintiff Carpenters Vacation Fund are Taft-Hartley Pension Funds. As reflected in the Certification of Securities Class Action filed herein, the Carpenters Funds purchased the following classes of Certificates

10

923071.1 1

pursuant and traceable to the Registration Statements and Prospectus Supplements and have been damaged thereby:

| Certificates Purchased | Amount of Units Purchased | Price Paid (Per Unit) | Value as of the Date of Filing of Complaint (Per Unit) |
|---|---|---|---|
| RALI Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QO7, Class M1 | 180,000 | $ 1.00625 | $ 0.00984 |
| RALI Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS1, Class 1A1 | 415,000 | $ 1.00980 | $ 1.0058[A] |
| RALI Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS1, Class 2A10 | 155,000 | $ 1.00500 | $ 1.0027[A] |
| RALI Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QH4, Class A1 | 80,000 | $ 0.99890 | $ 0.3049 |

[[A] - per unit price of security as of January 31, 2008.]

20.    Plaintiff Boilermaker Pension Trust is a Taft-Hartley Pension Fund.  As reflected in the Certification of Securities Class Action filed herein, the Boilermaker Pension Trust purchased the following Certificates pursuant and traceable to the Registration Statements and Prospectus Supplements and has been damaged thereby:

| Certificates Purchased | Amount of Units Purchased | Price Paid (Per Unit) | Value as of the Date of Filing of Complaint (Per Unit) |
|---|---|---|---|
| RALI Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QO4, Class A1A | 961,530.55 | $ 095520 | $ 0.3527 |

21.    Plaintiff IPERS is a public pension fund.  As reflected in the Certification of Securities Class Action filed with IPERS' Motion to Intervene on July 30, 2010 (*see* Dkt. Nos.

98-100), IPERS purchased the following Certificates pursuant and traceable to the Registration Statements and Prospectus Supplements:

| Certificates Purchased | Date of Purchase | Amount of Units Purchased | Price Paid (Per Unit) |
|---|---|---|---|
| RALI Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QO10, Class A1 | 5/1/2007 | 7,073,554.39 | $0.9986 |
| RALI Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS1, Class 2A2 | 5/29/2008 | 13,460,044.45 | $0.7275 |
| RALI Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QO2, Class A1 | 3/27/2008 | 3,356,988.00 | $0.7375 |

22.     Plaintiff OCERS is public pension fund.  As reflected in the Certification of Securities Class Action filed with OCERS' Motion to Intervene on July 30, 2010 (*see* Dkt. Nos. 98-100), OCERS purchased the following Certificates pursuant and traceable to the Registration Statements and Prospectus Supplements:

| Certificates Purchased | Date of Purchase | Amount of Units Purchased | Price Paid (Per Unit) |
|---|---|---|---|
| RALI Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QS18, Class 3A1 | 6/11/2007 | 1,376,865.76 | $0.9859 |
| RALI Mortgage Asset Backed Pass-Through Certificates, Series 2006-QO6, Class A1 | 3/5/2008 | 1,417,167.04 | $0.8300 |

23.     Plaintiff Midwest OE is a Taft-Hartley Pension Fund.  As reflected in the Certification of Securities Class Action filed with Midwest OE's Motion to Intervene on July 13, 2010 (*see* Dkt. Nos. 91-93, 95), Midwest OE purchased the following Certificates pursuant and traceable to the Registration Statements and Prospectus Supplements:

| Certificates Purchased | Date of Purchase | Amount of Units Purchased | Price Paid (Per Unit) |
|---|---|---|---|

923071.1 1

| | | | |
|---|---|---|---|
| RALI Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QO9, Class 1A1B | 9/26/2007 | 2,293,260.45 | $0.9874 |

24.     Detroit PFRS is a pension plan and trust established by the Charter and Municipal Code of the City of Detroit, Michigan.  Detroit PFRS has approximately $3.5 billion of net assets held in trust for the benefit of the active and retired police officers and firefighters of the City of Detroit, Michigan. As reflected in the certification filed with Detroit PFRS' Motion to Intervene on July 2, 2010 (*see* Dkt. Nos. 84-86), Detroit PFRS purchased the following Certificates pursuant and traceable to the Registration Statements and Prospectus Supplements and has been damaged by the following amounts:

| Certificates Purchased | Amount of Units Purchased | Price Paid (Per Unit) | Amount Received on Units Sold (Per Unit) |
|---|---|---|---|
| RALI Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QS8, Class A1 | 1,451,140.68 | $0.84 | $0.735 |

25.     Upon filing of the initial complaint on September 22, 2008 (the "Initial Complaint") the statute of limitations was tolled as to all claims asserted herein by Plaintiffs with respect to the RALI Series 2006-QO6, 2006-QO9, 2006-QO10, 2007-QO2 Offerings.  *See* Dkt. No. 1.  Thereafter, the filing of the FAC on May 18, 2009 tolled the statute of limitations as to all of the claims asserted herein by Plaintiffs with respect to the RALI Series 2006-QS8 and RALI Series 2006-QS18 Offerings. *See* Dkt. No. 27.  The filing of the FAC also tolled the statute of limitations on Plaintiff IPERS' claims with respect to the RALI Series 2007-QS1 Offering.  *Id.* This Complaint asserts the same Securities Act claims, names the same defendants and contains identical allegations as to the same Registration Statements and Prospectus Supplements as the Initial Complaint and/or the FAC.  The claims here arise out of the same conduct, transactions and occurrences set forth in the Initial Complaint and/or the FAC.  As set forth in this Court's

Decision and Order on the Defendants' Motion to Dismiss the First Amended Complaint dated March 31, 2010, both the Initial Complaint and the FAC asserted timely claims on the RALI Offerings included therein. Therefore, under the tolling doctrine set forth in *American Pipe* and its progeny, as well as the relation-back doctrine of Fed. R. Civ. P. 15(c), the claims asserted herein on behalf of all Plaintiffs are timely.

26.     General Motors Corporation ("GM") GM is primarily engaged in automotive production and marketing, and financing and insurance operations.   GM is a Delaware corporation with its principal offices located at 300 Renaissance Center, Detroit Michigan.

27.     Defendant GMAC, LLC, f/k/a General Motors Acceptance Corporation (collectively referred to herein as "GMAC"), is principally located at 200 Renaissance Center, Detroit, Michigan 48265.  GMAC was founded in 1919 as a wholly-owned subsidiary of General Motors Corporation, and was originally established to provide GM dealers with the automotive financing necessary to acquire and maintain vehicle inventories and to provide retail customers the means by which to finance vehicle purchases through GM dealers.  On November 30, 2006, GM sold a 51% interest in GMAC for approximately $7.4 billion to FIM Holdings LLC, an investment consortium led by Cerberus FIM Investors, LLC, the sole managing member, and changed its name to GMAC, LLC.  GMAC is a leading, independent, globally diversified, financial services firm with approximately $248 billion of assets and operations in approximately 40 countries.  Since its inception, GMAC has greatly expanded its business and now includes the following primary lines of business – Global Automotive Finance, Mortgage (Residential Capital, LLC) and Insurance.  GMAC is the parent and sole owner of Defendant RCC, as well as Defendant Residential Funding Securities Corporation.

28.     Defendant Residential Capital, LLC, f/k/a Residential Capital Corporation (collectively referred to herein as "RCC") is a wholly owned subsidiary of GMAC, LLC and is principally located at 8400 Normandale Lake Boulevard, Suite 600, Minneapolis, Minnesota 55437, has principal offices of operations in Minneapolis, Minnesota and Fort Washington, Pennsylvania and maintains significant presence in states throughout the U.S., including New Jersey, Texas and California.  Defendant RCC is the parent company of Defendants RALI, RFC and the principal originator of the loan collateral, HFN.  RCC and its subsidiaries originate, purchase, sell, and securitize residential mortgage loans primarily in the United States, as well as internationally;  provide primary and master servicing to investors in residential mortgage loans and securitizations; provide collateralized lines of credit, which are referred to as warehouse lending facilities, to other originators of residential mortgage loans;  and hold a portfolio of residential mortgage loans for investment or sale together with interests retained from our securitization activities.

29.     Defendant Residential Funding Company LLC, f/k/a Residential Funding Corporation (collectively referred to herein as "RFC"), acted as the Sponsor for the Certificates issued pursuant to the Registration Statements.  Residential Funding Corporation changed its status from a Delaware Corporation to a limited liability company in October 2006.  Residential Capital originated or acquired all underlying mortgage collateral for the various Offerings via the Sponsor, RFC.  (¶¶ 55-64).  RFC made certain representations and warranties in connection with the loan pools collateralizing the Certificates.  (*Id.*)  As set forth in the Registration Statements, RFC then conveyed the mortgages to the Depositor, Defendant RALI, which was formed for the sole purpose of creating, and thereafter depositing the collateral into, the Issuing Trusts.  The Issuing Trusts then issued the Certificates supported by the cash flows from the assets and were

secured by those assets. (¶¶ 34, 55-64).  RFC's principal office is located at 8400 Normandale Lake Boulevard, Suite 600, Minneapolis, Minnesota 55437.

30.     Defendant RALI served as the Depositor for the Offerings and is principally located at 8400 Normandale Lake Boulevard, Suite 600, Minneapolis, Minnesota 55437. Defendant RALI is the wholly owned subsidiary of RCC.  Defendant RALI filed Registration Statements and accompanying Prospectuses with the SEC in connection with the Offerings.  The role of RALI as the Depositor was to purchase the mortgage loans from the seller and then assign the mortgage loans and all of its rights and interest under the mortgage loan purchase agreement to the trustee for the benefit of the Bondholders.  RALI, as Depositor, was also responsible for preparing and filing any reports required under the Securities Exchange Act of 1934.

31.     Defendant RALI filed the following Registration Statements and accompanying Prospectuses with the SEC on Form S-3, as subsequently amended on Form S-3/A, under Registration Nos. 333-131213 and 333-140610 as follows:

### The 2006 Registration Statement:

| Date Filed | Form Type | Amount Registered |
|---|---|---|
| January 23, 2006 | S-3 | $ 1,000,000 |
| March 3, 2006 | S-3/A | $ 34,723,478,970[10] |

### The 2007 Registration Statement:

| Date Filed | Form Type | Amount Registered |
|---|---|---|
| February 12, 2007 | S-3 | $ 1,000,000 |
| April 3, 2007 | S-3/A | $ 80,000,000,000[11] |

---

[10]     The amount registered under the 2006 Registration Statement includes $24,723,478,970 previously registered under Registration No. 333-126732 on July 30, 2005 and which remained unissued as of March 3, 2006.

[11]     The amount registered under the 2007 Registration Statement includes $27,349,759,494 previously registered under Registration No. 333-131213 (the 2006 Registration Statement) and which remained unissued as of April 3, 2007.

923071.1 1

32.     Defendants RFC and RALI, as Sponsor/Seller and Depositor, respectively, formed the following eight (8) Issuing Trusts, by which RFC and RALI issued, or caused to be issued, the RALI Certificates, pursuant to the 2006 Registration Statement:

| Issuing Trust | Approximate Principal Amount | Approx. Offering Date | Underwriter(s) | Depositor/Issuer | Sponsor |
|---|---|---|---|---|---|
| RALI Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QO6 | $ 1,290,297,000 | June 28, 2006 | Goldman, Sachs & Co., Inc. | Residential Accredited Loans, Inc. | Residential Funding Corporation |
| RALI Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QO7 | $ 1,542,440,000 | September 29, 2006 | UBS Securities, LLC | Residential Accredited Loans, Inc. | Residential Funding Corporation |
| RALI Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QO9 | $ 890,657,000 | November 28, 2006 | Lehman Brothers, Inc. | Residential Accredited Loans, Inc. | Residential Funding Company, LLC |
| RALI Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QO10 | $ 889,857,000 | December 27, 2006 | Goldman, Sachs & Co., Inc. | Residential Accredited Loans, Inc. | Residential Funding Company, LLC |
| RALI Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QS8 | $ 953,783,554 | July 25, 2006 | Citigroup Global Markets, Inc./ Residential Funding Securities Corporation | Residential Accredited Loans, Inc. | Residential Funding Corporation |
| RALI Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QS18 | $ 1,164,635,393 | December 27, 2006 | Deutsche Bank Securities, Inc. | Residential Accredited Loans, Inc. | Residential Funding Company, LLC |
| RALI Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QO2 | $ 527,132,000 | February 26, 2007 | Deutsche Bank Securities, Inc. | Residential Accredited Loans, Inc. | Residential Funding Company, LLC |

17

| | | | | | |
|---|---|---|---|---|---|
| RALI Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS1 | $ 1,280,501,451 | January 26, 2007 | Citigroup Global Markets, Inc. | Residential Accredited Loans, Inc. | Residential Funding Company, LLC |

33.    Defendants RFC and RALI, as Sponsor/Seller and Depositor, respectively, formed the following two (2) Issuing Trusts, by which RFC and RALI issued, or caused to be issued, the RALI Certificates, pursuant to the 2007 Registration Statement:

| Certificate Trust Series | Approximate Principal Amount | Approx. Offering Date | Underwriter(s) | Depositor/Issuer | Sponsor |
|---|---|---|---|---|---|
| RALI Mortgage Asset-Backed Pass-Through Certificates, 2007-QH4 | $ 397,963,000 | April 26, 2007 | Goldman, Sachs & Co., Inc. / Residential Funding Securities Corporation | Residential Accredited Loans, Inc. | Residential Funding Company, LLC |
| RALI Mortgage Asset-Backed Pass-Through Certificates, 2007-QO4 | $ 502,837,000 | May 30, 2007 | Residential Funding Securities Corporation | Residential Accredited Loans, Inc. | Residential Funding Company, LLC |

34.    Each of the Issuing Trusts for the various Offerings set forth above was a common law trust formed for the sole purpose of holding and issuing the Certificates.  Each of the Issuing Trusts issued hundreds of millions of dollars worth of Certificates pursuant to a Prospectus Supplement, incorporated by reference into the corresponding Registration Statement, which broke out and identified numerous classes of Certificates within each Offering.

35.    Defendant Bruce J. Paradis ("Paradis") was, during the relevant time period, RALI's President and Chief Executive Officer.  Paradis also served as the President of Defendant RFSC.  Paradis signed the 2006 Registration Statement for the Offerings.

18

36.     Defendant Kenneth M. Duncan ("Duncan") was RALI's Acting Chief Financial Officer (Principal Financial Officer).  Duncan signed the 2006 Registration Statement for the Offerings.

37.     Defendant Davee L. Olson ("Olson") was a Director of RALI.  Olson signed the 2006 Registration Statement for the Offerings.

38.     Defendant Ralph T. Flees ("Flees") was, at all relevant times, RALI's Controller (Principal Accounting Officer).  Defendant Flees signed the 2006 and 2007 Registration Statements for the Offerings.

39.     Defendant Lisa R. Lundsten ("Lundsten") signed the 2006 and 2007 Registration Statements as Attorney-in-Fact.

40.     Defendant James G. Jones ("Jones") was RALI's President and Chief Financial Officer at the time the 2007 Registration Statement was issued and thereafter.  Jones signed the 2007 Registration Statement for the Offerings.

41.     Defendant David M. Bricker ("Bricker") was a Director of RALI as well as its Chief Executive s President and Chief Financial Officer at the time the 2007 Registration Statement was issued and thereafter.  Bricker signed the 2007 Registration Statement for the Offerings.

42.     Defendant James N. Young ("Young") was a Director of RALI at the time the 2007 Registration Statement was issued and thereafter.  Young signed the 2007 Registration Statement for the Offerings.

43.     The Defendants identified in ¶¶ 35-42 are referred to herein as the "Individual Defendants."  The Individual Defendants functioned as directors to the Issuing Trusts as they were officers and/or directors of RALI and signed either one or both of the Registration

19

Statements for the registration of the securities which were thereafter issued by the Issuing Trusts.

44.    The Individual Defendants participated with and/or conspired with the remaining Defendants in the wrongful acts and course of conduct or otherwise caused the damages and injuries claimed herein and are responsible in some manner for the acts, occurrences and events alleged in this Complaint.

45.    Defendant RFSC, d/b/a GMAC RFC Securities, served as the underwriter for two (2) of the RALI Certificate Offerings – specifically, the RALI Series 2007-QH4 and RALI Series 2007-QO4 Certificate Offerings (collectively the "RFSC Offerings").   RFSC is an SEC registered broker-dealer, principally located at 8400 Normandale Lake Boulevard, Suite 600, Minneapolis, Minnesota 55437 and is a wholly-owned subsidiary of Defendant RCC.   RFSC's banking operations are limited to broker-dealer functions in the issuance and underwriting of residential and commercial mortgage-backed securities.   Moreover, RFSC only conducts business with institutional clientele. RFSC was one of the leading MBS underwriters in the United States. RFSC, as an essential part of its investment banking business, has substantial contacts within this County and during the relevant time period transacted and continues to transact business in New York – specifically New York County (*i.e.*, Wall Street and the financial markets) including through the Offerings.   RFSC actively served as the underwriter in the sale of the Certificates and assisted in drafting and disseminating the Offering Documents pursuant to which the Certificates were issued.

46.    Defendant GSC served as the underwriter for three (3) of the RALI Certificate Offerings – specifically, the RALI Series 2006-QO6, RALI Series 2006-QO10 and RALI Series 2007-QH4 Certificate Offerings (collectively the "GSC Offerings").   GSC is an SEC registered

923071.1 1

broker-dealer, principally located at 85 Broad Street, New York, New York 10004.   GSC is one of the leading MBS underwriters in the United States.  GSC, as an essential part of its investment banking business, maintains its principal place of business operations and has substantial contacts within this County and during the relevant time period transacted and continues to transact business in New York – specifically New York County (*i.e.*, Wall Street and the financial markets) including through the Offerings.  GSC actively served as the underwriter in the sale of the Certificates and assisted in drafting and disseminating the Offering Documents pursuant to which the Certificates were issued.

47.     Defendant DBS served as the underwriter for two (2) of the RALI Certificate Offerings (collectively the "DBS Offerings"), including the RALI Series 2006-QS18 and RALI Series 2007-QO2 Certificate Offerings.  DBS is an SEC registered broker-dealer, principally located at 60 Wall Street, New York, New York 10005.  DBS is one of the leading MBS underwriters in the United States.  DBS, as an essential part of its investment banking business, in addition to maintaining its principal offices, has substantial contacts within this County and during the relevant time period transacted and continues to transact business in New York – specifically New York County (*i.e.*, Wall Street and the financial markets) including through the Offerings.  DBS actively served as the underwriter in the sale of the Certificates and assisted in drafting and disseminating the Offering Documents pursuant to which the Certificates were issued.

48.     Defendant CITI served as the underwriter for two (2) of the RALI Certificate Offerings, including the RALI Series 2006-QS8 and RALI Series 2007-QS1 (collectively the "CITI Offerings").  CITI is an SEC-registered broker-dealer, principally located at 399 Park Avenue, 7th Floor, New York, New York 10043.  Defendant CITI was intimately involved in the

CITI Offerings.  CITI is one of the leading MBS underwriters in the United States.  CITI, as an essential part of its investment banking business, has substantial contacts, including its principal offices, within this County and regularly transacts business in New York – specifically New York County (*i.e*., Wall Street and the financial markets) including through the Offerings.  CITI actively served as the underwriter in the sale of the Certificates and assisted in drafting and disseminating the Offering Documents pursuant to which the Certificates were issued.

49.     Defendant UBS served as the underwriter for the RALI Series 2006-QO7 Offering (the "UBS Offering").  UBS is an SEC registered broker-dealer, principally located at 1285 Avenue of the Americas, 19th Floor, New York, New York 10019.  UBS is one of the leading MBS underwriters in the United States.  UBS, as an essential part of its investment banking business, UBS maintains its principal offices and has substantial contacts within this County and during the relevant time period transacted business in New York – specifically New York County (*i.e*., Wall Street and the financial markets) including through the Offerings.  UBS actively served as the underwriter in the sale of the Certificates and assisted in drafting and disseminating the Offering Documents pursuant to which the Certificates were issued.

50.     Lehman Brothers, Inc. ("LB"), the former investment banking arm of the now-defunct entity Lehman Brother Holding, Inc. ("LBHI") served as the underwriter for the RALI Series 2006-QO9 Certificate Offering (the "LB Offering").  LB was an SEC registered broker-dealer, and was principally located at 745 Seventh Avenue, New York, New York 10019.  LB was one of the leading MBS underwriters in the United States.  LB, as underwriter for the LB Offering, is liable under Sections 11 and 12 of the Securities Act, but is not named as a Defendant herein because on September 15, 2008, its parent company, LBHI, filed for bankruptcy protection under Chapter 11 of the U.S. Bankruptcy Code, and in conjunction

therewith, the Securities Investor Protection Corporation commenced proceedings to liquidate LB.

51.     Defendants RFSC, GSC, DBS, CITI and UBS are collectively referred to herein and the "Underwriters" or "Underwriter Defendants."

52.     McGraw-Hill is a New York corporation with its principal place of business located at 1221 Avenue of the Americas, New York, New York 10020. S&P, a division of McGraw-Hill, provides credit ratings, risk evaluation, investment research and data to investors. S&P participated in the drafting and dissemination of the Prospectus Supplements pursuant to which the Certificates were sold to Plaintiffs and other Class members. In addition, S&P worked with Residential Capital, the Underwriter Defendants, loan sellers and servicers in forming and structuring the securitization transactions related to the Certificates, and then provided pre-determined credit ratings for the Certificates, as set forth in the Prospectus Supplements.

53.     Moody's Investors Service, Inc. (defined herein as "Moody's"), a division of Moody's Corp., is principally located at 250 Greenwich Street, New York, New York 10007, and provides credit ratings, risk evaluation, investment research and data to investors. Moody's participated in the drafting and dissemination of the Prospectus Supplements pursuant to which the Certificates were sold to Plaintiffs and other Class members. In addition, Moody's worked with Residential Capital, the Underwriter Defendants, loan sellers and loan servicers in forming and structuring the securitization transactions related to the Certificates, and then provided pre-determined credit ratings for the Certificates, as set forth in the Prospectus Supplements.

54.     McGraw-Hill, inclusive of S&P, and Moody's are collectively referred to hereinafter as the "Ratings Agencies").

923071.1 1

## IV.

## BACKGROUND

A.     **Residential Capital Emerges As a Major Issuer
       and Underwriter of Mortgage-Backed Securities**

55.     As illustrated below, a mortgage securitization is where mortgage loans are acquired, pooled together, and then sold to investors, who acquire rights in the income flowing from the mortgage pools.



56.     When mortgage borrowers make interest and principal payments as required by the underlying mortgages, the cash flow is distributed to the holders of the MBS certificates in order of priority based on the specific tranche held by the MBS investors.  The highest tranche (also referred to as the senior tranche) is first to receive its share of the mortgage proceeds and is also the last to absorb any losses should mortgage-borrowers become delinquent or default on their mortgage.  Of course, because the investment quality and risk of the higher tranches is affected by the cushion afforded by the lower tranches, diminished cash flow to the lower tranches results in impaired value of the higher tranches.

923071.1 1

57.     The securitization of loans fundamentally shifts the risk of loss from the mortgage loan originator to the investor who purchased an interest in the securitized pool of loans.  When the originator holds the mortgage through the term of the loan, it profits from the borrower's payment of interest and repayment of principal, but it also bears the risk of loss if the borrower defaults and the property value is not sufficient to repay the loan.  As a result, traditionally, the originator was economically vested in establishing the creditworthiness of the borrower and the true value of the underlying property through appraisal before issuing the mortgage loans.  In securitizations where the originator immediately sells the loan to an investment bank, it does not have the same economic interest in establishing borrower creditworthiness or a fair appraisal value of the property in the loan origination process.

58.     In the 1980s and 1990s, securitizations were generally within the domain of Government Sponsored Enterprises ("GSE"), *i.e.,* the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac"), which would purchase loans from originators.  Investors in these early GSE securitizations were provided protections since the underlying loans were originated pursuant to strict underwriting guidelines.

59.     Between 2001 and 2006, however, there was dramatic growth in both non-GSE loan originations and securitizations, for which there were no such underwriting limitations.  That growth resulted in a commensurate increase in subprime securitizations.  According to *Inside Mortgage Finance* (2007), in 2001, agency originations were $1.433 trillion and securitizations were $1.087 trillion – far outpacing non-agency originations of $680 billion and securitizations of $240 billion.  In 2006, agency originations grew to $1.040 trillion while securitizations declined to $904 million.  However, in that same period, non-agency originations

923071.1 1

had grown by 100% to $1.480 trillion, and non-agency securitizations had grown by 330% to $1.033 trillion in 2006. Further, non-agency origination of subprime loans grew by 315% – from $190 billion in 2001 to $600 billion in 2006; and non-agency Alt-A origination grew by 566% – from $60 billion in 2001 to $400 billion in 2006. Non-agency securitizations of subprime loans had also grown exponentially by 415% – from $87.1 billion in 2001 to $448 billion in 2006. Along with the growth of subprime securitizations the growth of subprime home equity securitizations also grew by 216% – from approximately $150 billion in 2002 to $475 billion in 2006.

60.     Residential Capital became a significant issuer in the MBS securitizations market. According to *Inside Mortgage Finance*, Residential Capital issued $42.336 billion and $56.93 billion of non-agency MBS in 2004 and 2005. (Moody's, *Bloomberg Asset Securitization*, January 2008.) In 2005, RFC was the fifth largest non-agency MBS issuer and ninth largest overall mortgage securities issuer. In 2006, Residential Capital increased their production to $66.2 billion, making it the fourth largest non-agency MBS issuer and eighth largest in total MBS issuance. In 2007, Residential Capital issued $6.6 billion of subprime MBS and an additional $22.2 billion of Alt-A MBS.

**B.     Residential Capital's Securitization Operations**

61.     In 2005 through 2007, Residential Capital's RMBS operations were run primarily out of its offices at 8400 Normandale Lake Boulevard, Suite 600, Minneapolis, Minnesota 55437.

62.     Residential Capital derived its profit from the sale of the Certificates for a price in excess of the amount paid for the underlying mortgage loans. The goal for Residential Capital was to sell the Certificates for a price above par or $1.00 per unit. As noted, for securitized

Certificates to be marketable to begin with, approximately 80% of the securitization had to have the highest rating by the rating agencies.  With that condition met, subprime securitizations and home equity securitizations posed the greater profit potential for Residential Capital.

63.    Before securitization could begin, Residential Capital had to acquire the underlying mortgage loans directly from its loan origination affiliate, HFN.  With the securitization structure in place, the Certificates were then issued through RALI Trusts designated with specific "Shelf" names.  The different shelf names reflected the different types of mortgage collateral underlying each of the specific RALI Offerings.  The underlying mortgages in the RALI "QH" Shelf Trusts were principally one- to four-family  residential, payment-option, hybrid  adjustable-rate  first lien mortgage loans with a negative amortization feature; the underlying mortgages in the RALI "QO" Shelf Trusts were also principally one- to four-family  residential,  payment-option, adjustable-rate first lien mortgage loans with a negative amortization feature; and the underlying mortgages in the RALI "QS" Shelf Trusts were principally one- to four-family residential first lien mortgage loans. RALI completed one (1) QH Offering, six (6) QO Offerings and three (3) QS Offerings pursuant to the 2006 and 2007 Registration Statements, between June 28, 2006 and May 30, 2007, which are all the subject of the within Complaint.

64.    Residential Capital and the Underwriter Defendants' ability to market the Certificates at all, much less at a profit - depended on ensuring that substantially all them were assigned the highest rating from the Ratings Agencies. In order to ensure this occurred Residential Capital and the Underwriter defendants made sure the Ratings Agencies participated in all aspects of the formation and structuring of the Certificates: from reviewing the loan tape before the loans were acquired to determining the loans to be included in the underlying

27

Certificate collateral pools.  These Defendants also had the Ratings Agencies compete for the engagement by including their proposed ratings on the Certificates as part of their bid for the Certificate rating engagement.  This ratings shopping resulted in 95% of the Certificates being assigned the highest AAA designation. The rating shopping practices was first disclosed in detail to investors in the July 2008 SEC Report (¶¶ 120-23) and in testimony by former Moody's and S&P managers in October 2008 (¶¶ 97-115).  The practice was effectively ended by way of an agreement entered into between the Ratings Agencies and NYAG in 2008.  (¶¶ 113, 124-25).

## V.

### DEFENDANTS' OMISSIONS OF MATERIAL FACT FROM THE OFFERING DOCUMENTS UNDER THE SECURITIES ACT

#### A. Exponential Increase in Borrower Delinquencies Shortly After Each Certificate Offering Reflects Defective Collateral and Faulty Origination

65.     Regardless of when the Certificate Offering occurred, delinquency rates rose exponentially shortly after issuance reflecting the defective quality of the loan collateral.

66.     At the time of issuance, the average delinquency and default rate of the outstanding loan balance was 0.00%.  Within four months of the Offerings, delinquencies skyrocketed from 0.00% of the outstanding loan balance as of the cut-off dates to 3.2% of the balance.  Broken down by Shelf, average delinquencies within four months of issue rose to over 3.7% for the RALI QO Offerings which are the subject of the within Complaint, to approximately 3.7% for the RALI QS Offerings and to 1.9% for the RALI QH Offering.

67.     Within six months after issuance of the Certificates, delinquencies dramatically worsened, increasing by 48,000% from issuance, from the cut-off dates, to 4.9% of the outstanding collateral balance – in excess of 4.6% for the RALI QO Offerings, 5.6% for the RALI QS Offerings and 4.6% for the RALI QH Offering.  As of the filing of the FAC in May

28

2009, the collateral had largely failed with a startling 41% of the total mortgage loans either delinquent, defaulted, in foreclosure or repossessed.

68.     The meteoric increase in delinquencies rates so soon after issuance is reflective of substantial instances of "early payment default" ("EPD") by borrowers on the underlying mortgage loans.  Such defaults are highly indicative of failed and deficient loan underwriting and origination practices.  (¶¶ 127-167).  As reported by the Federal Bureau of Investigation (the "FBI") in its 2006 and 2007 Mortgage Fraud Reports, a study of three million residential mortgage loans found that between 30% and 70% of early payment defaults were linked to significant misrepresentations in the original loan applications.  The study cited by the FBI and conducted by Base Point Analytics, found that loans that contained egregious misrepresentations were five times more likely to default in the first six months than loans that did not.  The misrepresentations included income inflated by as much as 500%, appraisals that overvalued the property by 50% or more, fictitious employers and falsified tax returns.  The 2006 FBI report also cited studies by a leading provider of mortgage insurance, Radian Guaranty Inc., found the same top states for mortgage fraud – including the states where the underlying HFN mortgage collateral was principally originated – were also the same top states with the highest percentage of early payment defaults.

69.     This pattern of borrower default shortly after the completion of the Offerings evidences substantial early payment default and borrower misrepresentations.  The origination of such fundamentally impaired loan collateral could only have occurred as a result of systematic failures to abide by the underwriting guidelines in the Offering documents and as a result of inadequate due diligence by Residential Capital and the Underwriter Defendants in monitoring compliance with those guidelines.

923071.1 1

B.   **The Collapse of the Certificates' Ratings Shortly After Each Offering Reflects Defective Collateral and Faulty Origination**

70.    The Ratings Agencies rated the Certificates pursuant to the following twenty three (23) level rating system:

| Color code | Number | Definition | Moodys | S & P | Fitch |
|---|---|---|---|---|---|
| | | **Investment Grade** | | | |
| | 10.0 | US Treasuries | *** | *** | *** |
| | 9.5 | Prime, maximum safety | Aaa | AAA | AAA |
| | 9.0 | Very high grade/quality | Aa1 | AA+ | AA+ |
| | 8.5 | " | Aa2 | AA | AA |
| | 8.0 | " | Aa3 | AA- | AA- |
| | 7.5 | Upper medium quality | A1 | A+ | A+ |
| | 7.0 | " | A2 | A | A |
| | 6.5 | " | A3 | A- | A- |
| | 6.0 | Lower medium grade | Baa1 | BBB+ | BBB+ |
| | 5.5 | " | Baa2 | BBB | BBB |
| | 5.0 | " | Baa3 | BBB- | BBB- |
| **Color code** | **Number** | **Definition** | **Moodys** | **S & P** | **Fitch** |
| | | **Speculative grade** | | | |
| | 4.5 | Speculative | Ba1 | BB+ | BB+ |
| | 4.0 | " | Ba2 | BB | BB |
| | 3.5 | " | Ba3 | BB- | BB- |
| | 3.0 | Highly speculative | B1 | B+ | B+ |
| | 2.5 | " | B2 | B | B |
| | 2.0 | " | B3 | B- | B- |
| | 1.5 | Substantial risk | Caa1 | CCC+ | CCC+ |
| | 1.0 | In poor standing | Caa2 | CCC | CCC |
| | 0.5 | " | Caa3 | CCC- | CCC- |
| | 0.0 | Extremely speculative | Ca | CC | CC |
| | 0.0 | Maybe in or extremely close to default | C | C+,C,C- | C+,C,C- |
| | 0.0 | Default | | D | D |

71.    As noted above, Moody's and S&P rated $9.14 billion and $9.26 billion, respectively, of the $9.44 billion Certificates issued pursuant to the RALI Offerings at issue in this Complaint.   At the time these Certificates were issued, Moody's assigned its highest investment grade rating of "Aaa" to 95.11%, or $8.7 billion, of the Moody's rated Certificates,

and S&P assigned its highest investment grade rating of "AAA" to 95%, or $8.8 billion, of the S&P rated Certificates. As a general matter, a rating downgrade of even one level – *e.g.,* from AAA to AA or from Aaa to Aa – is considered material to the financial condition of the rated entity or security. Here, the magnitude of the Certificate downgrades is unprecedented. The Certificates have been downgraded as many as the maximum 23 levels – with, for example, 100% of Certificates initially rated AAA having now been downgraded to "Ba1" or below, meaning these Certificates were not only designated "junk," but are considered in danger of "imminent default." The remaining Certificate tranches have fared no better since 100% of the $9.44 billion of Certificates at issue herein have been downgraded to speculative or "junk" status. Furthermore, Certificates rated in the Aa and A range by Moody's at issuance have been downgraded to CC and below – from "very high grade" and "upper medium" securities to "extremely speculative" junk bonds. This historic and dramatic reversal in the financial assessment of the Certificates by the Ratings Agencies underscores that these securities were defective from the outset.

**C.     Investigations and Disclosures Subsequent to Offerings Evidence That
        HFN Disregarded Stated Mortgage Loan Underwriting Guidelines**

72.     HFN was a principal originator for all 10 RALI Certificate Offerings subject to the within action. Homecomings Financial, LLC, formerly known as Homecomings Financial Network, Inc., ("HFN"), based in Minneapolis, Minnesota, is an indirect subsidiary of GMAC and a direct wholly-owned of RCC. HFN was founded in 1995 after RCC was purchased by GMAC, and has since served as RCC's primary wholesale lender.

73.     Following issuance of the Certificates, disclosures began to emerge which further reflected HFN's systemic disregard for the underwriting guidelines set forth in the Offering Documents, its practices and policies of favoring riskier, fee-driven mortgage lending including

sub-prime, Alt-A and option-ARM (hybrid adjustable rate or negative amortization) mortgage loans and inflating revenue via hidden prepayment penalties and fees.

74.    In mid-2008, the Federal Trade Commission (the "FTC") commenced an investigation into HFN's policies and practices after an FTC staff review of HFN's mortgage loan data report pursuant to the Home Mortgage Disclosure Act, 12 U.S.C. §§ 2801-2810, indicated that African American and Hispanic borrowers paid more for mortgage loans than non-Hispanic Whites.   According to a letter from the FTC to HFN's counsel, the investigation focused on whether the underwriting risk and the credit characteristics of the borrowers justified the reported disparities in loan price.

> Homecomings originated the vast majority of its loans through independent brokers and Homecomings' policy and practice was to set the risk-based price and other terms of its brokered loans.  In addition, Homecomings' policy and practice was to allow brokers to assess discretionary charges on these loans, within certain limits set by Homecomings.  These discretionary charges took the form of (1) fees charged at the time of origination, including broker points and fees, and (2) higher interest rates, in return for which Homecomings paid brokers yield spread premiums.
>
> Based on an extensive investigation, which included obtaining and analyzing Homecomings' full and complete loan data, the staff's statistical analyses of the data show that, on average, Homecomings charged African-American and Hispanic borrowers substantially more for home purchase and refinance loans than similarly-situated non-Hispanic whites.  ***The staff further determined that these disparities were caused by Homecomings' policy and practice of allowing its brokers broad discretion to determine the amount of discretionary fees charged to borrowers in addition to the risk-based price.  The staff concluded that the disparities in these discretionary charges are substantial, statistically significant, and cannot be explained by any legitimate underwriting or credit characteristics in violation of the FCOA and the FTC Act.***

75.    Before the FTC could complete their investigation, on September 3, 2009, RCC announced that it was shutting its wholesale mortgage origination operations, thereby closing down HFN, as well as its retail operations, GMAC Mortgage, LLC ("GMACM").  In a January 22, 2009 FTC letter closing the investigation, the FTC explained:

923071.1 1

During the course of this investigation, Homecomings ceased originating mortgage loans and stated it has no intention to resume mortgage lending in the future.   In addition, Residential Capital, LLC ("ResCap"), an indirect parent company of Homecomings, filed a 10-Q Quarterly report for the third quarter of 2008 for ResCap and its direct and indirect subsidiaries, including Homecomings (collectively, the "Company"), which states that the ability of the Company to continue as a going concern is in substantial doubt.  The 10-Q further notes that the Company is heavily dependent on its own indirect parent, GMAC, LLC, for funding and capital support and that there can be no assurance that such support will continue.   Because of these developments and based on additional information provided by the Company regarding its financial status, the staff has closed the investigation.  However, the staff will continue to monitor future developments concerning Homecomings, including whether GMAC's recent conversion to a bank holding company and its receipt of financial assistance from the U.S. Department of the Treasury, may affect Homecomings' operating and financial status.  If warranted by materially changed circumstances, the staff will take appropriate action, including the reopening of this investigation.

76.    In a March 5, 2009 article titled "Shaky Loans May Spur New Foreclosure Wave," the *Portland Tribune* recounted the events leading up to the massive failures throughout the U.S. mortgage lending industry - including the role of HFN:

"In order to keep your market share, you had to be more aggressive," said Tim Boyd, who sold subprime loans in the Portland area for six years and then Alt A loans for seven years for Homecomings Financial.

"The main focus was doing Alt A because that's where the money was," said Boyd, who left the industry.  A loan officer arranging a $300,000 Option ARM loan could collect $10,500 in fees, he said.

Lenders could unload shaky loans by selling them to investors, who often resold them in what amounted to a worldwide game of financial musical chairs.  Wall Street's insatiable appetite for more loans kept the pipeline filled, even if the deals weren't always sound.

"The V.P.s came down to the office beating the drums about Option ARMs," urging mortgage brokers to sell them to customers, Ridge said. "I had Wachovia march through there; I had GMAC."

*                    *                    *

He said he knows of loan officers who'd tell title agents to keep quiet about Option ARM loan provisions during document-signing time.

"They'd tell the title officer, 'Don't go over this; just glean through it quickly and get the thing signed.' "

Tim Boyd said he drew the line at selling Option ARMs because he saw how that could get people into trouble. "It made me sick," he said.

77.     In late 2002, the West Virginia Attorney General's Office began an investigation into predatory lending practices of HFN and another subprime mortgage lender, Fairbanks Capital Corp ("Fairbanks"). The investigation led to a June 25, 2005 settlement between the WVAG, Fairbanks and HFN, pursuant to which Fairbanks and HFN agreed to pay $773,000 in restitution, account credits and refunds for approximately 2,300 West Virginia consumers who had been charged unlawful fees and who lost their homes through "questionable foreclosures."

78.     In a September 11, 2006 article titled "Nightmare Mortgages," *BusinessWeek Magazine* described HFN's lending policies as using outrageous pre-payment penalties to keep borrowers stuck in pay-option ARM loans and their using "fine-print" in contracts to hide disclosures:

> Gordon Burger is among the first wave of option ARM casualties. The 42-year-old police officer from a suburb of Sacramento, Calif., is stuck in a new mortgage that's making him poorer by the month. Burger, a solid earner with clean credit, has bought and sold several houses in the past. In February he got a flyer from a broker advertising an interest rate of 2.2%. It was an unbeatable opportunity, he thought. If he refinanced the mortgage on his $500,000 home into an option ARM, he could save $14,000 in interest payments over three years. Burger quickly pulled the trigger, switching out of his 5.1% fixed-rate loan. "The payment schedule looked like what we talked about, so I just started signing away," says Burger. He didn't read the fine print.
>
> After two months Burger noticed that the minimum payment of $1,697 was actually adding $1,000 to his balance every month. "I'm not making any ground on this house; it's a loss every month," he says. ***He says he was told by his lender, Minneapolis-based Homecoming Financial, a unit of Residential Capital, the nation's fifth-largest mortgage shop, that he'd have to pay more than $10,000 in prepayment penalties to refinance out of the loan. If he's unhappy, he should take it up with his broker, the bank said. "They know they're selling crap, and they're doing it in a way that's very deceiving," he says. "Unfortunately, I got sucked into it."*** In a written statement, Residential

said it couldn't comment on Burger's loan but that "each mortgage is designed to
meet the specific financial needs of a consumer."

(Emphasis added).

**D.    The Offering Documents Failed to Disclose the Underwriter
        Defendants' Inadequate Due Diligence with Respect to
        Compliance with Stated Mortgage Loan Underwriting Guidelines**

79.     The Registration Statement provided that the loan underwriting guidelines used to
originate the loan collateral is as specifically set forth in each of the Prospectus Supplements.
(¶¶ 168-217).   The Prospectus Supplements provide that the mortgage loans underlying the
Certificates were originated pursuant to RFC's stated underwriting guidelines adhered to by HFN
in originating the mortgage loans. *Id.*

80.     As Underwriters of the Certificates Offerings, the Underwriting Defendants
conducted inadequate due diligence with respect to whether the Residential Capital and HFN
complied with the loan underwriting guidelines described in the Prospectus Supplements.

81.     Very little if any due diligence was actually conducted by the Underwriter
Defendants themselves.   The Underwriter Defendants contracted with external firms to review
whether the loans included in MBS that they underwrote were in compliance with the loan
originators' represented standards.   Residential Capital was a noted client of Bohan and Clayton.

82.     In June 2007, the NYAG subpoenaed documents from Bohan and Clayton related
to their due diligence efforts on behalf of the investment banks, such as Residential Capital, that
underwrote mortgage backed securities.   The NYAG, along with Massachusetts, Connecticut and
the SEC (all of which also subpoenaed documents) are investigating whether investment banks
held back information they should have provided in the disclosure documents related to the sale
of mortgage backed securities to investors.

83.     In a January 12, 2008 article titled "Inquiry Focuses on Withholding of Data on

Loans", *The New York Times* reported:

> An investigation into the mortgage crisis by New York State prosecutors is now focusing on whether Wall Street banks withheld crucial information about the risks posed by investments linked to subprime loans.
>
> Reports commissioned by the banks raised red flags about high-risk loans known as exceptions, which failed to meet even the lax credit standards of subprime mortgage companies and the Wall Street firms.  But the banks did not disclose the details of these reports to credit-rating agencies or investors.
>
> The inquiry, which was opened last summer by New York's attorney general, Andrew M. Cuomo, centers on how the banks bundled billions of dollars of exception loans and other subprime debt into complex mortgage investments, according to people with knowledge of the matter.  Charges could be filed in coming weeks.
>
> *          *          *
>
> The inquiries highlight Wall Street's leading role in igniting the mortgage boom that has imploded with a burst of defaults and foreclosures.  The crisis is sending shock waves through the financial world, and several big banks are expected to disclose additional losses on mortgage-related investments when they report earnings next week.
>
> As plunging home prices prompt talk of a recession, state prosecutors have zeroed in on the way investment banks handled exception loans.  In recent years, lenders, with Wall Street's blessing, routinely waived their own credit guidelines, and the exceptions often became the rule.
>
> It is unclear how much of the $1 trillion subprime mortgage market is composed of exception loans.  Some industry officials say such loans made up a quarter to a half of the portfolios they saw.  In some cases, the loans accounted for as much as 80 percent.  While exception loans are more likely to default than ordinary subprime loans, it is difficult to know how many of these loans have soured because banks disclose little information about them, officials say.
>
> Wall Street banks bought many of the exception loans from subprime lenders, mixed them with other mortgages and pooled the resulting debt into securities for sale to investors around the world.
>
> *          *          *

Mr. Cuomo, who declined to comment through a spokesman, subpoenaed several Wall Street banks last summer, including Lehman Brothers and Deutsche Bank, which are big underwriters of mortgage securities; the three major credit-rating companies: Moody's Investors Service, Standard & Poor's and Fitch Ratings; and a number of mortgage consultants, known as due diligence firms, which vetted the loans, among them Clayton Holdings in Connecticut and the Bohan Group, based in San Francisco.  Mr. Blumenthal said his office issued up to 30 subpoenas in its investigation, which began in late August.

*       *       *

To vet mortgages, Wall Street underwriters hired outside due diligence firms to scrutinize loan documents for exceptions, errors and violations of lending laws. But Jay H. Meadows, the chief executive of Rapid Reporting, a firm based in Fort Worth that verifies borrowers' incomes for mortgage companies, said lenders and investment banks routinely ignored concerns raised by these consultants,

"Common sense was sacrificed on the altar of materialism," Mr. Meadows said, "We stopped checking."

84.     On January 27, 2008, Clayton revealed that it had entered into an agreement with the NYAG for immunity from civil and criminal prosecution in the State of New York in exchange for agreeing to provide additional documents and testimony regarding its due diligence reports, including copies of the actual reports provided to its clients.  On the same day, both the *New York Times* (Anderson, J. and Bajaj, V., "Reviewer of Subprime Loans Agrees to Aid Inquiry of Banks," Jan. 27, 2008), and the *Wall Street Journal* ran articles describing the nature of the NYAG's investigation and Clayton's testimony.  The *Wall Street Journal* reported that the NYAG's investigation is focused on "the broad language written in prospectuses about the risky nature of these securities changed little in recent years, even as due diligence reports noted that the number of exception loans backing the securities was rising."  According to the *New York Times* article, Clayton told the NYAG "that starting in 2005, it saw a significant deterioration of lending standards and a parallel jump in lending expectations" and "some investment banks directed Clayton to halve the sample of loans it evaluated in each portfolio."

85.     A March 23, 2008 *Los Angeles Times* article reported that Clayton and Bohan employees "raised plenty of red flags about flaws [in subprime home loans] so serious that mortgages should have been rejected outright – such as borrowers' incomes that seemed inflated or documents that looked fake – but the problems were glossed over, ignored or stricken from reports" as follows:

> The reviewers' role was just one of several safeguards – including home appraisals, lending standards and ratings on mortgage-backed bonds – that were built into the country's mortgage-financing system.
>
> But in the chain of brokers, lenders and investment banks that transformed mortgages into securities sold worldwide, no one seemed to care about loans that looked bad from the start.  Yet profit abounded until defaults spawned hundreds of billions of dollars in losses on mortgage-backed securities.
>
> "The investors were paying us big money to filter this business," said loan checker Cesar Valenz.  "It's like with water.  If you don't filter it, it's dangerous.  And it didn't get filtered."
>
> As foreclosures mount and home prices skid, the loan-review function, known as "due diligence," is gaining attention.
>
> The FBI is conducting more than a dozen investigations into whether companies along the financing chain concealed problems with mortgages.  And a presidential working group has blamed the subprime debacle in part on a lack of due diligence by investment banks, rating outfits and mortgage-bond buyers.

*The Los Angeles Times*, "Subprime Watchdogs Ignored," March 23, 2008.

86.     Moreover, while underwriters would have sought to have Clayton review 25% to 40% of loans in a pool that was going to be securitized earlier in the decade, by 2006 the typical percentage of loans reviewed for due diligence purposes was just 5-7%.  Bohan's President, Mark Bohan, stated that "[b]y contrast [to investment banks in RMBS deals], buyers who kept the mortgages as an investment instead of packaging them into securities would have 50% to 100% of the loans examined."

**E. Governmental Agency Investigations Subsequent to Offerings Evidence Faulty Loan Origination and Securitization Practices**

87. In August 2007, following reports of defaults in mortgage loans underlying various MBS, downgrades of such MBS and potential downgrades of additional MBS in the future, and the resulting illiquidity in the credit markets, the President of the United States commissioned the Secretary of the Treasury, the SEC and the Commodities Futures Trading Commission ("CFTC") (hereinafter referred to as the "President's Working Group" or the "PWG") to investigate the causes of the market turmoil. After a seven-month investigation, the PWG issued its report on March 13, 2008. The PWG found as follows :

- A significant erosion of market discipline by those involved in the securitization process, including ***originators, underwriters, credit rating agencies, and global investors,*** related in part to failures to provide or obtain adequate risk disclosures;

- The turmoil in financial markets clearly was triggered by a ***dramatic weakening of underwriting standards for U.S. subprime mortgages***…

(Emphasis added).

88. Further, as noted, relatively soon after issuance, the delinquency and foreclosure rates of the Certificate collateral began to increase. (¶¶ 127-167). This performance was an indication to S&P of pervasive underwriting failures in the origination of the collateral which ultimately led to widespread and deep downgrades of most of the Certificate classes. On or about July 10, 2007, S&P publicly announced it was revising the methodologies used to rate numerous RMBS Certificates because the performance of the underlying collateral "called into question" the accuracy of the loan data. This announcement triggered several governmental investigations which only began reporting their findings in 2008.

89. S&P announced that it was revising its methodology assumption to require increased "credit protection" for rated transactions. S&P reiterated that it would also seek in the

39

future to review and minimize the incidence of potential underwriting abuse given "the level of *loosened underwriting* at the time of loan origination, misrepresentation and speculative borrower behavior reported for the 2006 ratings."

90.     One day later, on July 11, 2007, Moody's announced it was also revising its methodology used to rate the Certificates, and anticipated Certificate downgrades in the future. Moody's did in fact significantly downgrade most of the Certificate classes, noting "aggressive underwriting" used in the origination of the collateral.

91.     Further, as set forth more fully below, disclosures emerged well after the issuance of the Certificates with respect to each of the Originators which further evidenced that they had engaged in loan underwriting practices which were wholly inconsistent with the guidelines set forth in the Registration Statement and Prospectus Supplements.  (¶¶ 168-217).

**F.    The Offering Documents Failed to Disclose that Residential Capital and the Underwriter Defendants Relied on S&P and Moody's Outdated Models to Determine Levels of Credit Enhancement and Ratings**

92.     The Prospectus Supplements describe the varying forms of credit enhancement, including by way of subordination and over-collateralization.  The Supplements contain material misstatements and omissions of fact, including the failure to disclose that the amounts and forms of credit enhancement were insufficient and understated because they were largely determined by Ratings Agencies' models that had not been materially updated since 1999 (for S&P) and 2002 (for Moody's).   As a result, these outdated models were based primarily on the performance of fixed interest loans and not subprime, Alt-A, no or limited documentation loans – which were the kinds of loans substantially included in the Certificate collateralizations.  The models failed both to provide sufficient, appropriate credit enhancement and to disclose the deficiencies in the manner in which credit enhancement was determined.

93.    The Ratings Agencies' determinations of the amount and kind of credit enhancement to be included in the Certificates were faulty.  These same faulty determinations were then used by the same firms to assign inflated and faulty AAA ratings to a substantial portion of the total Certificate value of the Offerings (95.0% by S&P and 95.1% by Moody's). These ratings were unjustifiably high because they were determined pursuant to the same models used to determine credit enhancement – models that had not adequately been updated at the time the Certificates were issued.

94.    The truth about the Ratings Agencies' undisclosed use of outdated models in rating RMBS deals only began to emerge in 2008.  The inadequacy of the models used to rate (and determine the amount of credit enhancement needed to support the rating) was discussed in the April 2008 issue of *Mortgage Banking* which explained that the Ratings Agencies' models used statistical assumptions that were too heavily based on the performance of 30-year fixed mortgages – which were not the kinds of mortgages that had been securitized in the prior four years:

> S & P's Coughlin admits that "assumptions that went into decision-making [on credit ratings] were informed by what had happened in the past," and yet in this instance "previous loss data proved to be much less of a guide to future performance."

> But why?  Drexel University's Mason believes it's because the CRAs relied on statistical models that were misleading, at best.   "I think their [credit-rating] methodologies were demonstrably insufficient," he says.

> "Unlike the traditional rating processes for single-named issuers, which rely on empirical analysis at their core, structured-finance rating analysis is essentially driven by statistical models," write Mason and Rosner in their paper.  And the data that the rating agencies used when evaluating mortgage-backed securities-- including those backed by subprime mortgages--were heavily biased by over-reliance on traditional 30-year fixed prime mortgage loans.  But it turns out that a subprime loan, as Mason explains during an interview, is a very different animal.

> "This is not your historical mortgage loan," he says.  "This is more like a credit-

card loan."  Mason cites the increased popularity during the mortgage boom of so-called option ARMs, which are home loans that give the borrower a variety of monthly payment options and have variable cash-flow characteristics that are more like credit cards.

95.     In an article appearing in *The New York Times* on April 8, 2008, entitled "Triple A Failure," *The New York Times* took note of Moody's April 2007 disclosure that it was "revising" its model which had not been revised since 2002:

> In April 2007, Moody's announced it was revising the model it used to evaluate subprime mortgages.  It noted that the model "was first introduced in 2002.  Since then, the mortgage market has evolved considerably."  This was a rather stunning admission; its model had been based on a world that no longer existed.

96.     The article explained that when Moody's had analyzed subprime delinquency data in 2007 it had found trends that its 2002 model never accounted for:

> Poring over the data, Moody's discovered that the size of people's first mortgages was no longer a good predictor of whether they would default; rather, it was the size of their first and second loans – that is, their total debt – combined.  This was rather intuitive; Moody's simply hadn't reckoned on it.  Similarly, credit scores, long a mainstay of its analyses, had not proved to be a "strong predictor" of defaults this time.  Translation: even people with good credit scores were defaulting.  Amy Tobey, leader of the team that monitored XYZ, told me, "it seems there was a shift in mentality; people are treating homes as investment assets."  Indeed.  And homeowners without equity were making what economists call a rational choice; they were abandoning properties rather than make payments on them.  Homeowners' equity had never been as high as believed because appraisals had been inflated.

97.     On October 22, 2008, the United States House of Representatives Committee on Oversight and Government Reform (defined herein as the "House Oversight Committee") heard testimony from Frank Raiter (the "Raiter Testimony"), the former Managing Director and head of Residential Mortgage-Backed Securities at S&P from March 1995 through April 2005.  Raiter testified that the Ratings on S&P deals turn in part on the credit rating of the individual mortgages.  It was from this credit analysis that S&P determined ***(1) the expected default probability*** of a loan and ***(2) the loss that would occur in the event of a default*** which, in turn,

42

was used to establish the amount of AAA bonds that could be issued against the pool and amount

of equity or "credit enhancement" needed to protect the AAA bonds from experiencing losses:

> A mortgages backed security consists of a pool of individual mortgage loans. Depending on the type of mortgage product (i.e., prime-jumbo, subprime, Alt-A or HEL) underlying a given security, the pool could consist of 1,000 to 25,000 loans. The ratings process consists of two distinct operations – the credit analysis of individual mortgages and a review of the documents governing the servicing of loans and the payments to investors in the securities.
>
> ***The credit analysis is focused on determining the expected default probabilities on each loan and the loss that would occur in the event of a default.*** These, in turn, establish the expected loss for the entire pool and determine the amount of AAA bonds that can be issued against the pool. It is analogous to your equity position in your home and the underlying mortgage.
>
> The loss estimate determines the equity needed to support the bond – it is intended to protect the AAA bonds from experiencing any losses, much the same as the homeowners' equity stake in a house protects the lender from loss in the mortgage loan.

Raiter Testimony, at 3 (emphasis added).

98.    Raiter testified that in 1995, S&P developed a sophisticated model to estimate the

default and loss of individual loans and pools – a model based on approximately 500,000 loans

with performance data going back five or more years. This "LEVELS" Model was updated in

early 1999 based on a database of 900,000 loans. Raiter testified further that ***"it was critical to

maintain the best models as they were the linchpins of the rating process."*** Raiter Testimony,

at 4 (emphasis added). After the housing boom took off in 2001, S&P developed a far better

model in 2001, with updated data in 2003 and 2004, based on approximately 9.5 million loans

***"covering the full spectrum of new mortgage products, particularly in AAA and fixed/floating

payment type categories."*** *Id*.

99.    Nevertheless, S&P failed to implement this updated model, which, in Raiter's

view, would have forewarned on the loan-losses from the new loan products, in particular:

[T]he analysts at S&P had developed better methods for determining default which did capture some of the variations among products that were to become evident at the advent of the crisis. It is my opinion that had these models been implemented we would have had an earlier warning about the performance of many of the new products that subsequently lead to such substantial losses. That, in turn, should have caused the loss estimates mentioned above to increase and could have thus caused some of these products to be withdrawn from the market as they would have been too expensive to put into bonds.

Raiter Testimony, at 4.

100.    As Raiter explained, the unfortunate consequences of continuing to use outdated versions of the rating model included "the failure to capture changes in performance of the new non-prime products" and "the unprecedented number of AAA downgrades and subsequent collapse of prices in the RMBS market." S&P's current President, Deven Sharma, agreed, noting: "It is by now clear that a number of the assumptions we used in preparing our ratings on mortgage-backed securities issued between the last quarter of 2005 and the middle of 2007 did not work … [E]vents have demonstrated that the historical data we used and the assumptions we made significantly underestimated the severity of what has actually occurred."

101.    Executives at Moody's also acknowledged a lack of investment in Moody's ratings models and the failure of Moody's ratings models to capture the decrease in lending standards. In a confidential presentation to Moody's Board of Directors from October 2007, released by the House Oversight Committee on October 22, 2008 during the Committee's "Hearing on the Credit Agencies and the Financial Crisis" (the "House Oversight Committee Hearing"),[12] Raymond McDaniel, the current Chairman and CEO of Moody's, noted that underfunding can put ratings accuracy at risk and acknowledged that "Moody's Mortgage Model (M3) needs investment." McDaniel also acknowledged that Moody's models did not sufficiently capture the changed mortgage landscape. *Id.* Brian Clarkson – the former President and Chief

---

[12]    All exhibits released by the House Oversight Committee from the Committee's "Hearing on Credit Agencies and the Financial Crisis" can be found on the Committee's website at www.oversight.house.gov.

923071.1 1

Operating Officer of Moody's – also recognized during a Moody's Town Hall on September 10, 2007, the transcript of which was released during the House Oversight Committee Hearing on October 22, 2008, Moody's failure to incorporate decreased lending standards into their ratings, stating: "We should have done a better job monitoring that [decrease in underwriting standards]."

102.    Not only were Moody's and S&P's models based on outmoded data but they were often constructed by people who were not familiar with the housing markets in the areas that they were rating.  And, in some instances, real estate investments were graded by analysts who never actually reviewed the investment and who merely relied upon ratings assigned by a competitor ratings agency.

**G.    The Ratings Agencies Relaxed the Ratings Criteria Which
Led to Artificially High Ratings Awarded to the Certificates**

103.    Moody's and S&P repeatedly eased their ratings standards in order to capture more market share of the ratings business.  In a September 25, 2008 article published by *Bloomberg*, titled "Race to Bottom at Moody's, S&P Secured Subprime's Boom, Bust," a former S&P Managing Director – Richard Gugliada – explained the easing of standards as a "'*market-share war where criteria were relaxed*'" and admitted, "'*I knew it was wrong at the time … [i]t was either that or skip the business*.  That wasn't my mandate.  My mandate was to find a way.  Find the way.'"  According to Gugliada, when the subject of tightening S&P's ratings criteria came up, the co-director of CDO ratings, David Tesher, said: "Don't kill the golden goose."  *Id.*

104.    The loosening of ratings standards is exemplified by the following "instant message" conversation between Rahul Shah ("Shah") and Shannon Mooney ("Mooney"), two S&P analysts, from April 5, 2007, that described S&P's rating of an investment similar to the Trusts and that was submitted during the House Oversight Committee Hearing:

   **Shah:** btw – that deal is ridiculous

45

**Mooney:** i know right ... model def does not capture half of the rish [sic]

**Mooney:** *risk*

**Shah:** we should not be rating it

**Mooney:** we rate every deal

**Mooney:** it could be structured by cows and we would rate it

**Shah:** but there's a lot of risk associated with it – I personally don't feel comfy signing off as a committee member.

105.    In an email sent on December 5, 2006, released during the House Oversight Committee Hearing, an S&P analytical manager in the same group as Shah and Mooney wrote to a senior analytical manager that the "[r]ating agencies continue to create and [sic] *even bigger monster – the CDO market.  Let's hope we are all wealthy and retired by the time this house of cards falters.*"

106.    On October 28, 2008, former Moody's Managing Director Jerome S. Fons ("Fons") testified before the House Oversight Committee (hereinafter "Fons Testimony").  Fons had been an Executive at Moody's for 17 years, in various positions including Managing Director of Credit Policy.  Fons testified that due to profit concerns, a loosening of ratings standards took place at his company: "[T]he focus of Moody's shifted from protecting investors to being a marketing-driven [sic] organization" and "management's focus increasingly turned to maximizing revenues" at the expense of ratings quality.

107.    Fons explained that the originators of structured securities were free to shop around for the rating agency that would give them the highest rating and "*typically chose the agency with the lowest standards, engendering a race to the bottom in terms of rating quality*."  Fons Testimony, at 3.  Fons noted that the rating agencies' "drive to maintain or expand market share made [them] willing participants in this [rating] shopping spree" and made it "relatively

easy for the major banks to play the agencies off one another." *Id.*  Fons said it was this business model that "*prevented analysts from putting investor interests first*."  *Id.*

108.    Raymond McDaniel, the current CEO of Moody's, also acknowledged the degradation of ratings standards.  In the same confidential presentation to Moody's Board of Directors in October 2007, cited *supra*, McDaniel told the Board: "The real problem is not that the market ... underweights ratings quality but rather that in some sectors, it actually penalizes quality ... It turns out that *ratings quality has surprisingly few friends*."  He noted the pressure exerted on analysts to come up with high ratings, explaining "[a]nalysts and MDs [managing directors] are continually 'pitched' by bankers, issuers, investors" and sometimes "we 'drink the kool-aid.'"  In fact, *The Wall Street Journal,* in an article published on April 24, 2007, found that in at least one instance, Moody's increased the proportion of AAA ratings within a mortgage after its client complained and said it might go with a different rating firm.

## H.    The Prospectus Supplements Did Not Reflect the True Risk of the Certificates

109.    The Ratings Agencies rated the Certificates based in large part on data about each mortgage loan that Residential Capital provided to them – including appraisal values, LTV ratios, and borrower creditworthiness and the amount of documentation provided by borrowers to verify their assets and/or income levels.  As discussed above, much of this data was inaccurate due to the inflated appraisal values, inaccurate LTV ratios, borrower income inflation, and the other facets of defective underwriting addressed in this Complaint.  Neither Moody's nor S&P engaged in any due diligence or otherwise sought to verify the accuracy or quality of the loan data underlying the RMBS pools they rated (and specifically disclaimed any due diligence responsibilities).  Nor did they seek representations from sponsors that due diligence had been performed.  During Moody's September 2007 "Town Hall Meeting," hosted by Moody's

47

Managing Director, Raymond McDaniel, executives at Moody's acknowledged that the Ratings

Agencies used inaccurate data to form their ratings:

> We're on notice that a lot of things that we relied on before just weren't true...
> [W]e relied on reps and warrantees that no loans were originated in violation of
> any state or federal law.  We know that's a lie.

*       *       *

> There's a lot of fraud that's involved there, things that we didn't see...We're sort
> of retooling those to make sure that we capture a lot of the things that we relied on
> in the past that we can't rely on, on a going forward basis.

*       *       *

> [W]e're being asked to figure out how much everyone lied. ... [I]f all of the
> information was truthful and comprehensive and complete, we wouldn't have an
> issue here ...

> What we're really being asked to do is figure out how much lying is going on and
> bake that into a credit ... which is a pretty challenging thing to do.  I'm not sure
> how you tackle that from a modeling standpoint.

Moody's Town Hall Meeting Transcript, at 16, 58.

110.    In response to the "Town Hall Meeting," a Moody's employee noted:

> [W]hat really went wrong with Moody's sub prime ratings leading to massive
> leading to massive downgrades and potential more downgrades to come? We
> heard 2 answers yesterday: 1. people lied, and 2. there was an unprecedented
> sequence of events in the mortgage markets.  *As for #1, it seems to me that we
> had blinders on and never questioned the information we were given.*
> Specifically, why would a rational borrower with full information sign up for a
> floating rate loan that they couldn't possibly repay, and why would an ethical and
> responsible lender offer such a loan?  *As for #2, it is our job to think of the worst
> case scenarios and model them ... Combined, these errors make us look either
> incompetent at credit analysis, or like we sold our soul to the devil for revenue,
> or a little bit of both.*

Moody's Town Hall Meeting Transcript, at 79 (emphasis added).

111.    Because Moody's and S&P were using flawed information and models to

generate their ratings, the ratings assigned to the Certificates did not accurately reflect their risk,

48

and the Certificates were given investment grade ratings when in reality they were not of investment grade quality.  These artificially high ratings, which were published in the Prospectus Supplements, were false and misleading in that they did not reflect the true risk of the Certificates.

## I.      The Offering Documents Failed to Disclose
## Residential Capital's Ratings Shopping Practices

112.    The Registration Statement disclosed the engagement of Ratings Agencies but omitted disclosure of the manner in which the Ratings Agencies were engaged – so-called Ratings Shopping.  As noted, the SEC Report set forth that S&P and Moody's engaged in the practice of "ratings shopping," as indicative of one of the practices which may have pressured Ratings Agencies to issue faulty ratings for MBS.

113.    In June, 2008, the NYAG's Office announced that after an investigation of the Ratings Agencies in the context of mortgage-backed securities, it had reached an agreement with S&P, Moody's and Fitch which contemplated a complete overhaul of the then-current ratings procedures and guidelines and to put an end to what had been termed "ratings shopping." Instead of investment banks looking to issue mortgage-backed bonds going to all three agencies for a review, but only use, and pay for, the most optimistic rating, the agencies now will get paid up front regardless if they are hired to assign a rating, a move expected to remove any potential for conflicts of interest.

114.    As set forth above, in Fons' Testimony before the House Oversight Committee, he explained that Moody's provided inadequate ratings on RMBS because of conflicts of interest and being forced to "bid" or "shop" its ratings to obtain engagements:

> Why did it take so long for the rating agencies to recognize the problem?  Why were standards so low in the first place?  And what should be done to see that this does not happen again?

> *My view is that a large part of the blame can be placed on the inherent conflicts of interest found in the issuer-pays business model and rating shopping by issuers of structured securities.* A drive to maintain or expand market share made the rating agencies willing participants in this shopping spree. It was also relatively easy for the major banks to play the agencies off one another because of the opacity of the structured transactions and the high potential fees earned by the winning agency. Originators of structured securities typically chose the agency with the lowest standards, engendering a race to the bottom in terms of rating quality. While the methods used to rate structured securities have rightly come under fire, in my opinion, the business model prevented analysts from putting investor interests first.

Fons Testimony, at 3 (emphasis added).

115.   In further testimony at the October 22, 2008 House Oversight Committee

Hearing, Managing Director of Egan-Jones Rating Co., Sean J. Egan ("Egan"), stated, in part:

> Assigning ratings on structured finance bonds differs from the process for corporate and municipal bonds. In the unsecured corporate and municipal markets, debt issuers are subject to being rated by all of the rating agencies because financial information is publicly available to all parties. The structured finance market has been a "rating by request" market where the debt issuers invite some or all of the major rating agencies to preview the collateral pools so the rating agencies can provide preliminary rating indications that can be used to size the bond classes and structure the bond transactions.
>
> *Historically, all of the rating agencies have agreed to bow out of the rating process if they are not actually selected by the debt issuer to rate a securities transaction. This has encouraged the debt issuers to shop for the best ratings so they can optimize their securitization proceeds.*

Testimony of Sean J. Egan, House Oversight Committee Hearing, October 22, 2008, at 9 (emphasis added).

**J.      The Offering Documents Failed to Disclose the True
Roles of Ratings Agencies in Forming and Structuring
the Certificates for Sale as Primarily AAA Securities**

116.   In the April 2008 issue of *Mortgage Banking*, critics began to note the role of the

Ratings Agencies in providing "structuring advice:"

> But serious concerns have also been voiced by members of Congress about whether the CRAs' business model - where the large investment banks that

50

underwrite mortgage-backed securities (MBS) and collateralized debt offerings actually pay to have their deals rated by the agencies, and the agencies in turn provide feedback to the underwriters on how to boost their deals' credit rating to the highly coveted triple-A status – may have prejudiced their objectivity and integrity.

"It seems to me that the credit-rating agencies are playing both coach and referee," said Sen. Robert Menendez (D-New Jersey), during a September 2007 hearing by the Senate Banking Committee on the collapse of the subprime market.

Critics also argue that the CRAs are actively involved in the structuring of RMBS and CDO deals, and thus can hardly claim that their ratings are merely "opinions" on the likelihood that a debt security might go into default – or, as one agency official has called them, "the world's shortest editorials."

Joseph Mason, an associate professor of finance at Drexel University in Philadelphia and a former economist at the Office of the Comptroller of the Currency (OCC), says *it is indisputable that the CRAs provide underwriters with "active structuring advice" on how to get a triple-A credit rating for their deals. While the CRAs insist they're merely providing information to the investment bankers during the underwriting process, Mason says they're trying to draw "an artificial line between advice and communication."*

(Emphasis added).

117.    As reported in the *International Herald Tribune* on June 1, 2007, the Ratings Agencies did "much more than evaluate [MBS instruments] and give them letter grades," they played an "integral role" in structuring the transactions and instructing the assemblers "how to squeeze the most profit out" of the MBS by maximizing the tranches with the highest ratings. Now, it is evident that these credit ratings agencies indirectly and directly participated in and took steps necessary to the distribution of mortgage pass-through certificates and other MBS.

118.    An article appearing in *The Financial Times* on October 17, 2008 entitled "When Junk Was Gold," addressed the unique role of the Ratings Agencies in structured finance deals such as mortgage backed securities:

The first mortgage-backed bonds were created in the late 1980's, well before Clarkson's time, by a trader called "Lewie" Ranieri.  Ranieri, the head of the

mortgage trading desk at the former investment bank Salomon Brothers, was famous for the huge sums of money he netted for his employer and for the quantity of cheeseburgers he ate.  What he struck upon in structured finance was a process of pure alchemy: a way of turning myriad messy mortgage loans into standardized, regimented and easy-to-assess bonds.

Ranieri knew that the magic of structuring was in the packaging. Packaged in the right way, mortgages could come to create a huge, new tradable bond market. And this is where the rating agencies came in.  Structured bonds, like any other bond, needed ratings in order to be sold.  ***But with a structured bond, the pools of debt could be built or modified in order to attain a particular rating.  This wasn't a matter of disguising the risk, rather a way of reapportioning it and allowing investors with different risk appetites to buy the right product for them. "The rating is what gives birth to the structure in the first place," explains Sylvain Raynes, a financial modeling expert who was with Moody's in the 1990s, when Clarkson joined.  In some cases, the ratings are known before the bonds have even been inked.  "You start with a rating and build a deal around a rating," Clarkson told an investment magazine last year.***

(Emphasis added).

119.    The actual role of the Ratings Agencies in structuring the securitizations first began to emerge in an article appearing on *Conde Naste's Portfolio.com* in September 2007. The article described a presentation that Moody's gave to a group of Russian investors in 2006 where Moody's explained the "interative" process of MBS securitization where Moody's gave "feedback" to underwriters before the bonds were issued as follows:

Moody's revealed a significant, and ultimately more dangerous, role that the agencies play in financial markets.  ***The slides detailed an "iterative process, giving feedback" to underwriters before bonds are even issued.  They laid out how Moody's and its peer's help their clients put together complicated mortgage securities before they receive an official ratings stamp.***  But this give-and-take can go too far: Imagine if you wanted a B-plus on your term paper and your high-school teacher sat down with you and helped you write an essay to make that grade.

***The [investors] had just been let in on one of the dirtiest open secrets in the mortgage-ratings world, one that may have played a part in creating the housing bubble that's now popping: The ratings agencies have had a bigger role in the subprime-mortgage meltdown than most people know.  So far, irate investors have focused on—and upcoming congressional hearings and investigations will probe – the agencies' overly optimistic ratings for packages***

52

*of subprime mortgages, many of which are now – blowing up.  It's becoming clear that the ratings agencies were far from passive raters, particularly when it came to housing bonds.  With these, the agencies were integral to the process, and that could give regulators and critics the ammunition they've been looking for to finally force the Big Three to change.*  The credit-ratings agencies "made the market. Nobody would have been able to sell these bonds without the ratings," says Ohio attorney general Marc Dann, who is investigating the agencies for possibly aiding and abetting mortgage fraud.   "That relationship was never disclosed to anybody."

(Emphasis added).

120.   The Ratings Agencies' unique role in influencing the structure of the securitization was more fully discussed in the July 2008 SEC Report.   The SEC Report confirmed that S&P and Moody's provided "feed back" to the Sponsor of the Offerings as to the structure, which would result in the highest rating:

The three examined rating agencies generally followed similar procedures to develop ratings for subprime RMBS and CDOs.  *The arranger of the RMBS initiates the ratings process by sending the credit rating agency a range of data on each of the subprime loans to be held by the trust (e.g., principal amount, geographic location of the property, credit history and FICO score of the borrower, ratio of the loan amount to the value of the property and type of loan: first lien, second lien, primary residence, secondary residence),* the proposed capital structure of the trust and the proposed levels of credit enhancement to be provided to each RMBS trance issued by the trust.   Typically, if the analyst concludes that the capital structure of the RMBS does not support the desired ratings, this preliminary conclusion would be conveyed to the arranger.  *The arranger could accept that determination and have the trust issue the securities with the proposed capital structure and the lower rating or adjust the structure to provide the requisite credit enhancement for the senior tranche to get the desired highest rating.  Generally, arrangers aim for the largest possible senior tranche, i.e., to provide the least amount of credit enhancement possible, since the senior tranche – as the highest rated tranche – pays the lowest coupon rate of the RMBS' tranches and, therefore, costs the arranger the least to fund.*

(Emphasis added).

**K.     The Offering Documents Failed to Disclose Material Financial Conflicts
of Interest Between Residential Capital and the Ratings Agencies**

53

121.    The Offering Documents make no mention of the material financial conflicts of interest between Residential Capital and the Ratings Agencies, including the fact that the analysts involved in rating were also involved in the rating fees or the Ratings Agencies' business interests. The SEC Report confirmed significant undisclosed conflicts of interest which incented ratings agencies to issue inflated ratings.  The SEC Report found, in violation of SEC Rules, "key participants" in the securitization process negotiated fees the rating agency would receive in exchange for their high ratings.  SEC Report, at 23-24.

122.    The SEC noted, *inter alia*, that analysts are "aware" of the rating firm's "business interests when securing the rating of the deal" as follows:

- ***While each rating agency has policies and procedures restricting analysts from participating in fee discussions with issuers,*** these policies still allowed key participants in the ratings process to participate in fee discussions.

- Analysts appeared to be aware, when rating an issuer, of the rating agency's business interest in securing the rating of the deal.  The Staff notes multiple communications that indicated that some analysts were aware of the firm's fee schedules, and actual (negotiated) fees.  There does not appear to be any internal effort to shield analysts from emails and other communications that discuss fees and revenue from individual issuers.

- ***"Rating agencies do not appear to take steps to prevent considerations of market share and other business interests from the possibility that they could influence ratings or ratings criteria."***

SEC Report, at 24-25 (emphasis added).

123.    The July 2008 SEC Report found that a number of factors unique to the rating of RMBS may have "exacerbated" the effect of conflicts of interest inherent in the fact that the issuer or arranger pays for the ratings.  These factors include that the arranger of the deal has:

- ***"More flexibility to adjust the deal to obtain a desired credit rating as compared to arrangers of non-structured asset classes."***

- "Second, there is a high concentration in the firms conducting the

underwriting function…    While 22 different arrangers underwrote subprime RMBS deals, 12 arrangers accounted for 80% of the deals, in both number and dollar volume."

- With a fast-changing market, rating processes are frequently and quickly changed.   The high concentration of arrangers with the influence to determine the *choice of rating agency heightened the inherent conflicts in the "issuer pays" compensation model.*  Compensation is calculated by volume of deals and total dollar volume, as a result arrangers prefer fast and predictable ratings processes.

- Ratings Agencies may be pressured by arrangers to produce a more *favorable outcome or reduce credit enhancement levels,* thus reducing *the cost of the debt for a given level of cash inflows from the asset pool.* When the arranger also sponsors the RMBS or CDO trust, pressure can influence an agency's decision to update a model when the update would lead to a less favorable outcome.

- *High profit margins may have provided an incentive for rating agencies to encourage the arrangers to route future business its way.*  Unsolicited ratings were not available to provide independent checks on the rating agencies' ratings, nor was information regarding the structure of the security or portfolio of assets readily available to parties unrelated to the transaction, especially before issuance.

SEC Report, at 31-33 (emphasis added).

124.    As reported in *The Washington Post* on June 6, 2008, the New York State Attorney General's Office announced that it had reached an agreement with the credit-rating companies, S&P, Moody's and Fitch to:

… change the way they evaluate mortgage securities that have roiled financial markets for the past year.

The deal with Moody's Investors Service, Standard & Poor's and Fitch Ratings aims to restore confidence among investors -- who saw top-rated securities lose much of their worth in a matter of months -- by revising how the agencies are paid for issuing ratings.  The agreement also requires credit-rating agencies to direct investment banks to provide them with more data on the pools of mortgages that make up the bonds.

The agencies have been under fire for the role they played in the subprime mortgage crisis by awarding top ratings to securities that soured.  Regulators and investors have alleged that the agencies have a conflict of interest because they

are paid by the investment banks issuing the securities, thus encouraging the credit agencies to give high ratings to win business.

The agreement seeks to end this practice by having the issuers pay the credit-rating agencies at four points during the rating process, not just at the end when the rating is given.

Credit-rating agencies will also be required to disclose information about all securities submitted for review, allowing investors to determine whether issuers sought, but subsequently decided not to use, ratings from a specific agency.  This will allow investors to see whether investment banks shopped around for the agency that would give their securities the best rating, said Andrew M. Cuomo, New York's attorney general.

125.    The NYAG further stated that:

"The mortgage crisis currently facing this nation was caused in part by misrepresentations and misunderstanding of the true value of mortgage securities," Cuomo said in a statement.  "By increasing the independence of the rating agencies, ensuring they get adequate information to make their ratings, and increasing industry-wide transparency, these reforms will address one of the central causes of that collapse."

*Id.*, at 2.

126.    In or about July 2008, both Moody's and S&P sought to make internal changes to reform the conflicts of interest problems identified by the SEC.  In a *Reuters* article, S&P Draws Criticism as Sets Ratings Reform, published on July 2, 2008, it was reported that S&P had "unveiled an overhaul of its ratings process on Thursday, responding to widespread criticism of the quality and accuracy of credit ratings" and had:

… [a]nnounced 27 steps that its aid would boost confidence in credit ratings.  It came on the heels of planned reforms announced this week by its major rivals, [Moody's and Fitch].

Ratings agencies have come under fire from regulators and investors who say they helped precipitate the U.S. subprime mortgage crisis and credit tightening that began in 2007.

"The supposed reforms announced today by Standard & Poor's and by Moody's on Tuesday are too little, too late," New York State Attorney General Andrew Cuomo said in a statement.  "Both S&P and Moody's are attempting to make

piecemeal change that seem more like public relations window-dressing than systematic reform."  He pledged to continue investigating their roles in the mortgage crisis.

Critics say the agencies at first assigned high ratings to hundreds of billions of dollars of securities linked to low-quality debt, only to exacerbate market turmoil by later rapidly downgrading many of those same securities.

This has contributed to write-downs piling up in the financial industry, hurting stock prices and causing losses in a variety of pension and mutual funds.

L.    **Subsequent Disclosures Evidence Underwriter Defendants'
       Write-Downs and Near Collapse Due to Their Role in
       <u>Securitizing and Underwriting Mortgage-Backed Securities</u>**

127.    Each of the Underwriter Defendants maintained operations through which they conducted issuance and sale to investors of massive quantities MBS in 2005 and through 2007. These securities were collateralized with sub-prime and Alt-A mortgage loans originated under conditions which failed to comply with stated mortgage loan underwriting guidelines.  As delinquencies, foreclosures and repossessions began to skyrocket as early as four months after the initial Offering dates, all of the Underwriter Defendants were forced to write-down a significant portion of the value of their mortgage-related securities holdings, have been and continue to be subject to Federal and State investigations and in some cases, have been forced into bankruptcy from the resultant mortgage-related losses.

1.    **<u>Defendant RFSC</u>**

128.    As set forth in detail above, RFSC d/b/a GMAC RFC Securities is a registered broker-dealer engaged in the business of underwriting and selling securitized MBS to institutional investors.  RFSC is an affiliate of GMAC Bank, LLC.  According to the RCC, referred to at times as "ResCap," website, RFSC was one of the first mortgage conduits in the U.S. to focus on buying and securitizing single-family, jumbo mortgages, loans with balances above the purchasing authority of the government-sponsored enterprises.

57

129.   In 2005, GMAC-RFC was ranked as the fifth largest non-agency MBS issuer with $56.93 billion in volume, a 4.8% increase over its 2004 level of $42.336 billion.   In 2006, GMAC-RFC was rated by *IMF* as the eight largest mortgage securities producer, with $66.24 billion in mortgage securities volume and a 3.2% market share.   Of that $66.24 billion, $64.229 billion was from non-agency MBS.

130.   On July 30, 2007, GMAC and RCC both announced losses as a result of their residential mortgage business.   GMAC's net income fell to $293 million from $787 million a year earlier. RCC had a loss of $254 million, compared with a profit of $548 million a year earlier, because of loans to buyers with poor credit ratings.

131.   To make matters worse, as reported by *Reuters* on July 31, 2008, GMAC posted a $2.48 billion second quarter loss as a result of write-downs and mounting losses at its mortgage lending unit.

132.   On February 22, 2008, as reported by *Forbes Magazine*, S&P announced that it would be downgrading RCC as a result of mounting mortgage losses.

> GMAC and its Residential Capital mortgage unit were cut several notches deeper into junk status by Standard & Poor's, which said mounting mortgage losses might require new capital injections from General Motors and Cerberus Capital Management.

133.   On March 29, 2008, *Forbes* announced "GMAC had reported a heavy first-quarter loss, making for 6 consecutive losses of its kind."

> GMAC's loss increased to $589.0 million from $305.0 million a year earlier. The dent included an $859.0 million loss at its subsidiary Residential Capital. It was the mortgage unit's sixth consecutive quarterly loss, though the amount lost fell from $910.0 million last year.

134.    On December 24, 2008, as reported by *Reuters*, GMAC was forced to seek federal approval to become a bank holding company, giving it access to government lending programs and helping it to stave off bankruptcy.  '

135.    As alleged herein, RFSC failed to conduct proper due diligence and perform necessary oversight functions in the underwriting, securitization and preparation of the Offering Documents for the RALI Offerings complained of herein.

### 2.    Defendant Goldman Sachs

136.     Defendant GSC, or Goldman Sachs, is an investment banking firm that through its various subsidiaries, provides a range of investment banking, securities and investment management services. As an investment bank, GSC is an underwriter of a wide range of securities and other financial instruments, including mortgage related securities. According to its 2007 Annual Report, GSC's investment banking revenue skyrocketed from $3.67 billion in 2005, to $5.629 billion in 2006 and $3.671 billion in 2007.  In fact, On March 5, 2005, *Bloomberg News* labeled Goldman Sachs Group, Inc. the world's most profitable securities firm. In that year, GSC was ranked first in U.S. IPO underwriting.

137.    In 2005, *IMF* ranked Goldman Sachs as the ninth largest non-agency MBS issuer and the sixth largest non-agency MBS Underwriter with $38.772 billion and $69.432 billion in volume, respectively.  A year later, GSC was ranked the twelfth largest mortgage securities producer with $47.5 billion in volume.  In 2007, as reported by *IMF*, GSC issued $3.78 billion in subprime securities alone and ranked seventh among the largest prime and alt-A underwriters with $28.224 billion in volume.

138.    GSC made most its record profits during this time by betting against the U.S. mortgage market.  On December 15, 2007, the British newspaper, *The Times*, reported that while

key rivals were losing millions on investments, GSC had raked in over $4 billion by betting on the collapse of the U.S. subprime market.

> They believed that mortgage lending criteria had become so lax that a jump in defaults on high-risk home loans was inevitable and would drag down the value of the bonds that they backed.

139.    However, GSC's underwriting practices were as suspect as the rest of the industry.  On January 11, 2007, C*NN* reported that the City of Cleveland had filed suit against GSC and twenty other financial institutions alleging that the banks had caused the sub-prime crisis by creating a process of offering and securitizing loans given to borrowers who could not afford them.

140.    On January 30, 2008, the FBI and SEC launched a joint investigation into 14 investment banks, loan providers and developers as part of a crackdown focusing on the subprime mortgage crisis.  As reported that same day by the *Daily Telegraph*, GSC confirmed its involvement in the investigation.

> Goldman Sachs and Morgan Stanley, two of Wall Street's largest investment banks, have confirmed for the first time that they are embroiled in investigations into the US sub-prime mortgage collapse.
>
> In its annual report for the year to November 30, Goldman said it had "received requests for information from various governmental agencies and self-regulatory organizations relating to sub-prime mortgages, and securitizations, collateralized debt obligations and synthetic products related to sub-prime mortgages."

141.    *BusinessWire* reported on March 18, 2008 that GSC's February 2008 quarterly report disclosed a 40% drop in underwriting revenues for the investment bank.  GSC attributed this to the significantly lower net revenues in debt underwriting.

142.    In December 2007, the Massachusetts Attorney General launched an investigation into the securitization of subprime loans.  The investigation focused on the industry practices

involved with issuance and securitization of subprime loans to Massachusetts consumers. According to a Press Release issued by the Massachusetts Attorney General's Office,

> The Office is investigating whether securitizers may have:
>
> - facilitated the origination of "unfair" loans under Massachusetts law;
> - failed to ascertain whether loans purchased from originators complied with the originators' stated underwriting guidelines;
> - failed to take sufficient steps to avoid placing problem loans in securitization pools;
> - been aware of allegedly unfair or problem loans;
> - failed to make available to potential investors certain information concerning allegedly unfair or problem loans, including information obtained during loan diligence and the pre-securitization process, as well as information concerning their practices in making repurchase claims relating to loans both in and out of securitizations.

143.    On May 11, 2009, it was reported by both the *New York Times* and *Wall Street Journal* that GSC had agreed to provide $50 million in relief to Massachusetts sub-prime mortgage holders and pay an additional $10 million to the state to end the investigation into the company. According to *The New York Times* article,

> At a news conference, [the Massachusetts AG] said that the problem was industry-wide and that the Goldman settlement would provide "much needed relief for many in Massachusetts." Even so, she also criticized what she called predatory lending that was encouraged by Wall Street firms that bought individual subprime mortgages and repackaged them into securitized loans for investors.

144.    On December 16, 2008, as reported by *The New York Times*, GSC was forced to take its first quarterly loss, $2.12 billion, since going public in 1999.

145.    A detailed complaint for violations of the federal securities laws was filed against GSC on February 6, 2009 in United States Federal District Court for the Southern District of New York. *Public Employee's Retirement Sys. Of Miss. v. Goldman Sachs Group, Inc.,* No. 09-1110. According to the GSC Class Action Complaint (the "GSC Complaint" or the "GSC Compl.").

Wall Street aggressively pushed into the complex, high-margin business of packaging mortgages and selling them to investors as MBS, including mortgage pass through certificates. This aggressive push created a boom for the mortgage lending industry. By buying and packaging mortgages, Wall Street enabled the lenders to extend credit even as the dangers grew in the house market. At the center of the escalation was Wall Street's partnership with subprime lenders. This relationship was a driving force behind the once soaring home prices and the spread of exotic loans that are now defaulting and foreclosing in record numbers. (GSC Compl., ¶ 86).

Each of the Individual Defendants, Issuing Defendants and Underwriter Defendants failed to possess a reasonable basis for believing, and failed to make a reasonable investigation to ensure, that statements contained in the Offering Documents were true and/or that there was no omission of material facts necessary to make the statements contained therein not misleading. (GSC Compl., ¶ 124).

146.    As alleged herein, GSC failed to conduct proper due diligence and perform necessary oversight functions in the underwriting, securitization and preparation of the Offering Documents for the RALI Offerings complained of herein.

### 3.    Defendant Deutsche Bank

147.    Deutsche Bank Securities, Inc. ("DBS"), or Deutsche Bank, serves as the U.S. investment banking and securities arm of German Deutsche Bank AG. DBS was founded in 1973 as a subsidiary of Deutsche Bank AG. DBS is an SEC registered broker-dealer registered and is a member of NASD and the New York Stock Exchange.

148.    In 2005, DBS was ranked twenty-second in non-agency MBS issuers by *IMF*, issuing more than $17 billion. Moreover, in that same year, DBS was ranked eighth among non-agency MBS underwriters with $7.05 billion in volume. This was a drastic increase from its 2004 underwriting volume of $29.9 billion. In 2006, DBS climbed two spots among non-agency MBS underwriters with $72.765 billion. In that same year, *IMF* ranked DBS and its $25.328 billion in volume as the twenty-first largest mortgage securities producer and the sixth largest

home equity loan security underwriter with $29.46 billion in volume.  In 2007, DBS underwrote $11.94 billion and ranked eighth among the top subprime MBS underwriters.

149.    On October 3, 2007, *The New York Times* reported that DBS expected to write down $3.1 billion in loans and mortgage backed assets. On July 31, 2008, as reported by *Reuters*, Deutsche Bank AG announced another $3.6 billion in write-downs primarily due to DBS' over exposure to U.S. in residential MBS. The July 2008 write-down brought DBS's total write downs to more than $11 billion.

150.    On June 27, 2008 a lawsuit was filed in the Supreme Court of the State of New York alleging violations of federal securities law against DBS. *Massachusetts Bricklayers and Masons Trust Fund v. Deutsche Alt-A Securities, Inc.,* No. 08-CV-3178(LDW) (Removed to the Eastern District of New York on August 5, 2008) (the "Bricklayers Complaint" or "Bricklayers Compl.").  The Bricklayers Complaint alleges that DBS, as underwriter of the mortgage-backed certificates, failed to perform adequate due diligence on the mortgage loans DBS including in its MBS offerings.

151.    On March 20, 2009, another lawsuit, this time against Deutsche Bank AG, was filed in the United States District Court for the Southern District of New York alleging that the Bank, its subsidiaries and its officers violated the Securities Act of 1933 by issuing false and misleading registration statements, prospectuses and other documents.  *Kaess et al v. Deutsche Bank AG et al*, No. 09-CV-2556 Initial Complaint (the "Kaess Complaint" or "Kaess Compl."). The Kaess Complaint alleged, *inter alia*, that Deutsche Bank AG, with respect to its mortgage-related securities:

- failed to properly record provisions for credit losses, residential mortgage-backed securities, commercial real estate loans…
- The Company's internal controls were inadequate to prevent it from improperly recording provisions for credit losses, residential mortgage-

backed securities, commercial real estate loans…

Kaess Compl., ¶47 (emphasis added).

152.    As alleged herein, DBS failed to conduct proper due diligence and perform necessary oversight functions in the underwriting, securitization and preparation of the Offering Documents for the RALI Offerings complained of herein.

### 4.    Defendant Citigroup

153.    Defendant Citigroup Global Markets, Inc. ("CITI") is the registered broker-dealer of the global banking giant Citigroup, Inc. ("Citigroup").  As one of the top underwriters of MBS in the last five-years, Citigroup has been one of the major contributors to the collapse of the U.S. sub-prime mortgage market and the current economic crisis.  In 2005, CITI was ranked by *IMF* as the seventh largest MBS Issuer having issued $68.305 billion in MBS.  In that same year, CITI issued 17.9 billion of non-agency MBS alone.  In 2006, CITI issued $20 billion of non-agency MBS, and was ranked as the sixth largest producer of MBS with a volume of $71.782 billion.

154.    On January 15, 2008 Citigroup reported its greatest loss in its 196-year history as it wrote off $18.1 billion and announced $9.8 billion in sub-prime related losses for the fourth quarter. On April 18, 2008 Citigroup declared another write-down of an additional $15.2 billion.

155.    On March 7, 2008 the House Oversight and Government Reform Committee subpoenaed CITI's former CEO, Charles Prince, seeking information regarding CITI's role in the MBS financial meltdown.  According to a March 7, 2009 article in the *The New York Times*:

> Under Mr. Prince, Citigroup charged aggressively into the trading of mortgage-backed securities that were the hot product on Wall Street at the time.  As late as the summer of 2007, as evidence mounted of a collapse in the housing market, Mr. Prince declared that the bank was "still dancing."

Not much later, the music ended, and Mr. Prince was out in November of that year as the bank posted a $5.9 billion loss.

That turned out to be the first of many. On Jan. 16, 2009, Citigroup announced an $8.29 billion fourth-quarter loss, bringing its total losses for 2008 to $27.7 billion, among the largest in corporate history.

156.    On November 5, 2008, a class action complaint for violations of the Federal Securities Laws was filed against CITI in Federal District Court, Southern District of New York, alleging that, *inter alia*, in certain Public Offering documents, CITI materially understated loss reserves for the Company's $213 billion portfolio of residential mortgage loans.  *In re Citigroup Bond Litigation,* No. 08-CV-9522.  Consolidated Amended Class Action Complaint ("CITI Complaint" or "CITI Compl").  The CITI Complaint states in part:

> Many of these mortgages carried a high risk of default because they were made to borrowers who did not document their income or who possessed especially low credit scores, or because the loans were drawn against the equity value of a property at a time when housing prices were declining precipitously.  While accounting rules required Citigroup to take reserves based on losses that were "likely" to occur, the Company allowed its reserves to track – and at times to be less than – the amount of loans that had already defaulted.  Further, despite the Company's rapidly expanding portfolio of particularly risky loans, coupled with the collapse of the housing market, Citigroup reduced its allowance for loan losses as a percentage of total loans in 2006 and 2007.

CITI Compl., at ¶ 8.

157.    In latter part of 2008, in order to remain viable, CITI received $52 billion in cash from the Government's Troubled Asset Relief Program ("TARP") and handed over 36% of ownership to the federal government.

158.    As alleged herein, CITI failed to conduct proper due diligence and perform necessary oversight functions in the underwriting, securitization and preparation of the Offering Documents for the RALI Offerings complained of herein.

5.   **Defendant UBS**

159.   Defendant UBS, a wholly-owned subsidiary of UBS AG, is an SEC registered broker-dealer which engages in investment banking activities around the world, including underwriting, financing and asset management. In 2005, as reported by IMF, UBS issued $12.75 billion of MBS and was the seventh largest underwriter of non-agency MBS ($58.536 billion). The following year, UBS broke into the top 25 of non-agency issuers, issuing $12.752 billion of MBS, and was the thirty-fifth largest MBS producers, producing $12.847 billion of MBS.  In 2007, UBS issued $3.05 billion of subprime MBS.

160.   In 2005, according to its Annual Audit Report filed with the SEC, UBS ended the year with $127 billion in total assets - $26 billion of which were mortgage-backed obligations. Furthermore, in 2006, according to its Annual Audit Report, UBS' assets at year-end totaled $153 billion, of which over $36 billion were in the form of mortgage-backed obligations.  And in 2007, the investment bank's assets totaled $156 billion with $33.5 billion in the form of mortgage-backed obligations.

161.   By 2008, however, the one-time massive global investment bank now valued its mortgage-backed obligations at only $8 billion and reported total assets of only $54 billion - a 76% decline in total mortgage-backed obligations and a 65% decline in total assets as compared to 2007.

162.   In December, 2007, UBS issued a profit warning, expecting write downs related to sub-prime mortgage losses - estimating the figure to reach upwards of $10 billion.

163.   In January 2008, *The Wall Street Journal* reported that due to massive exposure to the U.S. housing and mortgage markets, UBS was forced to take substantial write-downs resulting from sub-prime mortgage related losses.

UBS, the world's largest wealth manager, announced the need to write down another $4 in subprime-related losses. This new write-down brings the total for UBS subprime losses over $18.4 billion. Subprime related losses pushed the company its worst year of performance in its institutional history."

164.     UBS has written off nearly $38 billion since the subprime crisis began, over $18 billion of which came in the first quarter of 2008.

165.     In April 2008, a *New York Times* article reported that the "UBS, which has written off more debt from the sub-prime crisis than any other bank, conceded in a report on Monday that a blind drive for revenue led it to take more risks than it should have."

166.     *The Wall Street Journal* reported on February 2, 2008 that a federal criminal investigation of UBS had been commenced, focusing on practices of misleading investors about the value of its mortgage-related holdings. This report include:

A U.S. attorney's office investigation as to whether UBS AG criminally misled investors by posting inflated prices of its mortgage bond holdings, despite knowing that the valuations had dropped.

An SEC probe into similar "mismarking" issues surrounding the bank's massive holdings of mortgage securities. The SEC case has recently been upgraded to a formal investigation.

167.     As alleged herein, UBS failed to conduct proper due diligence and perform necessary oversight functions in the underwriting, securitization and preparation of the Offering Documents for the RALI Offerings complained of herein.

923071.1 1

**VI.**

**MATERIAL MISSTATEMENTS AND OMISSIONS IN THE OFFERING DOCUMENTS**

A.   **Defendants' Material Misstatements and Omitted Information
Regarding Stated Mortgage Loan Underwriting Guidelines**

1.   **The Registration Statements**

168.   The Registration Statements set forth the underwriters expectations that each originator will have applied strict procedures to evaluate the loans it had originated.

> The depositor expects that the originator of each of the mortgage loans will have applied, consistent with applicable federal and state laws and regulations, underwriting procedures intended to evaluate the borrower's credit standing and repayment ability and/or the value and adequacy of the related property as collateral.

Residential Accredit Loans, Inc., Form S-3/A Registration Statement, filed March 3, 2006, at 12; *cf.,* Residential Accredit Loans, Inc., Form S-3/A Registration Statement, filed April 3, 2007, at 18.

169.   *Omitted Information*: This statement failed to disclose that the originators made little or no attempt to evaluate the borrowers' credit standing and repayment ability.  As has emerged, all of the originators loosened or totally disregarded their stated underwriting guidelines in an effort to increase origination volume.

170.   The Registration Statements each set forth the underwriting guidelines applied in the origination of the mortgage loan collateral underlying the Certificates.[13]  In terms of the "General Standards" applicable to the origination process, the Registration Statements state, in part:

> In most cases, under a traditional "full documentation" program, each mortgagor will have been required to complete an application designed to provide to the original lender pertinent credit information concerning the mortgagor.  As part of the description of the mortgagor's financial condition, the mortgagor will have

---

[13]   Both Registration Statements and the Prospectus Supplements for those Offerings in which the underlying collateral was originated by Residential Capital's own Homecomings Financial include the identical language describing the Originator's "Underwriting Guidelines" and refer specifically to "The Program." (¶¶ 219-232).

923071.1 1

furnished information, which may be supplied solely in the application, with respect to its assets, liabilities, income (except as described below), credit history, employment history and personal information, and furnished an authorization to apply for a credit report that summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy…

***If specified in the accompanying prospectus supplement, a mortgage pool may include mortgage loans that have been underwritten pursuant to a streamlined documentation refinancing program. Such program permits some mortgage loans to be refinanced with only limited verification or updating of the underwriting information that was obtained at the time that the original mortgage loan was originated.***

***If specified in the accompanying prospectus supplement, some mortgage loans may have been originated under "limited documentation," "stated documentation" or "no documentation" programs that require less documentation and verification than do traditional "full documentation" programs. Under a limited documentation, stated documentation or no documentation program, minimal investigation into the mortgagor's credit history and income profile is undertaken by the originator and the underwriting may be based primarily or entirely on an appraisal of the mortgaged property and the LTV ratio at origination.***

Residential Accredit Loans, Inc., Form S-3/A Registration Statement, filed March 3, 2006, at 12-13; *cf.,* Residential Accredit Loans, Inc., Form S-3/A Registration Statement, filed April 3, 2007, at 18.

171.   ***Omitted Information:***   In the industry, mortgage loans originated under streamlined or other "less than full-documentation" programs were referred to as "liar loans" which were much riskier than suggested by the Prospectus Supplements.   Specifically, Residential Capital took the information on the borrower application as true, performing little if any review of the underlying documentation, if any such documentation was required.   The computerized underwriting system employed by Residential Capital (and explained further below) did not have the ability to verify information entered into it by Residential Capital or directly by correspondent lenders, and only reviewed the information it was programmed to review.   Because little if any verification was required, borrower and mortgage broker fraud – or "lies" – were common in these types of applications and ignored by Residential Capital.

69

172.     Furthermore, the Registration Statements included explanations of the appraisals of the underlying mortgaged property and the methodologies used in obtaining proper valuation of the properties:

> The adequacy of a mortgaged property as security for repayment of the related mortgage loan will typically have been determined by an appraisal or an automated valuation, as described above under "Loan-to-Value Ratio." Appraisers may be either staff appraisers employed by the originator or independent appraisers selected in accordance with pre-established guidelines established by or acceptable to the originator. The appraisal procedure guidelines will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed…
>
> The underwriting standards applied by an originator typically require that the underwriting officers of the originator be satisfied that the value of the property being financed, as indicated by an appraisal or other acceptable valuation method as described below, currently supports and is anticipated to support in the future the outstanding loan balance…

Residential Accredit Loans, Inc., Form S-3/A Registration Statement, filed March 3, 2006, at 13; *cf.*, Residential Accredit Loans, Inc., Form S-3/A Registration Statement, filed April 3, 2007, at 18-19.

173.     ***Omitted Information:*** In fact, Residential Capital was not nearly as thorough in getting documentation from or about borrowers as these statements imply. As set forth herein in detail, the Originators and "underwriting officers" placed the emphasis not on adherence to underwriting guidelines, but rather, on getting loans "done," severely hindering the quality of the mortgage loans and resulting in flawed and in many cases fraudulent loan applications which, among other things, included over-valued property appraisals, and making no attempt to confirm the standards actually used by mortgage brokers, correspondents and other third-parties from which they acquired mortgages. Higher deal fees and more profitable market conditions were motivation for Residential Capital not to spend the time and money to investigate the validity of appraisal values on the underlying mortgaged properties prior to securitization. Specifically,

70

only a small sampling of the mortgage loan pool, no more than 5% to 7%, was reviewed before Residential Capital securitized the loans, leaving a substantial amount of bad loans to escape inspection.  Further, with Residential Capital's use of the computerized underwriting software (¶¶ 168-195) the loan characteristics became numbers blindly plugged into a computer with little or no attention paid to the underlying collateral, as long as the averages of the loan pool fit within a certain loosely defined parameter.  These statements were materially false and misleading since appraisal standards were largely disregarded and the values of the underlying mortgage properties were, in many instances, inflated in the loan origination process.

174.    The Registration Statements then set forth the process of review by the Sponsor/Seller, Defendant RFC, in determining whether or not the mortgage was originated in-line with its stated underwriting standards:

> The level of review by Residential Funding Corporation, if any, will vary depending on several factors.  Residential Funding Corporation, on behalf of the depositor, typically will review a sample of the mortgage loans purchased by Residential Funding Corporation for conformity with the applicable underwriting standards and to assess the likelihood of repayment of the mortgage loan from the various sources for such repayment, including the mortgagor, the mortgaged property, and primary mortgage insurance, if any.  Such underwriting reviews will generally not be conducted with respect to any individual mortgage pool related to a series of certificates.

*     *     *

> In addition, Residential Funding Corporation may conduct additional procedures to assess the current value of the mortgaged properties.  Those procedures may consist of drive-by appraisals, automated valuations or real estate broker's price opinions.  The depositor may also consider a specific area's housing value trends.  These alternative valuation methods may not be as reliable as the type of mortgagor financial information or appraisals that are typically obtained at origination.  In its underwriting analysis, Residential Funding Corporation may also consider the applicable Credit Score of the related mortgagor used in connection with the origination of the mortgage loan, as determined based on a credit scoring model acceptable to the depositor.

*     *     *

71

A portion of the mortgage loans typically will be reviewed by Residential Funding Corporation or by a designated third party for compliance with applicable underwriting criteria. … Any determination of underwriting eligibility using an automated system will only be based on the information entered into the system and the information that the system is programmed to review.

Residential Accredit Loans, Inc., Form S-3/A Registration Statement, filed March 3, 2006, at 14--16; *cf.,* Residential Accredit Loans, Inc., Form S-3/A Registration Statement, filed April 3, 2007, at 19-22.

175.   ***Omitted Information:*** The above statement was misleading and omitted information regarding the level of scrutiny with which RFC and HFN examined the collateral and conducted due diligence.   As set forth above, Residential Capital, and RFC and HFN specifically, were more concerned with "pushing loans through" and increasing fees and profits from MBS securitizations than kicking-back loans to correspondent lenders.   Moreover, the sample size of the loans that Residential Capital did review was just a small percentage of the loans it acquired from HFN and correspondent lenders, from which only extreme outliers which fell outside acceptable parameters were dropped out.   Regardless, Residential Capital farmed out most of the "review" of the mortgage loan collateral to third-party firms, including Bohan and Clayton, which have publicly disclosed the severe deficiencies in the standards applied in underwriting and securitizing mortgage loan collateral throughout the relevant time period.

176.   Furthermore, the Registration Statements set forth borrower documentation and verification requirements for more risky loans such as ARMs or Buy-Down Mortgages:

Once all applicable employment, credit and property information is received, a determination is made as to whether the prospective borrower has sufficient monthly income available to meet the borrower's monthly obligations on the proposed mortgage loan and other expenses related to the home, including property taxes and hazard insurance, and other financial obligations and monthly living expenses. ***ARM loans, Buy-Down Mortgage Loans, graduated payment mortgage loans and any other mortgage loans will generally be underwritten on the basis of the borrower's ability to make monthly payments as determined by reference to the mortgage rates in effect at origination or the reduced initial***

72

*monthly payments, as the case may be, and on the basis of an assumption that the borrowers will likely be able to pay the higher monthly payments that may result from later increases in the mortgage rates or from later increases in the monthly payments, as the case may be, at the time of the increase even though the borrowers may not be able to make the higher payments at the time of origination.* The mortgage rate in effect from the origination date of an ARM loan or other types of loans to the first adjustment date are likely to be lower, and may be significantly lower, than the sum of the then applicable index and Note Margin…

Residential Accredit Loans, Inc., Form S-3/A Registration Statement, filed March 3, 2006, at 15-16; *cf.,* Residential Accredit Loans, Inc., Form S-3/A Registration Statement, filed April 3, 2007, at 21.

177. **Omitted Information:**   In fact, Residential Capital instructed correspondent lenders to push certain types of mortgage loans, such as hybrid option-ARM loans, also referred to as Negative Amortization loans (*see, supra*), historically reserved for only those borrowers with outstanding credit history and sufficient income.  These hybrid loan products allowed borrowers to "pick-a-payment" for an initial period of one to five years, with the difference between what was owed and what was paid then added on to the outstanding loan amount.  In an attempt to increase the amount of loans originated, the Originators failed to disclose to borrowers that once the outstanding loan amount reached a certain level, i.e., 110% of original balance, the "pick-a-payment" period ended, and borrowers would be required to make monthly payments of an even larger outstanding amount at an adjusted, and significantly higher, interest rate.  As such, HFN buried or completely omitted information regarding the option-ARM caps, rate adjustments when originating these types of loans for sub-prime or otherwise unqualified borrowers in order to increase the volume of origination of these types of loans.

178. Residential Capital, according to the Registration Statements, also originated or purchased loans which were underwritten pursuant to certain "Expanded Criteria:"

*Residential Funding Corporation's Expanded Criteria Program is designed for borrowers with good credit who may have difficulty obtaining traditional*

923071.1 1

> *financing due to loan characteristics, such as a LTV ratios higher than 80%, occupancy of the mortgaged property or type of mortgaged property, or borrower characteristics such as self-employment.*

Residential Accredit Loans, Inc., Form S-3/A Registration Statement, filed March 3, 2006, at 16; *cf.,* Residential Accredit Loans, Inc., Form S-3/A Registration Statement, filed April 3, 2007, at 21.

179.    **Omitted Information:** As set forth herein in detail, Residential Capital failed to adhere to these criteria because loans were continuously approved for borrowers with bad credit, high LTV or no verifiable employment whatsoever.  The public disclosures of late have revealed that mortgage lenders throughout the country engaged in fraudulent activities in order to obtain mortgages for borrowers and the fees obtained as payment – HFN being no exception.

180.    The Registration Statements also explained that Residential Capital, in reviewing the loans originated by correspondent lenders, employs the use of an automated underwriting system which reviews "most" of the information contained in borrower applications for determinations of whether or not to purchase individual mortgages loans for securitization:

> In recent years, the use of automated underwriting systems has become commonplace in the residential mortgage market.  Residential Funding Corporation evaluates many of the mortgage loans that it purchases through the use of one or more automated underwriting systems.  In general, these systems are programmed to review most of the information set forth in Residential Funding Corporation's Seller Guide as the underwriting criteria necessary to satisfy each underwriting program.  In the case of the Expanded Criteria Program, the system may make adjustments for some compensating factors, which could result in a mortgage loan being approved even if all of the specified underwriting criteria in the Seller Guide for that underwriting program are not satisfied.
>
> *In some cases, Residential Funding Corporation enters information into the automated underwriting system using documentation delivered to Residential Funding Corporation by the mortgage collateral seller.*  In this situation, each automated review will either generate an approval or a recommendation for further review.  Most approved mortgage loans will not receive any additional review of their credit components.  In the case of a recommendation for further review, underwriting personnel may perform a manual review of the mortgage loan documentation before Residential Funding Corporation will accept or reject the mortgage loan.  For most mortgage collateral sellers, Residential Funding

Corporation will conduct a limited review of the mortgage loan documentation.  If that limited review does not detect any material deviations from the applicable underwriting criteria, Residential Funding Corporation will approve that mortgage loan for purchase.

***In other cases, the mortgage collateral seller enters the information directly into the automated underwriting system. Mortgage loans that have been approved by the automated underwriting system, and submitted to Residential Funding Corporation for purchase may be reviewed to verify that the information entered by the mortgage collateral seller accurately reflects information contained in the underwriting documentation.***  For most mortgage collateral sellers, Residential Funding Corporation will verify the accuracy of the information with respect to a sample of that mortgage collateral seller's mortgage loans.

Because an automated underwriting system will only consider the information that it is programmed to review, which may be more limited than the information that could be considered in the course of a manual review, the results of an automated underwriting review may not be consistent with the results of a manual review.

Residential Accredit Loans, Inc., Form S-3/A Registration Statement, filed March 3, 2006, at 17; *cf.,* Residential Accredit Loans, Inc., Form S-3/A Registration Statement, filed April 3, 2007, at 22-23.

181.    ***Omitted Information:***  The above statements were misleading and omitted information relating to Residential Capital's lack of incentive to perform any review or verification on the information in the mortgage application.  Residential Capital's need for non-conforming mortgage loans in a competitive market caused it to forego any substantial review the validity of mortgage loan applications and borrower information.

2.    **The Prospectus Supplements**

182.    The underlying loan collateral for all of the Issuing Trusts (¶¶ 32-33) was principally originated by HFN. As set forth above, HFN is a Delaware corporation and wholly-owned subsidiary of RFC, which in turn, in a wholly-owned subsidiary of Defendant RCC. As set forth in the Prospectus Supplement for the RALI Series 2006-QO7 Certificates, "all of the

HFN collateral was originated in accordance with RFC's underwriting standards."  RALI Series

2006-QO7 Prospectus Supplement, Form 424B5, filed September 29, 2006, at S-58.

183.    Moreover, the underwriting guidelines, or "The Program" according to the

Prospectus Supplements, was "administered by Residential Funding on behalf of" RALI, the

Depositor.  *Id*., at S-56.

184.    The Prospectus Supplements described the RFC underwriting guidelines,

supposedly adhered to by HFN in originating the underlying mortgage loan collateral.  For

example, the Prospectus Supplement for the RALI 2006-QO7 Certificate Offering stated:

> *Program Underwriting Standards*. In accordance with the Seller Guide, the
> Expanded Criteria Program Seller is required to review an application designed to
> provide to the original lender pertinent credit information concerning the
> mortgagor.  As part of the description of the mortgagor's financial condition, each
> mortgagor is required to furnish information, which may have been supplied
> solely in the application, regarding its assets, liabilities, income (except as
> described below), credit history and employment history, and to furnish an
> authorization to apply for a credit report which summarizes the borrower's credit
> history with local merchants and lenders and any record of bankruptcy.

*Id*., at S-56.

185.    ***Omitted Information***: These statements failed to disclose that the issues of

borrower creditworthiness were largely disregarded.  Beginning in 2006, RCC, specifically RFC

and HFN began abandoning prudent lending standards in order to "push more loans through the

system."  The company's approach was to originate enough loans so that they could outrun their

own delinquency rates and raise capital after GMAC's credit rating was revised to the lowest

possible grade in late 2005, hindering GMAC and RCC's access to credit markets and long-term

capital.  The lax controls led to the substantial increase of low-quality mortgage loans as more

stress was placed on quantity at the expense of loan quality.

186.    The RALI 2006-QO7 Prospectus Supplement also stated:

Based on the data provided in the application and certain verifications, if required, a determination is made by the original lender that the mortgagor's monthly income, if required to be stated, will be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property, including property taxes, utility costs, standard hazard insurance and other fixed obligations.

*Id.*, at S-57.

187.   **Omitted Information:**   In fact, HFN did not verify the income of borrowers as represented, and was extremely liberal with terms even to borrowers with low credit scores. Over time, HFN became heavily focused on pushing Option-ARM and hybrid products to borrowers who could otherwise not qualify for a mortgage loan.   Moreover, HFN's correspondent loans routinely included hidden fees and charges to borrowers who were never informed of them in the application process.

188.   The RALI 2006-QO7 Prospectus Supplement also stated:

Certain of the mortgage loans have been originated under "reduced documentation" or "no stated income" programs, which require less documentation and verification than do traditional "full documentation" programs. Generally, under a "reduced documentation" program, no verification of a mortgagor's stated income is undertaken by the originator. Under a "no stated income" program, certain borrowers with acceptable payment histories will not be required to provide any information regarding income and no other investigation regarding the borrower's income will be undertaken. Under a "no income/no asset" program, no verification of a mortgagor's income or assets is undertaken by the originator. The underwriting for those mortgage loans may be based primarily or entirely on an appraisal of the mortgaged property and the LTV ratio at origination.

*Id.*

189.   **Omitted Information**:   These deficiencies in income documentation made accurate and reliable appraisals essential since so much emphasis was placed on the value of the mortgaged property.   However, appraisers were in fact pressured to appraise to certain levels. Appraisers knew if they appraised under certain levels they would not be hired again.   Thus, the

appraisals were inherently unreliable and there was little to support the value and adequacy of the mortgaged property.

190.   The RALI 2006-QO7 Prospectus Supplement also stated:

The adequacy of the mortgaged property as security for repayment of the related mortgage loan generally is determined by an appraisal in accordance with appraisal procedure guidelines described in the Seller Guide.  Appraisers may be staff appraisers employed by the originator.  The appraisal procedure guidelines generally require the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property is in good condition and that construction, if new, has been substantially completed.  The appraiser is required to consider a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property, or replacement cost analysis based on the current cost of constructing or purchasing a similar property.  In certain instances, the LTV ratio is based on the appraised value as indicated on a review appraisal conducted by the mortgage collateral seller or originator.

*Id*.

191.   ***Omitted Information:***  Appraisals of the underlying properties were not nearly as meticulous as suggested by the Prospectus Supplement.  They were much more perfunctory, and appraisers were motivated to reach a certain conclusion – much more so than to use their professional judgment.  Given the credit problems of many of these borrowers, the lack of valid appraisals was a significant adverse fact and indication of future problems.  In fact, HFN's home loan appraisals were not obtained from independent appraisers or appraisal services, but rather from appraisers who understood that their appraisals must conform to predetermined levels at which a loan could be approved, or risk their association and employment with HFN or brokers working with HFN and its correspondent lenders.  The result was that purportedly independent appraisals were not prepared in conformance with these stated appraisal standards.  HFN and RFC failed to confirm that appraisers were following the guidelines described, and this, combined with the implied or express pressures placed on appraisers to appraise to the desired

value, created enormous upward pressure on appraisal values, distorting loan-to-value ratios and making the mortgage loans in the pool much riskier than suggested by the Offering Documents. This was particularly true in 2006 and 2007 when real estate values in many of the areas where the mortgage pools were located had stopped increasing at the rapid pace of 2004 to 2005. Thus, the aggressive lending practices introduced during those years where, for example, borrowers with mortgages in excess of their ability to pay were assured that by the promise of refinancing to a lower rate, were unavailable.

192.    The RALI 2006-QO7 Prospectus Supplement also stated:

> Prior to assigning the mortgage loans to the depositor, Residential Funding will have reviewed the underwriting information provided by the mortgage collateral sellers for the mortgage loans and, in those cases, determined that the mortgage loans were generally originated in accordance with or in a manner generally consistent with the underwriting standards described in the Seller Guide. With regard to a material portion of these mortgage loans, this review of underwriting information by Residential Funding was performed using an automated underwriting system. Any determination described above using an automated underwriting system will only be based on the information entered into the system and the information the system is programmed to review.

*Id.*

193.    ***Omitted Information***: As set forth herein, the above statements were misleading and omitted information relating to Residential Capital's lack of incentive to perform any review or verification on the information in the mortgage application. Residential Capital's need for non-conforming mortgage loans in a competitive market caused it to forego any substantial review the validity of mortgage loan applications and borrower information.

194.    The RALI 2006-QO7 Prospectus Supplement also stated:

> The applicable underwriting standards include a set of specific criteria by which the underwriting evaluation is made. However, the application of the underwriting standards does not imply that each specific criterion was satisfied individually. Rather, a mortgage loan will be considered to be originated in accordance with the underwriting standards described above if, based on an overall qualitative

evaluation, the loan is in substantial compliance with the underwriting standards.

*Id.*, at S-58.

195.   **Omitted Information**: Exceptions to guidelines were granted in many circumstances – not just where compensating factors existed or substantial compliance was satisfied.  The exceptions were granted when the borrower could not qualify for a mortgage loan.  A substantial portion of the loans originated pursuant to the HFN/RFC Program underwriting guidelines were approved and submitted by mortgage brokers and correspondent lenders throughout the country.  Thereafter, as set forth above, the loans would be evaluated using a computerized system which could not exercise any degree of realistic control over the truthfulness of the borrower information contained in mortgage applications.

**B.     The Offering Documents Omitted Information**
        **Regarding Delinquencies as of the Cut-Off Dates**

196.   The Registration Statements contained general descriptions of the information that would be contained in each of the Prospectus Supplements.  With regards to delinquencies of the underlying collateral as of the cut-off date, the 2006 Registration Statement stated as follows:

> As of the cut-off date, none of the mortgage loans will be 30 or more days delinquent in payment of principal and interest.

Residential Accredit Loans, Inc., Form S-3/A Registration Statement, filed March 3, 2006, at S-37; *cf.,* Residential Accredit Loans, Inc., Form S-3/A Registration Statement, filed April 3, 2007, at S-39.

197.   Each of the Prospectus Supplements contained the same or similar language as set forth above, indicating that as of the "cut-off date" (defined differently in each Prospectus Supplement) none of the mortgage loans were 30 days or more delinquent as of that date.  In

80

addition, the Prospectus Supplements contained additional information regarding delinquencies of the underlying collateral as follows:

> ***As of the cut-off date, none of the mortgage loans are currently 30 to 59 days delinquent in payment of principal and interest.*** As of the cut-off date, one of the mortgage loans representing 0.1% of the mortgage loans has been 30 to 59 days delinquent in payment of principal and interest in the past 24 months. As of the cut-off date, none of the mortgage loans are currently 60 to 89 days delinquent in the payment of principal and interest. As of the cut-off date, none of the mortgage loans have been 60 to 89 days delinquent in the payment of principal and interest in the past 24 months. As of the cut-off date, none of the mortgage loans are currently 90 or more days delinquent in the payment of principal and interest. As of the cut-off date, none of the mortgage loans have been 90 or more days delinquent in the payment of principal and interest in the past 24 months.

RALI Series 2006-QA4 Prospectus Supplement, Form 424B5, filed May 26, 2006, at S-43 (emphasis added); *see also* RALI Series 2006-QO7 Prospectus Supplement, Form 424B5, filed September 29, 2006, at S-54 (emphasis added).

198.    ***Omitted Information:*** These statements masked the true impaired nature of the collateral since the delinquency rates for these loan pools followed the same pattern of skyrocketing delinquencies immediately following the Offerings.   Specifically, within four months after the respective "cut-off dates," borrower delinquency rates increased by an average of 47,000%, from 0.00% to almost 4.78% of the outstanding collateral balance, and within six months that figure further rose to over 6.39%, another 28% increase within just two months and a combined increase of over 63,000% from the cut-off dates.   As of the date of the filing of the within Complaint, borrower delinquency and defaults have increased to over 36.9% of the outstanding collateral balance.

## C.     The Offering Documents Included Material Misstatements and Omitted Information Regarding Credit Support

199.    "Credit enhancement" refers to excess mortgage loan collateral which provides support to the mortgage collateral underlying the Offered Certificates and generates additional

81

interest to protect security holders in the event of borrower default or other event which may

impair the collateral underlying the certificates.

200.    The Registration Statements stated, in regards to credit enhancement, that:

Each series may include multiple classes of certificates with differing payment terms and priorities. ***Credit enhancement will be provided for all offered certificates.***

Residential Accredit Loans, Inc., Form S-3/A Registration Statement, filed March 3, 2006, at 2; *cf.,* Residential Accredit Loans, Inc., Form S-3/A Registration Statement, filed April 3, 2007, at A-7.

201.    Further, with respect to credit enhancement, the Registration Statements provided

explanations of the losses that credit enhancement is in place should such losses occur:

## DESCRIPTION OF CREDIT ENHANCEMENT

### General

Credit support for each series of certificates may be comprised of one or more of the following components. Each component will have a dollar limit and will provide coverage with respect to Realized Losses that are:

- Defaulted Mortgage Losses;
- Special Hazard Losses;
- Bankruptcy Losses; and
- Fraud Losses.

Residential Accredit Loans, Inc., Form S-3/A Registration Statement, filed March 3, 2006, at 52; *cf.,* Residential Accredit Loans, Inc., Form S-3/A Registration Statement, filed April 3, 2007, at 62.

202.    The Registration Statements also set forth the nature of the credit enhancements

and the degree of loss that it would cover:

Most forms of credit support will not provide protection against all risks of loss and will not guarantee repayment of the entire outstanding principal balance of the certificates and interest. If losses occur that exceed the amount covered by credit support or are of a type that is not covered by the credit support, certificate-holders will bear their allocable share of deficiencies. In particular, Defaulted Mortgage Losses, Special Hazard Losses, Bankruptcy Losses and Fraud Losses in excess of the amount of coverage provided therefor and Extraordinary Losses will

> not be covered. To the extent that the credit enhancement for any series of certificates is exhausted, the certificate-holders will bear all further risks of loss not otherwise insured against.

Residential Accredit Loans, Inc., Form S-3/A Registration Statement, filed March 3, 2006, at 51; *cf.,* Residential Accredit Loans, Inc., Form S-3/A Registration Statement, filed April 3, 2007, at 62.

203.    The Registration Statements also set forth the obligations of the parties to maintain the stated credit enhancements.

> **Maintenance of Credit Enhancement**
> If credit enhancement has been obtained for a series of certificates, the master servicer, the servicer or the Certificate Administrator will be obligated to exercise its best reasonable efforts to keep or cause to be kept the credit enhancement in full force and effect throughout the term of the applicable pooling and servicing agreement, unless coverage thereunder has been exhausted through payment of claims or otherwise, or substitution therefor is made as described below under "-Reduction or Substitution of Credit Enhancement."

Residential Accredit Loans, Inc., Form S-3/A Registration Statement, filed March 3, 2006, at 59; *cf.,* Residential Accredit Loans, Inc., Form S-3/A Registration Statement, filed April 3, 2007, at 72.

204.    Furthermore, the Prospectus Supplements each set forth the types of credit enhancement applicable to each specific offering:

> **Credit Enhancement**
>
> Credit enhancement for the offered certificates consists of:
> - excess cash flow;
> - overcollateralization;
> - a swap agreement; and
> - subordination provided to the Class A Certificates by the Class M Certificates, and subordination provided to the Class M Certificates by each class of Class M Certificates with a lower payment priority.

RALI Series 2006-QA4 Prospectus Supplement, Form 424B5, filed May 26, 2006, at cover; *see also* RALI Series 2006-QO7 Prospectus Supplement, Form 424B5, filed September 29, 2006, at cover.

205.    In addition, the Prospectus Supplements contained explanations of the credit enhancement specific to each of the Offerings.  For example, the Prospectus Supplement for the RALI Series 2006-QA4 Offering provided that credit enhancement would include:

**Credit Enhancement**

The credit enhancement for the benefit of the offered certificates consists of:
Excess Cash Flow. Because more interest with respect to the mortgage loans is payable by the mortgagors than is expected to be necessary to pay the interest on the offered certificates each month and related expenses, there may be excess cash flow. Some of this excess cash flow may be used to protect the offered certificates against some realized losses by making an additional payment of principal up to the amount of the realized losses.

*Overcollateralization*. On the closing date, the trust will issue an aggregate principal amount of offered certificates which is approximately equal to 99.35% of the aggregate principal balance of the mortgage loans as of the cut-off date.  On each distribution date, to the extent not used to cover realized losses, excess cash flow, if necessary, will be used to pay principal to the offered certificates, reducing the aggregate certificate principal balance of those certificates below the aggregate principal balance of the mortgage loans to the extent necessary to maintain the required overcollateralization amount. The excess amount of the balance of the mortgage loans represents overcollateralization, which may absorb some losses on the mortgage loans to the extent not covered by excess cash flow.

*Subordination*. So long as the Class M Certificates remain outstanding, losses on the mortgage loans which are not covered by excess cash flow or overcollateralization will be allocated to the Class M Certificates that remain outstanding with the lowest payment priority, and the other classes of certificates will not bear any portion of such losses. If none of the Class M Certificates are outstanding, all such losses will be allocated to the related Class A Certificates as described in this prospectus supplement.

*Swap Agreement.* The holders of the Class A Certificates and Class M Certificates will benefit from a swap agreement. On each distribution date, the trust will be obligated to make fixed payments, and HSBC Bank USA, N.A., the swap counterparty, will be obligated to make floating payments, in each case as set forth in the swap agreement and as described in this prospectus supplement. To the extent that the fixed payment exceeds the floating payment on any distribution date, amounts otherwise available to certificate-holders will be applied to make a net swap payment to the swap counterparty. To the extent that the floating payment exceeds the fixed payment on any distribution date, the swap counterparty will make a net swap payment to the trust which may be used to

84

cover certain interest shortfalls, basis risk shortfalls and losses on the mortgage loans as described in this prospectus supplement.

Upon early termination of the swap agreement, the trust or the swap counterparty may be liable to make a swap termination payment to the other party (regardless of which party has caused the termination). The swap termination payment will be computed in accordance with the procedures set forth in the swap agreement. In the event that the trust is required to make a swap termination payment to the swap counterparty, that amount will be paid by the trust on the related distribution date and on any subsequent distribution dates until paid in full, prior to any distribution to the Class A Certificates and Class M Certificates, except for certain swap termination payments resulting from an event of default by or certain termination events with respect to the swap counterparty as described in this prospectus supplement, for which payments by the trust to the swap counterparty will be subordinated to all distributions to the Class A Certificates and Class M Certificates. The swap agreement will terminate after the distribution date in May 2011.

Except as described in the second preceding sentence, amounts payable by the trust to the swap counterparty will be deducted from available funds before distribution to certificate-holders.

RALI Series 2006-QA4 Prospectus Supplement, Form 424B5, filed May 26, 2006, at S-13; *see also* RALI Series 2006-QO7 Prospectus Supplement, Form 424B5, filed September 29, 2006, at S-18.

206.    *Omitted Information:* The above statements failed to disclose that the Ratings Agencies largely determined the amount and kind of credit support or credit enhancement to be provided for each class of Certificates, before and after the Ratings Agencies were formally "engaged" by Residential Capital, in order for the Certificates to be assigned predetermined desired ratings of the Underwriter.  The above statements also failed to disclose that the amounts and kind of credit support the Ratings Agencies determined was appropriate for the Certificates, as specifically set forth in each Prospectus Supplement, were faulty, erroneous and inaccurate since the Ratings Agency models had not been updated and failed to accurately or adequately reflect the performance of the Certificate mortgage loans.  Regardless of that fact, Residential Capital and the Underwriters continued to consummate Offerings of MBS throughout 2006 and

2007.  Furthermore, as the statements purport to convey to the investor that credit support levels are determined by the exposure to risk of default or delinquency by the underlying borrowers, this was far from the truth.  In fact, credit enhancement levels were set at the absolute minimum level that was required not to protect investors, but rather to achieve and be awarded the highest possible credit rating in order to maximize fees and profit from selling the Certificates at inflated prices.

**D.  The Prospectus Supplements Misstated the True Loan-to-Value Ratios Associated with the Underlying Mortgages**

207.    Each of the Prospectus Supplements contained detailed information about the LTV ratios of the loans underlying the trusts. In a series of charts, investors were provided with LTV ratio data, including information about the number of loans containing LTV ratios within a given range.  The following chart, taken from the Prospectus Supplement for RALI Series 2006-QA4, stated:

**Original Loan-to-Value Ratios of the Mortgage Loans**

| Original Loan-to-Value Ratio (%) | Number of Mortgage Loans | Principal Balance | Percentage of Mortgage Loans | Average Principal Balance | Weighted Average Credit Score |
|---|---|---|---|---|---|
| 00.01 – 50.00 | 31 | $6,356,761 | 2.07% | $205,057 | 719 |
| 50.01 – 55.00 | 13 | 3,988,603 | 1.30 | 306,816 | 705 |
| 55.01 – 60.00 | 27 | 11,836,249 | 3.86 | 438,380 | 718 |
| 60.01 – 65.00 | 50 | 20,397,677 | 6.66 | 407,954 | 708 |
| 65.01 – 70.00 | 63 | 22,896,056 | 7.47 | 363,429 | 718 |
| 70.01 – 75.00 | 106 | 31,808,740 | 10.38 | 300,082 | 713 |
| 75.01 – 80.00 | 685 | 201,960,535 | 65.91 | 294,833 | 711 |
| 80.01 – 85.00 | 3 | 818,341 | 0.27 | 272,780 | 703 |
| 85.01 – 90.00 | 22 | 3,961,049 | 1.29 | 180,048 | 718 |
| 90.01 – 95.00 | 10 | 2,080,593 | 0.68 | 208,059 | 722 |
| 95.01 – 100.00 | 2 | 334,900 | 0.11 | 167,450 | 745 |
| Total, Average or Weighted Average | 1,012 | $306,439,505 | 100.00% | $302,806 | 712 |

The weighted average Loan-to-Value ratio at origination of the mortgage loans will be approximately 75.68%.

RALI Series 2006-QA4 Prospectus Supplement, Form 424B5, filed May 26, 2006, at I-3; *see also* RALI Series 2006-QO7 Prospectus Supplement, Form 424B5, filed September 29, 2006, at I-3.

208.   **_Omitted Information_**: As explained above, the appraisal value of the properties underlying the mortgage loans and borrower incomes and credit were grossly inaccurate and significantly inflated.  Furthermore, due to hidden incentives, the stated sales price of properties underlying the mortgage loans did not accurately reflect the true value of the properties. These inflated appraisals and misleading sales price figures were used to form the LTV ratios set forth in the prospectus supplements.  Incorporating an inflated appraisal into the LTV calculation will result in a lower LTV ratio for a given loan.  For instance, as described above, if a borrower seeks to borrow $90,000 to purchase a house worth $100,000, the LTV ratio is $90,000/$100,000 or 90%. If, however, the appraised value of the house is artificially increased to $120,000, the LTV ratio drops to just 75% ($90,000/$120,000).

209.   Due to the inflated appraisals, the LTV ratios listed in the prospectus supplements were artificially low, making it appear that the loans underlying the trusts were less risky than they really were.  Due to the fact that such a large percentage of each Offering contained mortgage loan collateral which had the option or negative amortization feature, understated and misleading LTV ratios had a direct correlation to the skyrocketing delinquency and default rates within the first six months of the Offerings.  Incorporating the example above, if a borrower's $90,000 loan application on a home appraised by an originator at $100,000, the LTV ratio is 90%.  In a negative amortization scenario, if the true appraisal value of the underlying property for the borrower's mortgage is actually $80,000, the LTV ratio increases to 112.5%, triggering the automatic adjustment in rate and loss of the negative amortization feature.  Since many of the negative amortization loans underlying the Certificates were made to subprime and Alt-A borrowers, the resulting payments would be considerably more than what they could have been able to afford.

87

210.    Furthermore, also due to the artificially inflated appraisals (as detailed above) mortgages were extended to borrowers whose true LTV ratio did not support the amount of the mortgage loan.  Moreover, contrary to the statement that these many of the mortgages were in fact "limited documentation," or not "full documentation" loans, they were not extended to borrowers who have a credit history that demonstrates an established ability to repay indebtedness in a timely fashion.  In fact, the originators implemented policies designed to extend mortgages to borrowers regardless of whether they were able to meet their obligations under the mortgage such as:

- Coaching borrowers to misstate their income on loan applications to qualify for mortgage loans under the originators' underwriting standards, including directing applicants to no-documentation loan programs when their income was insufficient to qualify for full documentation loan programs.

- Steering borrowers to more expensive loans that exceeded their borrowing capacity.

- Encouraging borrowers to borrow more than they could afford by suggesting NINA and SISA loans when they could not qualify for full documentation loans based on their actual incomes.

- Approving borrowers based on "teaser rates" for loans despite knowing that the borrower would not be able to afford the "fully indexed rate" when the adjustable rate adjusted.

- Allowing non-qualifying borrowers to be approved for loans under exceptions to the originators' underwriting standards based on so-called "compensating factors" without requiring documentation for such compensating factors.

- Incentivizing their employees to approve borrowers under exceptions to the originators' underwriting policies.

- Failing to determine whether stated income or stated assets were reasonable.

E.      **The Prospectus Supplements Misstated the**
        <u>**the Certificates' True Investment Rating**</u>

211.    The Registration Statements and Prospectus Supplements contained statements regarding the ratings of the Certificates that were supported by the mortgage loans. The Registration Statements referred the investor to the Prospectus Supplements for specific information as to the ratings for each of the Certificates.

212.    Each of the Prospectus Supplements provided: (1) both S&P's and/or Moody's actual rating for each class of Offered Certificate within each Offering; or (2) stated that the Certificates in each class would not be offered unless they received ratings from both Moody's and/or S&P that were at least as high as those set forth in the Prospectus Supplement. All of the ratings set forth in all of the Prospectus Supplements were within the "Investment Grade" range of Moody's (Aaa through Baa3) and S&P (AAA through BBB) and the majority of Offered Certificates, over 95% of the total Offering values for each Moody's and S&P, received the highest rating of AAA.

923071.1 1

213.   The following chart, taken from the Prospectus Supplement for RALI Series 2006-QA4 is an example of this representation:

| Offered Certificates | | | | |
|---|---|---|---|---|
| Class | Pass-Through Rate | Initial Certificate Principal Balance | Initial Rating (S&P/ Moody's)[1] | Designations |
| Class A Certificates: | | | | |
| A | Adjustable Rate | $286,520,000 | AAA / Aaa | Senior /Adjustable Rate |
| Class M Certificates: | | | | |
| M-1 | Adjustable Rate | $5,056,000 | AA+ / Aa1 | Mezzanine/Adjustable Rate |
| M-2 | Adjustable Rate | $2,604,000 | AA+ / Aa2 | Mezzanine/Adjustable Rate |
| M-3 | Adjustable Rate | $1,991,000 | AA+ / Aa3 | Mezzanine/Adjustable Rate |
| M-4 | Adjustable Rate | $1,072,000 | AA / A1 | Mezzanine/Adjustable Rate |
| M-5 | Adjustable Rate | $1,072,000 | AA / A2 | Mezzanine/Adjustable Rate |
| M-6 | Adjustable Rate | $1,072,000 | AA / A3 | Mezzanine/Adjustable Rate |
| M-7 | Adjustable Rate | $1,072,000 | AA- / Baa1 | Mezzanine/Adjustable Rate |
| M-8 | Adjustable Rate | $1,072,000 | A / Baa2 | Mezzanine/Adjustable Rate |
| M-9 | Adjustable Rate | $1,378,000 | A- / Baa3 | Mezzanine/Adjustable Rate |
| M-10 | Adjustable Rate | $1,533,000 | BBB / Ba2 | Mezzanine/Adjustable Rate |
| Total Class M Certificates: | | $17,922,000 | | |
| Total Offered Certificates: | | $304,442,000 | | |
| Non-Offered Certificates[2] | | | | |
| SB | N/A | $1,997,504 | N/A | Subordinate |
| R-I | N/A | N/A | N/A | Residual |
| R-II | N/A | N/A | N/A | Residual |
| R-III | N/A | N/A | N/A | Residual |
| Total non-offered certificates: | | $1,997,504 | | |
| Total offered and non-offered certificates: | | $306,439,504 | | |

(1)  See "Ratings" in this prospectus supplement.
(2)  The information presented for non-offered certificates is provided solely to assist your understanding of the offered certificates.

RALI Series 2006-QA4 Prospectus Supplement, Form 424B5, filed May 26, 2006, at S-6; *see also* RALI Series 2006-QO7 Prospectus Supplement, Form 424B5, filed September 29, 2006, at S-6.

214.   **Omitted Information**: The ratings stated in the Prospectus Supplements were based on outdated models, lowered ratings criteria, and inaccurate loan information as set forth

in great detail above.  These flaws produced artificially high credit ratings for the Certificates,

making them appear less risky than they really were.

215.    Furthermore, the Prospectus Supplements contained the following language or

slight variation thereof pertaining to the Certificates' ratings:

> It is a condition to the issuance of the offered certificates that they be rated as
> indicated on page S-6 of this prospectus supplement.

RALI Series 2006-QA4 Prospectus Supplement, Form 424B5, filed May 26, 2006, at S-109; *see
also* RALI Series 2006-QO7 Prospectus Supplement, Form 424B5, filed September 29, 2006, at
S-126.

216.    Furthermore, in each Prospectus Supplement appears the following language or

variation thereof:

> Standard & Poor's ratings on mortgage pass-through certificates address the
> likelihood of the receipt by certificate-holders of payments required under the
> pooling and servicing agreement. Standard & Poor's ratings take into
> consideration the credit quality of the mortgage pool, structural and legal aspects
> associated with the certificates, and the extent to which the payment stream in the
> mortgage pool is adequate to make payments required under the certificates.
> Standard & Poor's rating on the certificates does not, however, constitute a
> statement regarding frequency of prepayments on the mortgages.

> *            *            *

> The rating assigned by Moody's to the offered certificates address the likelihood
> of the receipt by the offered certificate-holders of all distributions to which they
> are entitled under the pooling and servicing agreement. Moody's ratings reflect its
> analysis of the riskiness of the mortgage loans and the structure of the transaction
> as described in the pooling and servicing agreement.

*Id*.

217.    **Omitted Information:** The ratings stated in the Prospectus Supplements were

based on outdated models, lowered ratings criteria, and inaccurate loan information as set forth

in great detail above.  These flaws produced artificially high credit ratings for the Certificates,

making them appear less risky than they really were.  As such, the ratings set forth in the

Prospectus Supplements issued in connection with the Offerings did not accurately address the likelihood of receipt of any distributions, let alone "all distributions," as is apparent from the staggering percentage initially AAA rated Certificates which have since been downgraded to speculative or junk grades.

## VII.

## CLASS ACTION ALLEGATIONS

218.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure behalf of a class consisting of all persons or entities who acquired the Certificates issued by the Issuing Trusts, as set forth in ¶¶ 32-33 above, pursuant and/or traceable to the false and misleading Registration Statements and who were damaged thereby (the "Class").

219.    Excluded from the Class are Defendants, the officers and directors of the Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

220.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by RCC, RFC, RALI or their transfer agents and maybe notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.  Billions of dollars worth of Certificates were issued pursuant to the Registration Statements.

221.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

222.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

223.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are: whether Defendants violated the Securities Act; whether the Registration Statements issued by Defendants to the investing public negligently omitted and/or misrepresented material facts about the underlying mortgage loans comprising the pools; and to what extent the members of the Class have sustained damages and the proper measure of damages.

224.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## VIII.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### For Violation of § 11 of the Securities Act
### (Against RALI, the Individual Defendants and the Underwriter Defendants)

225.    Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein, to the extent that such allegations do not sound in fraud.

226.    This Cause of Action is brought pursuant to § 11 of the Securities Act, on behalf of Plaintiffs and the Class, against the Issuers of the Registration Statements, the Individual Defendants and the Underwriter of the Offerings.  This Cause of Action is predicated upon Defendants' strict liability for making material misleading statements and omitting material information from and in the Offering Documents.

227.    The Offering Documents were materially misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

228.    Defendant RALI, the Individual Defendants and the Underwriter Defendants are strictly liable to Plaintiffs and the Class for making the misstatements and omissions in issuing the Certificates.

229.    The Individual Defendants each signed one or both of the Registration Statements.

230.    The Underwriter Defendants acted as underwriter in the sale of Certificates issued by the Issuing Trusts, directly and indirectly participated in the distribution of the Certificates, directly and indirectly solicited offers to purchase the Certificates, and directly and indirectly participated in drafting and disseminating the Offering Documents for the Certificates.

94

923071.1 1

231.     Defendant RALI, the Individual Defendants and the Underwriter Defendants owed to the Plaintiffs and other Class members the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.

232.     Defendant RALI, the Individual Defendants and the Underwriter Defendants knew, or in the exercise of reasonable care should have known, of the material misstatements and omissions contained in or omitted from the Offering Documents as set forth herein.

233.     Defendant RALI, the Individual Defendants and the Underwriter Defendants failed to possess a reasonable basis for believing, and failed to make a reasonable investigation to ensure, that statements contained in the Offering Documents were true and/or that there was no omission of material facts necessary to make the statements contained therein not misleading.

234.     Defendant RALI, the Individual Defendants and the Underwriter Defendants issued and disseminated, caused to be issued or disseminated, and participated in the issuance and dissemination of material statements to the investing public which were contained in the Offering Documents, which made false and misleading statements and/or misrepresented or failed to disclose material facts, as set forth above.

235.     By reason of the conduct alleged herein, Defendant RALI, the Individual Defendants and the Underwriter Defendants each violated § 11 of the Securities Act, and are liable to Plaintiffs and the Class.

236.     Plaintiffs and other Class members acquired the Certificates pursuant and/or traceable to the Registration Statements.  At the time Plaintiffs and Class members obtained their

Certificates they did so without knowledge of the facts concerning the misstatements and omissions alleged herein.

237.    Plaintiffs and other Class members have sustained damages as a result of the wrongful conduct alleged and the violations of Defendant RALI, the Individual Defendants and the Underwriter Defendants.

238.    By virtue of the foregoing, Plaintiffs and other Class members are entitled to damages, jointly and severally from Defendant RALI, the Individual Defendants and the Underwriter Defendants, as set forth in § 11 of the Securities Act.

239.    This action is brought within one year after the discovery of the untrue statements and omissions contained in the Offering Documents and within three years of the Certificates being offered to the public.  Despite the exercise of reasonable diligence, Plaintiffs could not have reasonably discovered the untrue statements and omissions in the Offering Documents at an earlier time.

## SECOND CAUSE OF ACTION

### For Violation of § 12(a)(2) of the Securities Act
### (Against the Underwriter Defendants)

240.    Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein, to the extent that such allegations do not sound in fraud.

241.    This Cause of Action is brought pursuant to § 12(a)(2) of the Securities Act, on behalf of Plaintiffs and the Class, against the Underwriters of the Offerings.

242.    The Underwriter Defendants promoted and sold the Certificates pursuant to the defective Prospectus Supplements for their own financial gain.  The Prospectus Supplements contained untrue statements of material fact, omitted to state facts necessary to make statements not misleading, and concealed and failed to disclose material facts.

243.    The Underwriter Defendants owed to Plaintiffs and the other Class members who purchased Certificates pursuant to the Offering Documents, a duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents, to ensure that such statements were true and that there was no omission of material fact necessary to make the statements contained therein not misleading.

244.    The Underwriter Defendants knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the Offering Documents, as set forth herein.

245.    Plaintiffs and other Class members purchased or otherwise acquired Certificates pursuant to and/or traceable to the defective Offering Documents.  Plaintiffs did not know, and in the exercise of reasonable diligence could not have known, of the misrepresentations and omissions contained in the Offering Documents.

246.    By reason of the conduct alleged herein, The Underwriter Defendants violated § 12(a)(2) of the Securities Act, and are liable to Plaintiffs and other Class members who purchased Certificates pursuant to and/or traceable to the Offering Documents.

247.    Plaintiffs and other Class members were damaged by The Underwriter Defendants' wrongful conduct.  Those Class members who have retained their Certificates have the right to rescind and recover the consideration paid for their Certificates, as set forth in § 12(a)(2) of the Securities Act.  Those Class members who have sold their Certificates are entitled to rescissory damages, as set forth in § 12(a)(2) of the Securities Act.

248.    This action is brought within one year after the discovery of the untrue statements and omissions contained in the Offering Documents, within one year after reasonable discovery of the untrue statements and material omissions and within three years of when the Certificates

97

were sold to the public.  Despite the exercise of reasonable diligence, Plaintiffs could not have reasonably discovered the untrue statements and omissions in the Offering Documents at an earlier time.

### **THIRD CAUSE OF ACTION**

**Violations of § 15 of the Securities Act**
**(Against the Individual Defendants and the Underwriter Defendants)**

249.    Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein, to the extent that such allegations do not sound in fraud.

250.    This Cause of Action is brought pursuant to § 15 of the Securities Act against the Individual Defendants and the Underwriter Defendants.

251.    Each of the Individual Defendants, by virtue of his or her control, ownership, offices, directorship, and specific acts set forth above was, at the time of the wrongs alleged herein, a controlling person of RCC, RFC, RALI and the Issuing Trusts within the meaning of Section 15 of the Securities Act.  Each of the Individual Defendants had the power to influence, and exercised that power and influence, to cause RCC, RFC, RALI and the Issuing Trusts to engage in violations of the Securities Act, as described above.

252.    The Underwriter Defendants, by virtue of their control, influence, participation and solicitation of offers to purchase the Certificates and specific acts set forth above were, at the time of the wrongs alleged herein, controlling persons of RCC, RFC, RALI and the Issuing Trusts within the meaning of Section 15 of the Securities Act.  The Underwriter Defendants had the power to influence, and exercised that power and influence, to cause RCC, RFC, RALI and the Issuing Trusts to engage in violations of the Securities Act, as described above.

923071.1 1

253.   The Individual Defendants' and the Underwriter Defendants' control, position and influence made them privy to, and provided them with actual knowledge of, the material facts and omissions concealed from Plaintiffs and the other Class members.

254.   Each of the Individual Defendants were each a participant in the violations alleged herein, based on their having prepared, signed or authorized the signing of the Registration Statements and having otherwise participated in the consummation of the Offerings detailed herein.  The Defendants named herein were responsible for overseeing the formation and operation of the Issuing Trusts, including routing payments from the borrowers to investors.

255.   Individual Defendants prepared, reviewed and/or caused the Registration Statements and Prospectus Supplements to be filed and disseminated.

256.   Since the Defendants named herein controlled the ultimate decision of which mortgage loans would be included and excluded from the securitized pools of loans as well as the ultimate amount of credit enhancement required in order for the Certificates to be sold to investors, they controlled all material aspects relating to the acquisition, structure and sale of the Certificates and thus, the activities of the Issuing Trusts and Individual Defendants within the meaning Section 15 of the Securities Act.

257.   By virtue of the wrongful conduct alleged herein, the Individual Defendants and the Underwriter Defendants are liable to Plaintiffs and the other Class members for the damages sustained.

923071.1 1

## IX.

## <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

A.      Determining that this action is a proper class action and certifying Plaintiffs as Class representatives;

B.      Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.      Awarding rescission or a rescissory measure of damages; and

E.      Awarding such additional equitable, injunctive or other relief as deemed appropriate by the Court.

100

## JURY DEMAND

Plaintiffs hereby demand a trial by jury

Dated: New York, New York
       January 3, 2011

Respectfully submitted,

**COHEN MILSTEIN SELLERS & TOLL PLLC**

By: _____

     Joel P. Laitman
     Christopher Lometti
     Richard Speirs
     Michael B. Eisenkraft
     Daniel B. Rehns
     Kenneth M. Rehns
150 East 52nd Street, Thirtieth Floor
New York, New York 10022
Telephone: (212) 838-7797
Facsimile: (212) 8380-7745
*jlaitman@cohenmilstein.com*
*clometti@cohenmilstein.com*
*rspeirs@cohenmilstein.com*
*meisenkraft@cohenmilstein.com*
*drehns@cohenmilstein.com*
*krehns@cohenmilstein.com*

     Steven J. Toll *(pro hac vice)*
     Julie Goldsmith Reiser *(pro hac vice)*
     Joshua Devore *(pro hac vice)*
     S. Douglas Bunch
1100 New York Avenue, NW, Suite 500 West
Washington, D.C. 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
*stoll@cohenmilstein.com*
*jdevore@cohenmilstein.com*
*jreiser@cohenmilstein.com*
*dbunch@cohenmilstein.com*

*Lead Counsel for Plaintiffs New Jersey Carpenters
Vacation and Health Funds, Boilermaker
Blacksmith National Pension Trust, IPERS,
OCERS and Midwest OE and the Proposed Class*

923038.1 1

*-and-*

Robin F. Zwerling
Jeffrey C. Zwerling
Justin M. Tarshis
**ZWERLING, SCHACHTER &**
**ZWERLING, LLP**
41 Madison Avenue
New York, New York 10010
Telephone: (212) 223-3900
Facsimile: (212) 371-5969
*rzwerling@zsz.com*
*jzwerling@zsz.com*
*jtarshis@zsz.com*

*Counsel for the Police & Fire Retirement System of*
*the City of Detroit*

923038.1 1

## CERTIFICATE OF SERVICE

I, Daniel B. Rehns, counsel for the Plaintiffs, hereby certify that on January 3, 2011, I filed an original of the foregoing by hand with the Clerk of the Court and delivered a copy to all parties named herein and/or counsel of record in the within action by hand or first-class mail.

_____
Daniel B. Rehns

923038.1 1